GARMAN TURNER GORDON LLP
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail: tpilatowicz@gtg.legal
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone 725-777-3000
*[Proposed] Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>U.S.A. DAWGS INC.,<br><br>Debtor. | Case No.: BK-S-18-10453-LED<br><br>Chapter 11<br><br>Date:   OST Pending<br>Time:   OST Pending |

**OMNIBUS DECLARATION OF STEVEN MANN
IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION,
FIRST DAY MOTIONS, AND EMPLOYMENT APPLICATIONS**

I, Steven Mann, hereby declare as follows:

1. I am over the age of 18 and mentally competent and I make this declaration in support of U.S.A. Dawgs, Inc.'s ("Debtor") Chapter[1] 11 Petition, *Debtor's Emergency Motion For Entry of Interim Approval Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b); (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Use of Cash Collateral By Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor* (the "Cash Collateral Motion"); *Debtor's Emergency Motion for Order: (I) Authorizing Debtor to Pay Wages, Salaries, Benefits, and Other Employee Obligations; and (II) Authorizing and Directing Financial Institutions to Honor and*

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "LBR" shall refer to the Local Rules of Practice of the United States Bankruptcy Court, District of Nevada.

*Process Checks and Transfers Related to Such Obligations* (the "Employee Wage Motion"); *Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "Utility Motion" and together with the Cash Collateral Motion, the Employee Wage Motion, the Utility Motion, the "First Day Motions") and the *Application to Employ Garman Turner Gordon LLP as Debtor's Counsel* (the "GTG Motion," and together with the First Day Motions, the "Motions"). [2]

2. Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on January 31, 2018 (the "Petition Date").

3. I am the President of Debtor. In my capacity as such, I am familiar with Debtor's daily business, operations, and financial affairs. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

**A.     Debtor's Operations**

4. In the early 2000s, I suffered from excruciating back pain and required chiropractic visits at least multiple times per month to find relief. That all changed when I commenced wearing special footwear made of light-weight, ultra-soft, and easy to clean conforming material that proved to provide relief that I was unable to find anywhere else.

5. That concept formed the foundation of a company I initially founded in Canada called Double Diamond Distribution Ltd. ("Diamond"). Diamond began by developing and selling DAWGS Brand footwear. Finding initial success in Canada and realizing a greater ability to conduct business in the United States, I formed Debtor, a Nevada corporation, in June 2006. Debtor began substantive operations in 2007 and began shipping footwear in 2008.

---

[2] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

6. Soon after its launch, the DAWGS brand footwear label quickly became a significant competitor in the shoe industry's evolution towards new comfort, leading to substantial sales of merchandise.

7. Today, Debtor operates out of a 44,0000 square-foot warehouse (the "Property") in southwest Las Vegas and concentrates on distributing specialized quality and value priced footwear. Debtor currently employs a workforce of twenty-one people and in recent years has had sales ranging between $9 and $17 million per year in gross-revenue.

8. Debtor sells DAWGS branded products and other private labels including "Doggers" and "Hounds," which are owned by Diamond not only on its website, www.usadawgs.com (the "Website"), but also through third-party online sites, retailers, wholesalers, and catalog companies throughout the United States. In addition to its DAWGS brand and other private label brands of footwear, Debtor also sells Agiato and Steven Craig brands of apparel.

**B.    The Events Leading to Chapter 11.**

9. Despite its early success, Debtor has encountered more than its fair share of challenges. While Debtor has consistently been able to overcome these obstacles, the confluence of them has led Debtor to seek the protections of the Bankruptcy Code to protect its assets and creditors.

**1.    Debtor's 12-Year Litigation with Crocs, Inc.**

10. Within months of formation, by April 2006, Diamond found itself the target of Crocs, Inc. ("Crocs"), which claimed that certain of Diamond's DAWGS branded footwear infringed two patents. On March 31, 2006, Crocs filed a Complaint with the International Trade Commission ("ITC") against Diamond and other respondents. Three days later, on April 3, 2006, Crocs filed a lawsuit (the "2006 Lawsuit") against Diamond and other defendants, asserting the same two patents. The 2006 Lawsuit was stayed while the ITC investigation proceeded.

11. As the case made its way through the ITC, Diamond initially was successful. On April 11, 2008, the presiding Administrative Law Judge ("ALJ") found no violation by Diamond. On July 25, 2008, the ITC affirmed the ALJ's determination. However, on February

24, 2010, the U.S. Court of Appeals for the Federal Circuit issued a limited-scope decision reversing the ITC's determination. As a result, in 2011 the ITC issued remedial orders that prevented the importation of certain DAWGS branded footwear into the U.S.

12. In 2012, the 2006 Lawsuit was reopened and Crocs amended its complaint to add Debtor as a defendant. After Diamond filed a request for reexamination of one of Crocs' patents with the U.S. Patent Office, Crocs retaliated by suing Debtor's then-largest customer, CVS Pharmacy ("CVS"), five days later. Debtor subsequently sought reexamination of the other patent that Crocs had asserted, which is Crocs' cornerstone patent ("the '789 Design Patent"). The 2006 Lawsuit was then again stayed to allow the U.S. Patent Office to conduct the reexamination proceedings.

13. In 2013, 2016, and finally in 2017, the U.S. Patent Office rejected the '789 Design Patent as unpatentable. In the 2017 action, which was mailed on August 9, 2017, the U.S. Patent Office issued a Right of Appeal Notice rejecting the '789 Design Patent as unpatentable for the third time. Unless Crocs is successful in its efforts to overturn the decision of the U.S. Patent Office on appeal, the '789 Design Patent will be cancelled by the U.S. Patent Office.

14. The results of the reexamination of the '789 Design Patent have confirmed the belief long held by Diamond and Debtor that the patents asserted by Crocs are invalid and never should have been granted in the first place. However, the multiple rejections of the '789 Design Patent have not stopped Crocs from continuing to pursue litigation against Debtor. Crocs has also purposely used the existence of the lawsuit to harass Debtor's customers. As discussed above, in 2012, Crocs sued Debtor's largest customer, CVS. However, after CVS moved to dismiss the lawsuit against it, Crocs dismissed the suit instead of responding to the motion to dismiss, and filed a new lawsuit against CVS that same day in a different district. Debtor intervened in that lawsuit, which Crocs filed in the Southern District of Florida, and with a trial date five months away and discovery commencing in earnest, Crocs successfully moved to dismiss its own lawsuit over the opposition of Debtor. In addition to that obviously harassing lawsuit, Crocs issued subpoenas to dozens of Debtor's customers. More recently, over the past few months, Crocs has used the customer list supplied by Debtor in the litigation to contact

Debtor's customers and threaten them with lawsuits. The foregoing actions have strained Debtor's relationship with its customers and, in many cases, caused Debtor's customers to diminish or cease their business with Debtor.

15. While Crocs' claims against Debtor in the 2006 Lawsuit are without merit, Debtor has been forced to expend large sums defending against them. In contrast to Crocs' claims, Debtor has also raised counterclaims against Crocs, which Debtor believes to be of substantial value. In essence, Crocs has been falsely promoting the material from which its footwear is made as "patented," "proprietary," and "exclusive," for the past fifteen years, when the material is none of those things. While Debtor's claims against Crocs (and against eighteen current and former Crocs officers and directors) has already survived motions to dismiss, Debtor has had to expend significant resources ensuring that it is able to bring the litigation to a successful resolution.

16. Today, two cases remain pending between Debtor and Diamond, and Crocs and its current and former officers: (1) *Crocs, Inc. v. Effervescent et al*, Civil Action No. 06-cv-605 pending in the United States District Court for the District of Colorado; and (2) *U.S.A. Dawgs, Inc. v. Snyder, et al.*, Civil Action No. 16-cv-2004 pending in the United States District Court for the District of Colorado (collectively, the "Crocs Litigation"). Debtor and Diamond have also sought to have the ITC modify or rescind the exclusion order that prevents the importation of certain DAWGS brand footwear into the U.S. The ITC's denial of the petition of Debtor and Diamond is now in front of the U.S. Court of Appeals for the Federal Circuit, in Case No. 18-1219.

**2. Debtor's Largest Customer Files for Bankruptcy and Its Customers Continued to be Threatened by Crocs.**

17. Debtor operates with a myriad of online retailers for which it acquires and stocks products and fulfills online orders.

18. One such retailer was Choxi.com, Inc. f/k/a Nomorerack ("Choxi"). Choxi unexpectedly (to Debtor, at least) found itself the subject of an involuntary Chapter 7 bankruptcy filing in the United States Bankruptcy Court for the Southern District of New York on November

Garman Turner Gordon
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

5

10, 2016. On December 5, 2016, Choxi filed a voluntary petition under Chapter 11, which case remains pending as Case No. 1613131.

19. Choxi and Debtor's business relationship was irreparably harmed as a result of the bankruptcy filing, which caused Debtor's sales to Choxi to be significantly reduced from between $7 million and $9 million per year in 2014 and 2015 to zero as a result of Choxi's bankruptcy. In addition, Debtor holds an unpaid claim against Choxi of approximately $78,000.

20. This, compounded with the aggressive and improper attack by Crocs on Debtor's other customers, resulted in a temporary income decline that Debtor has steadily been rebuilding.

### 3. Lender Breaches the Loan Agreement and Refuses to Provide Adequate Funding to Debtor.

21. From its inception until approximately 2012, Debtor operated without any traditional corporate financing in place, instead funding its operations primarily through revenue. However, given the strains caused by the Crocs Litigation and Crocs' improper tactics to interfere with Debtor's relationship with its customers, Debtor found itself in a position of having to locate outside financing.

22. As I am a Canadian citizen and given the pending Crocs Litigation, traditional funding from Debtor's operations were not readily available. Therefore, Debtor was forced to seek unconventional financing, which came with burdensome terms and extraordinary interest rates. Debtor located such funding through GemCap Lending I, LLC ("Lender").

23. On or about October 24, 2012, Debtor entered into the *Loan and Security Agreement by and between GemCap Lending I, LLC as Lender and U.S.A. Dawgs Inc. as Borrower* (the "Loan Agreement") which provided for lending (the "Revolving Loan Commitment") up to the lesser of: (1) $2,000,000 (the "Maximum Credit") or, the Borrowing Base, calculated as set forth in 1.15 of the Loan Agreement (the "Borrowing Base Calculation"). A true and correct of the Loan Agreement is attached hereto as **Exhibit "1."**

24. Concurrently with the Loan Agreement, Lender and Debtor executed the *Loan Agreement Schedule* dated as of October 24, 2014 (the "Loan Agreement Schedule"), (ii) *Secured Promissory Note (Revolving Loans)* dated as of October 24, 2012 (the "Promissory

Note"); and (iii) other Loan Documents (collectively, the "Loan Documents"). The original maturity date (the "Maturity Date") under the Promissory Note was October 2014. True and correct copies of the Loan Documents are attached hereto as **Exhibits "2" - "4."**

25. The Loan Agreement is guaranteed by both myself and Barrie Mann, one of Debtor's other owners.

26. The Loan Agreement provides for substantial fees to Lender in addition to an annual interest rate of 17%, and a default rate of 24%. In addition, the Loan Agreement specifically provided for amounts to be advanced over the Revolving Loan Commitment, defined as "Overadvances." See Loan Agreement and Loan Documents.

27. The revolving loan works as follows, Lender initially provides funding secured by Debtor's inventory and accounts receivables and is repaid in part as the accounts receivables are paid. Then, based on a formula involving the value of the inventory and receivables, Lender advances additional funds that Debtor uses for business expenses and operations, which loan is repaid in part through the accounts receivable. The revolving loan payments are called Advances.

28. Lender quickly realized the strength of Debtor's business and, through a series of seven amendments over approximately five years, Lender continually increased the amount available under the Revolving Loan Commitment and amended certain terms in the Loan Agreement and Loan Documents. The amendments (collectively, the "Loan Agreement Amendments")[3] provide as follows:

    a. *Amendment No. 1 to Loan and Security Agreement* (the "First Loan Amendment") dated December 9, 2013 - Increased the Revolving Loan Commitment from $2,000,000 to $2,500,000. A true and correct copy of the First Loan Amendment is attached hereto as **Exhibit "6."**

    b. *Amendment No. 2 to Loan and Security Agreement* (the "Second Loan Amendment") dated January 30, 2014 – Increased the Revolving Loan

---

[3] The Loan Agreement Amendments generally had corresponding amendments to the Loan Documents.

Commitment from $2,500,000 to $3,000,000. A true and correct copy of the Second Loan Amendment is attached hereto as **Exhibit "7."**

c. *Amendment No. 3 to Loan and Security Agreement* (the "Third Loan Amendment") dated March 15, 2014 – (1) Increased the Revolving Loan Commitment from $3,000,000 to $4,500,000; (2) Extended the Maturity Date to March 31, 2015; and (3) decreased the interest rate commencing March 15, 2014 from 17% to 13%. A true and correct copy of the Third Loan Amendment is attached hereto as **Exhibit "8."**

d. *Amendment No. 4 to Loan and Security Agreement* (the "Fourth Loan Amendment") dated November 25, 2014 – (1) Increased the Revolving Loan Commitment from $4,500,000 to $5,500,000 and (2) Extended the Maturity Date to March 31, 2015. A true and correct copy of the Fourth Loan Amendment is attached hereto as **Exhibit "9."**

e. *Amendment No. 5 to Loan and Security Agreement and to the Loan Agreement Schedule* (the "Fifth Loan Amendment") dated April 9, 2015 – (1) Increased the Revolving Loan Commitment from $5,500,000 to $7,500,000; (2) extended the Maturity Date to March 31, 2016; and (3) Increased the interest rate to 15%. A true and correct copy of the Fifth Loan Amendment is attached hereto as **Exhibit "10."**

f. *Amendment No. 6 to Loan and Security Agreement* (the "Sixth Loan Amendment") dated March 31, 2016 – Extended the Maturity Date to March 31, 2017. A true and correct copy of the Sixth Loan Amendment is attached hereto as **Exhibit "11."**

g. *Amendment No. 7 to Loan and Security Agreement and to the Loan Agreement Schedule* (the "Seventh Loan Amendment") dated April 1, 2017 – (1) decreased the Maximum Credit to $5,500,000; (2) Extended the Maturity Date to March 31, 2018; and (3) Increased the interest rate to the greater of (I) fifteen percent and (II) sum of (i) the "Prime Rate" as reported in the "Money

Rates" column of The Wall Street Journal, adjusted as and when such prime rates changes plus (ii) eleven percent (11%). A true and correct copy of the Seventh Loan Amendment is attached hereto as **Exhibit "12."**

29. Debtor's strong operations proved to be an incredible investment for Lender which, on average, received interest (at the rate of between 13% and 17%) and significant fees Since October 2012, Debtor has paid Lender over $3,200,000 in interest and fees. Recently, for example, in Debtor's fiscal year 2016, Debtor paid Lender over $910,000 in interest and fees, and in fiscal year 2017, Debtor paid Lender over $759,000 in interest and fees. These amounts are *in addition to principal repayment*.

30. Consistent therewith, in its approximately five-year history with Lender, Debtor's assets always supported a sufficient Borrowing Base to obtain adequate capital and Overadvances were never necessary nor utilized.

31. Debtor has also repaid significant principal. For example, on December 31, 2015, the loan balance was approximately $5,900,000, and in January 2018, Lender acknowledges that the outstanding loan balance had been reduced to at least approximately $3,800,000. Thus, the loan balance was reduced by $2,100,000 in a short period of twenty-five months (while Dawgs was paying huge amounts of interest, as specified above).

32. However, despite receiving all of the aforementioned payments, inexplicably, by mid-2017, Lender decreased the Revolving Loan Commitment and begin reducing the Borrower Base to prevent Debtor from obtaining sufficient funds to adequately continue operations. Based on Lender's own comments and publicly available information, it appears that Lender's decrease may have been a result of Lender's own cash-flow concerns, including a number of underperforming loans in its portfolio.

33. Compounding Lender's limit to proper access to funds, contrary to the express Borrowing Procedures,[4] as well as the parties' course of conduct since October 2012, in order to

---

[4] Pursuant to the Borrowing Procedures, "[w]henever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ('Borrowing Certificate') no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of all Accounts, (B) a schedule

delay timely providing the required Advances, for months, Lender began demanding information not required in the Borrowing Certificate as a condition to providing the requested Advances. Further exacerbating the harm, Lender often intentionally made these demands minutes before the Advance deadline to ensure that the Advance could not be made until the next day. Lender made these demands in spite of the fact that it conducted extensive audits of Debtor that lasted weeks on at least an annual basis, and had constant access to Debtor's financial information and status.

34. The cumulative result was that Debtor was prohibited from borrowing up to its Revolving Loan Commitment of $5,500,000. Instead, with more than $1,600,000 available under the Revolving Loan Commitment, Lender contended the Borrowing Base had become insufficient and, refused to provide the funds customarily provided in order for Debtor to meet its normal business operations, including its payroll liabilities.

35. Also in mid-2017, Lender presented the *Amendment Number 8 to the Loan and Security Agreement and the Loan Agreement Schedule* (the "Eighth Loan Amendment") providing for an Overadvance of $240,000 at an immediate fee to Lender of $50,000 payable at approximately $17,000 per month for three months. A true and correct copy of the Eighth Loan Amendment is attached hereto as **Exhibit "13."**

36. In addition to the significant fees obtained by Lender as a result of the Overadvance, Lender demanded that, in exchange for providing the $240,000 Advance, in addition to the interest in the inventory and accounts receivable, Debtor grant Lender a security interest in the Crocs Litigation. This occurred after Debtor informed Lender of the significant value of the Crocs Litigation

---

(continued)
of Eligible Accounts setting forth the calculation of the Eligible Accounts on which such Advance is to be based and a calculation of the Advance requested in connection therewith, (C) a schedule of all Inventory, and (D) a schedule of Eligible Inventory setting forth the calculation of Eligible Inventory on which such Advance is to be based and the calculation of the Advance requested in connection therewith, together with copies of documentation evidencing the purchase and Cost of the Eligible Inventory on which such Advance is to be based, which Borrowing Certificate shall in all respects be subject to Lender's review and approval."

37. Pursuant to the Loan Agreement Schedule, Lender is obligated to apply the collection of proceeds and collateral: first, to Overadvances; second, to all fees costs and expenses; third, to accrued and unpaid interest; and fourth, to matured and unpaid obligations.

38. On August 22, 2017, following the $240,000 Overadvance, the balance under the Loan Agreement was $4,453,175.28. Since August 2017, in excess of $2,000,000 has been collected by from Debtor by Lender. As set forth in the Loan Agreement Schedule, the first $240,000 of the over $2 million received should have been applied to the Overadvance. However, Lender has failed to properly apply the funds it has received to the Overadvance.

39. Lender continues to take all of Debtor's receivables while refusing to provide sufficient and proper Advances thereon. For example, between December 22, 2017 through January 24, 2018, Lender directly received more than $400,000 in cash receivables from Debtor's sales. Lender, in turn, has only provided Advances of $23,100 during that same time period. At the same time, Lender sharply reduced Advances requested by Debtor in certain instances and in others outright refused to provide any Advances at all. Since January 11, 2018, Lender funded only one Advance for $3,600. Lender has failed to provide information as to how it has applied the $400,000 received.

40. Furthermore, Lender has made demand on Debtor to quickly reduce inventory in order to provide additional payments to Lender. While Debtor believes that doing so does not maximize the value of the inventory, Lender has left Debtor with no other choice, yet uses such reduced sales as further purported evidence of a decreased Borrowing Base.

41. It became increasingly clear to Debtor that Lender was attempting to manufacture defaults and to quickly obtain Debtor's assets in order to address its own liquidity concerns. Moreover, Lender's intention to force Debtor to go out of business and/or to take control of Debtor and of the Crocs Litigation is further evidenced by the fact that Lender has been consistently aware of the precise financial condition and needs of Debtor.

42. Sure enough, despite *its own breaches* of the Loan Agreement commencing, at the latest, in mid-2017, on January 23, 2018, Lender delivered a *Notice of Default* (the "Notice of

Default") to Debtor contending that *Debtor was in breach* of the Loan Agreement for the following:

> Borrower has failed to comply with certain representations and warranties and covenants and conditions set forth in the Loan Agreement, including, but not limited to, the following:
>
> • Section 9.1 (Notify Lender) – Borrower failed to notify Lender of all material adverse information relating to the financial condition of Borrower.
>
> • Section 9.4 (Observe Covenants, etc.) – Borrower failed to observe its covenant to timely pay interest on the Loan and to cause all Collections with respect to all Accounts to be directed to Lender and deposited into the Collection Account.
>
> In addition, Events of Default as described in the Loan Agreement have occurred (such Events of Default are referred to as the "Specified Events of Default"), including, but not limited to, the following:
>
> • Section 11.1 (Failure to Pay) – Borrower failed to pay interest when due.
>
> • Section 11.2 (Failure of Insurance)
>
> • Section 11.3 (Failure to Perform) - Borrower failed to notify Lender of all material adverse information relating to the financial condition of Borrower and failed to observe its covenant to cause all Collections with respect to all Accounts to be directed to Lender and deposited into the Collection Account.
>
> • Section 11.9 (Change of Condition

A true and correct copy of the Notice of Default is attached hereto as **Exhibit "14."**

43. As a result, Lender (i) accelerated the payment of all obligations under the Loan Agreement and demanded immediate payment of the same on or before 5:00 p.m. EST on January 26, 2018, (ii) purported to increase the interest rate under the Loan Agreement to the default rate of 24%; and (iii) demanded that Debtor assemble and make available to Lender all the Collateral at any place and time designated by Lender. Lender assert that the amount due as of the Petition Date is $3,895,104.83.

44. The following day, on January 24, 2018, Debtor sent a letter to Lender refuting Lender's assertions that Debtor had breached the Loan Agreement. The letter also explained that Lender had in fact breached its own obligations under the Loan agreement, including:

- Improper and artificial deflation of borrowing base under Section 1.15;

- Improper denial and delay of funding advances under Section 1(v);

- Improper application of payments under Section 1(x); and

- Failure to act fairly and in good faith.

A true and correct copy of the January 24, 2018 letter from Debtor to Lender is attached hereto as **Exhibit "15."**

45. Debtor requires breathing room to refocus its efforts from dealing with Lender's interruptions to maximizing the value of its estate and investigating its options against Lender regarding its improper breach of the Loan Agreement.

46. Debtor also has significant assets to protect. Debtor estimates, through extensive evaluation, its potential recovery in the Crocs Litigation could reach hundreds of millions of dollars, and is extremely likely to exceed tens of millions of dollars.

47. Debtor also holds approximately $6,000,000 of inventory at cost which, based on sales prices over the last twelve months (which themselves were reduced prices due to the pressure applied by Lender explained above) would be sold for approximately $18,000,000. In a normalized environment, without the pressure from Lender, this same inventory should be sold for in excess of $25,000,000. Contrary to typical fashion products, which may decrease in value as trends change, Debtor's inventory consists of functional evergreen products which Debtor has sold for the past ten-years, and Debtor anticipates being able to sell for several more years to come. Debtor also holds more than $450,000 in accounts receivable which Debtor anticipates are collectible. Debtor holds other assets too, including a customer list of over 500,000 customers.

48. Notably, without Lender's continued interference and with proper access to its income, Debtor has sufficient funds, and sufficient history of running a profitable operation, to continue operations and proceed towards proposing a plan of reorganization for the benefit Debtor, the estate, and its creditors.

## FIRST DAY MOTIONS AND EMPLOYMENT APPLICATIONS

49. Debtor has commenced its Chapter 11 Case in response to the above-discussed challenges and to protect and maximize its assets. Debtor's transition into its Chapter 11 proceeding must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy. It is important to minimize the distractions to Debtor's business operations that could result from Debtor petitioning for Chapter 11 relief.

50. I have reviewed and am generally familiar with the contents of each of the First Day Motions. Based on that familiarity and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable Debtor to operate in its Chapter 11 Cases with minimal disruption or loss of productivity or value. I also believe that the First Day Motions are vital to Debtor's reorganization efforts and are in the best interests of Debtor and its creditors. Further, I request approval of the GTG Motion in the ordinary course.

**A.    The Cash Collateral Motion.**

51. On the Petition Date, Debtor had cash and cash equivalents located on the Property as of the Petition Date (the "Cash on Hand") and cash in its bank accounts as of the Petition Date (the "Deposit Accounts") in the approximate aggregate sum of $34,500. Such cash was not in the possession of or under the control of Lender.

52. Debtor cannot meet its ongoing post-position obligations unless it has the immediate ability to use Cash on Hand, the Deposit Accounts, and the cash generated or received by Debtor from and after the Petition Date (the "Post-Petition Cash"). In the absence of such use, immediate and irreparable harm will result to Debtor, its estate, and its creditors, and will render an effective and orderly reorganization of Debtor's business impossible.

53. An integral aspect of maintaining Debtor's business operations is Debtor's ability to use Cash on Hand, the Deposit Accounts, and Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary business expenses. Debtor also requires the use of the Cash Collateral to obtain new inventory to generate additional accounts receivable

54. As exemplified by the Budget, Debtor is solely seeking to utilize the Cash Collateral to maintain the value of the business, to satisfy its obligations to its customers, and to pay its necessary operating expenses. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or continue Debtor's operations, which is the sole means of generating revenue, thereby increasing the value of Debtor's business and providing the resources for Debtor to effectuate its Chapter 11 plan and an expeditious resolution of this Chapter 11 Case.

55. Debtor also believes, as to the intellectual property and Crocs Litigation, the Collateral will not diminish in value.

**B.    The Employee Wage Motion.**

56. As of the Petition Date, Debtor employed approximately twenty-one employees ("Employees") in the ordinary course of its business. Continued service by the Employees is vital to the value and preservation of Debtor's assets.

57. As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Debtor for wages and salaries incurred in the ordinary course of Debtor's business, including any prepetition compensation (collectively, the "Wage Obligations"). The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is approximately $50,000. Debtor pays its Employees on a bi-monthly payroll cycle on the 4th and 19th days of each month. The last payroll was made on January 19, 2018 for wages accrued through January 15, 2018.

58. Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that Debtor has deducted funds from

the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

59. In addition, Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

60. In addition, in the ordinary course of its business, Debtor has accrued amounts for health insurance programs pertaining to services rendered by the Employees prior to the Petition Date (the "<u>Employee Benefit Plans</u>"). These employee benefit contributions (the "<u>Employee Benefit Contributions</u>") are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date is estimated to be approximately $17,000.

61. Debtor's Employee Obligations to be paid to or for the benefit of each of the Employees pursuant to and the Employee Wage Motion will not exceed $12,850.00 per employee.

62. If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that certain essential Employees will resign and that those Employees that remain will be discontented.

63. Debtor anticipates that it will have sufficient cash to honor all of the foregoing Employee Obligations.

64. Continued payment of Wage Obligations and Employee Benefit Contributions are essential to preserve the morale and to maintain positive relations between Debtor and its Employees. If the relief requested in the Motion is not granted, the success of Debtor's Chapter 11 Case will be placed in substantial jeopardy.

## C.  The Utility Motion.

65. In the ordinary course of its business, Debtor incurs utility expenses for security monitoring, electricity, waste management, telephone, and internet.  These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on **Exhibit "2"** to the Utility Motion (the "Utility Service List").

66. On average, Debtor spends approximately $4,300 each month on utility costs.[5]  As of the Petition Date, Debtor believes it is substantially current on utility payments as set forth in the Utility Service List that came due on or before the Petition Date.  Debtor does owe a small pre-petition balance to Republic Services and Nevada Energy.

67. Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its Chapter 11 Case.  Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively affecting customer relationships and revenues.  Such a result could jeopardize Debtor's reorganization efforts and, ultimately, the value of Debtor's assets.  It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

68. Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner.  Debtor expects that it will have ample funds, based upon post-petition operations, to pay its post-petition obligations to its Utility Providers.

69. To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $4,500 (representing more than one month's average utility expense) to be segregated and available for payment of utility payments (the "Utility Reserve").  The Utility Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively, with the Utility Reserve, the "Proposed Adequate Assurance").  Debtor submits

---

[5] To calculate the approximate monthly expenditure for utility costs, Debtor determined the average costs based on actual costs over a twelve-month period.

that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

70. The proposed Procedures are necessary for Debtor to carry out its Chapter 11 efforts. If they are not approved, Debtor could be forced to address a host of requests by its Utility Providers in a disorganized manner during the critical first weeks of its Chapter 11 Case. Moreover, Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly electricity, could essentially shut down operations, and any significant disruption of operations could put the Debtor's reorganization efforts in jeopardy.

**D.      The GTG Motion.**

71. Debtor has selected GTG as its attorneys because of the firm's knowledge of Debtor's business and financial affairs and GTG's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code.

72. The terms of GTG's retention are set forth in the Amended Engagement Agreement (the "GTG Retention Agreement") attached to the GTG Motion as **Exhibit "1."** The GTG Retention Agreement permits GTG to bill Debtor for services performed at current hourly rates and current charges for certain expenses, and that such matters are subject to reconsideration on a semi-annual basis. Talitha Kozlowski is the attorney principally responsible for the representation and her rate is $445 per hour.

. . .

. . .

. . .

. . .

73. During the course of this representation, GTG has become familiar with Debtor's business, financial affairs, and capital structure. Accordingly, GTG has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of Debtor's Chapter 11 Case. GTG is both well-qualified and able to represent Debtor in its Chapter 11 Case in a most efficient and timely manner.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 1st day of February, 2018.

_____
STEVEN MANN