GARMAN TURNER GORDON LLP
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail:  tgray@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail:  tpilatowicz@gtg.legal
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone: 725-777-3000
Facsimile: 725-777-3112
*[Proposed] Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-18-10453-LED |
| U.S.A. DAWGS, INC., | Chapter 11 |
| Debtor. | |
| U.S.A. DAWGS, INC. | Adversary No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| GEMPCAP LENDING I, LLC, a Delaware limited liability company; | |
| Defendant. | |

U.S.A. Dawgs, Inc., debtor and debtor-in-possession ("Debtor" or "Plaintiff"), by and through its counsel, the law firm of Garman Turner Gordon LLP, for its Complaint against GEMCAP LENDING I, LLC ("Lender"), a secured-creditor in the above-captioned Chapter 11 bankruptcy case (the "Chapter 11 Case"), states and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      On January 31, 2018 (the "Petition Date"), Debtor filed a voluntary bankruptcy

petition under Chapter 11 of the United States Bankruptcy Code, thereby commencing the Chapter 11 Case.

2.    Defendant Lender is a Delaware limited liability company.  Upon information and belief, Lender is not authorized to conduct business in Nevada. Lender can be served with process via its registered agent at National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware, 19904.

3.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157 and 1334.

4.    Venue of this proceeding is proper in this District pursuant to 28 U.S.C. §1409.

5.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

## FACTUAL ALLEGATIONS

### A.    Debtor's Operations

1.    In the early 2000s, Steven Mann ("Mann"), founder, president, and chief executive officer of Plaintiff, suffered from excruciating back pain and required chiropractic visits at least multiple times per month to find relief.  That all changed when Mann commenced wearing special footwear made of light-weight, ultra-soft, and easy to clean conforming material that proved to provide relief that he was unable to find anywhere else.

2.    That concept formed the foundation of a company Mann founded in Canada called Double Diamond Distribution Ltd. ("Diamond"). Diamond began by developing and selling DAWGS Brand footwear. Finding initial success in Canada and realizing a greater ability to conduct business in the United States, Mann formed Debtor, a Nevada corporation, in June 2006. Debtor began substantive operations in 2007 and began shipping footwear in 2008.

3.    Soon after its launch, the DAWGS brand footwear label quickly became a significant competitor in the shoe industry's evolution towards new comfort, leading to substantial sales of merchandise.

4.    Today, Debtor operates out of a 44,0000 square-foot warehouse (the "Property") in southwest Las Vegas and concentrates on distributing specialized quality and value priced

footwear. Debtor currently employs a workforce of twenty-one people and in recent years has had sales ranging between $9 and $17 million per year in gross-revenue.

5.      Debtor sells DAWGS branded products and other private labels including "Doggers" and "Hounds," which are owned by Diamond not only on its website, www.usadawgs.com (the "Website"), but also through third-party online sites, retailers, wholesalers, and catalog companies throughout the United States. In addition to its DAWGS brand and other private label brands of footwear, Debtor also sells Agiato and Steven Craig brands of apparel.

**B.      Lender Breaches the Loan Agreement and Refuses to Provide Adequate Funding to Debtor, Causing Significant Strain and Harm to Debtor' Business Operations.**

6.      From its inception until approximately 2012, Debtor operated without any traditional corporate financing in place, instead funding its operations primarily through revenue. However, given the strains caused by various litigation (the "Crocs Litigation") with Crocs. Inc. ("Crocs") and Crocs' improper tactics to interfere with Debtor's relationship with its customers, Debtor found itself in a position of having to locate outside financing.

7.      As Mann is a Canadian citizen and given the pending Crocs Litigation, traditional funding for Debtor's operations was not readily available. Therefore, Debtor was forced to seek unconventional financing, which came with burdensome terms and extraordinary interest rates. Debtor located such funding through Lender.

8.      On or about October 24, 2012, Debtor entered into the *Loan and Security Agreement by and between GemCap Lending I, LLC as Lender and U.S.A. Dawgs Inc.as Borrower* (the "Loan Agreement") which provided for lending (the "Revolving Loan Commitment") up to the lesser of: (1) $2,000,000 (the "Maximum Credit") or, the Borrowing Base, calculated as set forth in 1.15 of the Loan Agreement (the "Borrowing Base Calculation"). A true and correct of the Loan Agreement is attached hereto as **Exhibit "1."**

9.      Concurrently with the Loan Agreement, Lender and Debtor executed the *Loan Agreement Schedule* dated as of October 24, 2014 (the "Loan Agreement Schedule"), (ii) *Secured Promissory Note (Revolving Loans)* dated as of October 24, 2012 (the "Promissory Note"); and

(iii) other Loan Documents (collectively, the "Loan Documents").  The original maturity date (the "Maturity Date") under the Promissory Note was October 2014.  True and correct copies of the Loan Documents are attached hereto as **Exhibits "2" - "4."**

10.    The Loan Agreement provides for substantial fees to Lender in addition to an annual interest rate of 17%, and a default rate of 24%.  In addition, the Loan Agreement specifically provided for amounts to be advanced over the Revolving Loan Commitment, defined as "Overadvances." See Loan Agreement and Loan Documents.

11.    The revolving loan (the "Loan") works as follows, Lender initially provides funding secured by Debtor's inventory and accounts receivable and is repaid in part as the accounts receivable are paid.  Then, based on a formula involving the value of the inventory and receivables, Lender advances additional funds (the "Advances") that Debtor uses for business expenses and operations, which loan is repaid in part through the accounts receivable.

12.    Lender quickly realized the strength of Debtor's business and, through a series of seven amendments over approximately five years, Lender continually increased the amount available under the Revolving Loan Commitment and amended certain terms in the Loan Agreement and Loan Documents.  The amendments (collectively, the "Loan Agreement Amendments")[1] provide as follows:

   a.    *Amendment No. 1 to Loan and Security Agreement* (the "First Loan Amendment") dated December 9, 2013 - Increased the Revolving Loan Commitment from $2,000,000 to $2,500,000.  A true and correct copy of the First Loan Amendment is attached hereto as **Exhibit "6."**

   b.    *Amendment No. 2 to Loan and Security Agreement* (the "Second Loan Amendment") dated January 30, 2014 – Increased the Revolving Loan Commitment from $2,500,000 to $3,000,000.  A true and correct copy of the Second Loan Amendment is attached hereto as **Exhibit "7."**

---

[1] The Loan Agreement Amendments generally had corresponding amendments to the Loan Documents.

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

c. *Amendment No. 3 to Loan and Security Agreement* (the "<u>Third Loan Amendment</u>") dated March 15, 2014 – (1) Increased the Revolving Loan Commitment from $3,000,000 to $4,500,000; (2) Extended the Maturity Date to March 31, 2015; and (3) decreased the interest rate commencing March 15, 2014 from 17% to 13%. A true and correct copy of the Third Loan Amendment is attached hereto as **Exhibit "8."**

d. *Amendment No. 4 to Loan and Security Agreement* (the "<u>Fourth Loan Amendment</u>") dated November 25, 2014 – (1) Increased the Revolving Loan Commitment from $4,500,000 to $5,500,000 and (2) Extended the Maturity Date to March 31, 2015. A true and correct copy of the Fourth Loan Amendment is attached hereto as **Exhibit "9."**

e. *Amendment No. 5 to Loan and Security Agreement and to the Loan Agreement Schedule* (the "<u>Fifth Loan Amendment</u>") dated April 9, 2015 – (1) Increased the Revolving Loan Commitment from $5,500,000 to $7,500,000; (2) extended the Maturity Date to March 31, 2016; and (3) Increased the interest rate to 15%. A true and correct copy of the Fifth Loan Amendment is attached hereto as **Exhibit "10."**

f. *Amendment No. 6 to Loan and Security Agreement* (the "<u>Sixth Loan Amendment</u>") dated March 31, 2016 – Extended the Maturity Date to March 31, 2017. A true and correct copy of the Sixth Loan Amendment is attached hereto as **Exhibit "11."**

g. *Amendment No. 7 to Loan and Security Agreement and to the Loan Agreement Schedule* (the "<u>Seventh Loan Amendment</u>") dated April 1, 2017 – (1) decreased the Maximum Credit to $5,500,000; (2) Extended the Maturity Date to March 31, 2018; and (3) Increased the interest rate to the greater of (I) fifteen percent and (II) sum of (i) the "Prime Rate" as reported in the "Money Rates" column of The Wall Street Journal, adjusted as and when such prime rates changes plus

(ii) eleven percent (11%).   A true and correct copy of the Seventh Loan Amendment is attached hereto as **Exhibit "12."**

13.    Debtor executed the Loan Agreement and the Loan Agreement Amendments in Las Vegas, Nevada.

14.    Debtor's strong operations proved to be an incredible investment for Lender which, on average, received interest (at the rate of between 13% and 17%) and significant fees. Since October 2012, Debtor has paid Lender over $3,200,000 in interest and fees.  Recently, for example, in Debtor's fiscal year 2016, Debtor paid Lender over $910,000 in interest and fees, and in fiscal year 2017, Debtor paid Lender over $759,000 in interest and fees. These amounts are *in addition to principal repayment*.

15.    Consistent therewith, in its approximately five-year history with Lender, Debtor's assets always supported a sufficient Borrowing Base to obtain adequate capital and Overadvances were never necessary nor utilized. Prior to mid-2017, it would have been uncommon for any Advance requested by Debtor to be denied. Debtor relied on Lender's consistent conduct in providing requested Advances from 2012 to mid-2017 in its belief that Lender would continue such conduct and continue providing Advances upon Debtor's request.

16.    Debtor has also repaid significant principal. For example, on December 31, 2015, the loan balance was approximately $5,900,000, and in January 2018, Lender acknowledges that the outstanding loan balance had been reduced to at least approximately $3,800,000.  Thus, the loan balance was reduced by $2,100,000 in a short period of twenty-five months (while Dawgs was paying huge amounts of interest, as specified above).

17.    However, despite receiving all of the aforementioned payments, inexplicably, by mid-2017, Lender began reducing the Borrowing Base to prevent Debtor from obtaining sufficient funds to adequately continue operations.  Based on Lender's own comments and publicly available information, it appears that Lender's decrease may have been a result of Lender's own cash-flow concerns, including a number of underperforming loans in its portfolio.

18.     Compounding Lender's limit to proper access to funds, contrary to the express Borrowing Procedures,[2] as well as the parties' course of conduct since October 2012, in order to delay timely providing the required Advances, for months, Lender began demanding information not required in the Borrowing Certificate as a condition to providing the requested Advances. Further exacerbating the harm, Lender often intentionally made these demands minutes before the Advance deadline to ensure that the Advance could not be made until the next day.  Lender made these demands in spite of the fact that it conducted extensive audits of Debtor that lasted weeks on at least an annual basis, and had constant access to Debtor's financial information and status.

19.     The cumulative result was that Debtor was prohibited from borrowing up to its Revolving Loan Commitment of $5,500,000.  Instead, with more than $1,600,000 available under the Revolving Loan Commitment, Lender contended the Borrowing Base had become insufficient and, refused to provide the funds customarily provided in order for Debtor to meet its normal business operations, including its payroll liabilities.

20.     Also, in mid-2017, Lender presented the *Amendment Number 8 to the Loan and Security Agreement and the Loan Agreement Schedule* (the "Eighth Loan Amendment") providing for an Overadvance of $240,000 at an immediate fee to Lender of $50,000 payable at approximately $17,000 per month for three months.  A true and correct copy of the Eighth Loan Amendment is attached hereto as **Exhibit "13."**

21. In addition to the significant fees obtained by Lender as a result of the Overadvance, Lender demanded that, in exchange for providing the $240,000 Advance, in addition to the interest in the inventory and accounts receivable, Debtor grant Lender a security interest in the Crocs

---

[2] Pursuant to the Borrowing Procedures, "[w]henever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ('Borrowing Certificate') no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of all Accounts, (B) a schedule of Eligible Accounts setting forth the calculation of the Eligible Accounts on which such Advance is to be based and a calculation of the Advance requested in connection therewith, (C) a schedule of all Inventory, and (D) a schedule of Eligible Inventory setting forth the calculation of the Eligible Inventory on which such Advance is to be based and the calculation of the Advance requested in connection therewith, together with copies of documentation evidencing the purchase and Cost of the Eligible Inventory on which such Advance is to be based, which Borrowing Certificate shall in all respects be subject to Lender's review and approval."

Litigation. This occurred after Debtor informed Lender of the significant value of the Crocs Litigation.

22. The Eighth Loan Amendment and the $240,000 Overadvance (with the associated exorbitant fees), was initiated by Lender. Lender recommended that Debtor accept the Overadvance and apply it to outstanding tax obligations. While Lender indicated that it was surprised that Debtor had outstanding tax obligations, Lender had constant and on-demand access to Debtor's finances as well as the status of Debtor's tax obligations. Moreover, any immediate demand for Debtor to pay $240,000 was manufactured by Lender. The same third-party service that Lender used (at Debtor's expense) to monitor the status of Debtor's tax obligations indicated that they would negotiate with the Internal Revenue Service, and that they had successfully done so before such that an entity would pay its tax obligations over an extended period of time. Lender was part of that discussion, and was aware that immediate payment of Debtor's tax obligations was not the only potential course of action. However, Lender demanded that Debtor pay $240,000 to the Internal Revenue Service immediately, while it of course benefitted from a high interest rate and excessive $50,000 fee. Debtor would not have signed the Eighth Loan Amendment but for the duress that Debtor was under from Lender.

23. Pursuant to the Loan Agreement Schedule, Lender is obligated to apply the collection of proceeds and collateral: first, to Overadvances; second, to all fees, costs, and expenses; third, to accrued and unpaid interest; and fourth, to matured and unpaid obligations.

24. On August 22, 2017, following the $240,000 Overadvance, the balance under the Loan Agreement was $4,453,175.28. Since August 2017, in excess of $2,000,000 has been collected from Debtor by Lender. As set forth in the Loan Agreement Schedule, the first $240,000 of the over $2 million received should have been applied to the Overadvance. However, Lender has failed to properly apply the funds it has received to the Overadvance. Lender has also failed to release the collateral it received in exchange of the Overadvance.

25. Lender continued to take all of Debtor's receivables while refusing to provide sufficient and proper Advances thereon. For example, between December 22, 2017 through January 24, 2018, Lender directly received more than $400,000 in cash receivables from Debtor's sales.

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

Lender, in turn, has only provided Advances of $23,100 during that same time period. At the same time, Lender sharply reduced Advances requested by Debtor in certain instances and in others outright refused to provide any Advances at all. Since January 11, 2018, Lender funded only one Advance for $3,600. Lender has failed to provide information as to how it has applied the $400,000 received.

26. Furthermore, Lender has made constant demands on Debtor to quickly reduce inventory in order to provide additional payments to Lender. While Debtor believes that doing so does not maximize the value of the inventory, Lender left Debtor with no other choice, yet used such reduced sales as further purported evidence of a decreased Borrowing Base.

27. Nevertheless, as of the Petition Date, despite Lender's allegations to the contrary, Debtor holds approximately $6,000,000 of inventory at cost which, based on sales prices over the last twelve months (which themselves were reduced prices due to the pressure applied by Lender explained above) would be sold for approximately $18,000,000. In a normalized environment, without the pressure from Lender, this same inventory should be sold for in excess of $25,000,000. Contrary to typical fashion products, which may decrease in value as trends change, Debtor's inventory consists of functional evergreen products which Debtor has sold for the past ten-years, and Debtor anticipates being able to sell for several more years to come. Debtor also holds more than $450,000 in accounts receivable, approximately $390,000 of which Debtor anticipates are collectible. Debtor holds other assets too, including a customer list of over 500,000 customers.

28. It became increasingly clear to Debtor that Lender was attempting to manufacture defaults and to quickly obtain Debtor's assets in order to address its own liquidity concerns. Moreover, Lender's intention to force Debtor to go out of business and/or to take control of Debtor and of the Crocs Litigation is further evidenced by the fact that Lender has been consistently aware of the precise financial condition and needs of Debtor.

29. For example, on January 4, 2018, Lender demanded that Debtor sign a forbearance agreement, by which Lender would provide Debtor with $90,000 to cover some of its operational costs, in exchange for $1,000,000 within 45 days in addition to a release of all claims Debtor had against Lender and full control over the ability to settle or otherwise terminate the Crocs Litigation.

In all of the previous agreements between Lender and Debtor, Lender had never made these unreasonable and unacceptable demands. In fact, this proposal only came about because Debtor questioned why Lender had not funded Debtor's requested Advances, as Lender had done for nearly five years, prior to mid-2017.

30. Sure enough, despite *its own breaches* of the Loan Agreement commencing, at the latest, in mid-2017, on January 23, 2018, Lender delivered a *Notice of Default* (the "Notice of Default") to Debtor contending that *Debtor was in breach* of the Loan Agreement for the following:

> Borrower has failed to comply with certain representations and warranties and covenants and conditions set forth in the Loan Agreement, including, but not limited to, the following:
>
> • Section 9.1 (Notify Lender) – Borrower failed to notify Lender of all material adverse information relating to the financial condition of Borrower.
>
> • Section 9.4 (Observe Covenants, etc.) – Borrower failed to observe its covenant to timely pay interest on the Loan and to cause all Collections with respect to all Accounts to be directed to Lender and deposited into the Collection Account.
>
> In addition, Events of Default as described in the Loan Agreement have occurred (such Events of Default are referred to as the "Specified Events of Default"), including, but not limited to, the following:
>
> • Section 11.1 (Failure to Pay) – Borrower failed to pay interest when due.
>
> • Section 11.2 (Failure of Insurance)
>
> • Section 11.3 (Failure to Perform) - Borrower failed to notify Lender of all material adverse information relating to the financial condition of Borrower and failed to observe its covenant to cause all Collections with respect to all Accounts to be directed to Lender and deposited into the Collection Account.
>
> • Section 11.9 (Change of Condition)

A true and correct copy of the Notice of Default is attached hereto as **Exhibit "14."**

31. Notably, despite the express oral agreement of the parties, as well as the parties'

**Garman Turner Gordon LLP**
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

historical course of conduct providing for payment of interest at the end of the month (the "Interest Payment Agreement"), Lender asserted a breach in the payment of interest for failing to pay the same at the beginning of the month.

32. As a result, Lender (i) accelerated the payment of all obligations under the Loan Agreement and demanded immediate payment of the same on or before 5:00 p.m. EST on January 26, 2018, (ii) purported to increase the interest rate under the Loan Agreement to the default rate of 24%; and (iii) demanded that Debtor assemble and make available to Lender all the Collateral at any place and time designated by Lender.  Lender asserts that the amount due as of the Petition Date is $3,895,104.83.

33. Lender thereafter increased the interest rate that it purported to charge Debtor to, upon information and belief, an amount even greater than the 24% rate that Lender claims it is entitled to. For example, Lender charged, and Debtor paid more than $56,000 in interest and $1,800 in fees in October 2017; nearly $54,000 in interest and over $1,800 in fees in November 2017; and nearly $55,000 in interest and over $1,900 in fees in December 2017. In January 2018, Lender's records show that Lender seeks to charge more than $93,000 in interest and $2,000 in fees. According to Lender's "Monthly Interest Statements" for those months, Lender's "daily interest rate" was .0424 in October and November 2017, .0431 in December 2017, and .0792 in January 2018. As a result, according to Lender's own records it was charging more than 15% interest in late 2017, but in January 2018 it seeks to charge more than 28% interest. True and correct copies of Lender's Monthly Interest Statements from October 2017 to January 2018 are attached hereto as **Exhibit "15."**

34. The following day, on January 24, 2018, Debtor sent a letter to Lender refuting Lender's assertions that Debtor had breached the Loan Agreement.  The letter also explained that Lender had in fact breached its own obligations under the Loan Agreement, including:

- Improper and artificial deflation of borrowing base under Section 1.15;

- Improper denial and delay of funding advances under Section 1(v);

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

- Improper application of payments under Section 1(x); and

- Failure to act fairly and in good faith.

A true and correct copy of the January 24, 2018 letter from Debtor to Lender is attached hereto as **Exhibit "16."**

35. On that same day Lender sent letters to all of Debtor's significant sources of revenue (the "Debtor Account Letters"). Lender stated that Debtor "is in default," and that Debtor "had failed to . . . pay obligations as they became due." Lender also "**NOTIFIED AND DIRECTED THAT, EFFECTIVE UPON RECEIPT OF THIS NOTICE . . . ALL SUMS PAYABLE BY YOU TO BORROWERS FOR GOODS SOLD TO YOU OR SERVICES PROVIDED TO YOU, SHALL BE PAID DIRECTLY TO LENDER.**" (emphasis and capitalization in original). Lender's letter therefore ignored that Debtor had not in fact breached the Loan Agreement, and that in fact Lender had breached the Loan Agreement. According to Lender's records, Lender spent more than $1,900 on "postage" mailing out this improper communication. Lender has added this amount to the balance that it claims Debtor owes. A true and correct copy of one letter that Lender mailed to one of Debtor's customers is attached hereto as **Exhibit "17."**

36. Lender subsequently asked Debtor for a standstill agreement by which each party would agree not to contact Debtor's account debtors and also not to initiate any litigation or other legal proceedings. Debtor agreed to the standstill to allow the parties to attempt to reach an agreement to resolve their disputes in lieu of legal action. The standstill agreement was ultimately extended and expired at noon on January 31, 2018.

**C.    Bankruptcy Proceedings.**

37. Debtor advised Lender of repeatedly in the days preceding the Petition Date that, absent an agreement between the parties during a negotiated standstill period, which terminated at 12:00 p.m. on January 31, 2018, Debtor intended to file a voluntary petition under Chapter 11.

38. On the morning of January 31, 2018, after it was evident that negotiations had broken down, Debtor confirmed to Lender that immediately following the standstill, it would file this Chapter 11 case.

39. As a direct result of Lender' actions, Debtor filed the Chapter 11 Case at 12:01 p.m. on the Petition Date.

40. Debtor informed Lender, through its counsel, at 12:16 p.m. on the Petition Date that the Chapter 11 Case that had been filed.

41. At 12:19 p.m. on the Petition Date, in violation of the automatic stay of Section 362, Lender filed the case styled *GemCap Lending I, LLC v. U.S.A. Dawgs, Inc., et al*, case number 2:18-cv-00797 in the United States District Court for the Central District of California, Western Division (the "Post-Petition Complaint"). Lender continued violating the automatic stay by filing three additional case initiation documents until 12:31.

42. Upon information and belief, on or about February 2, 2018, Lender re-sent the Account Debtor Letters dated January 24, 2018 and January 31, 2018, once again improperly directing payments due to Debtor to be paid to Lender instead. As a result, Lender again ignored its own breaches to the Loan Agreement. Lender's records show that it has spent more than $300 on postage on February 2, 2018, which amount Lender purported to charge to Debtor.  Upon information and belief, to date, Lender has taken no action to rescind the Account Debtor Letters that it repeatedly sent.

43. As a result of the Lender's Account Debtor Letters, after the Petition Date, Lender collected $31,044.62 of accounts receivables from Debtor's customers (and together with any subsequent accounts receivables from Debtor's customers, the "Account Funds").

44. Additionally, on January 31, 2018 and February 2, 2018, following the Petition Date, Lender withdrew funds directly from Debtor's bank account held at Wells Fargo.

**D.   Harm to Debtor Caused by Lender**

45. Significant harm has resulted to Debtor as a result of Lender's actions. Lender essentially starved Debtor of cash in recent months. This has affected Debtor's ability to run its business and pay its bills and has strained Debtor's relationship with its customers and vendors. Lender's recent and deliberately repeated contact with Debtor's customers has caused further harm to Debtor's relationship with its customers.  Lender's intentional failure to correct its improper contact with Debtor's customers has increased that harm.  Finally, Lender has impacted the value

of the Crocs Litigation by starving Debtor of the resources that it needs to properly defend itself and prosecute its own valuable claims in that Crocs Litigation. Given that Lender itself breached the Loan Agreement, any alleged default by Debtor is fabricated or was caused by Lender's own breaches. Lender had no legal right to withhold Debtor's funds, let alone cause Debtor additional harm by contacting its customers.

46. Lender has long been aware of the potential harm to Debtor as a result of its actions and, upon information and belief, acted deliberately to cause as much harm to Debtor as possible. Lender has not acted in good faith to merely ensure that it would be paid the money owed, but acted to intentionally inflict harm on Debtor and the personal guarantors.

47.    Lender has had direct on-demand access to Debtor's financial information since 2012. Moreover, Lender has conducted multiple extensive audits of Debtor. As a result, Lender is well aware of the funds that Debtor needs to operate normally, and of what the consequences are of Lender's failure to abide by the Loan Documents to provide Debtor with access to its own funds.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

48.    Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

49. The Loan Documents constitutes a valid and enforceable contract between Lender and Debtor.

50.  Lender is contractually bound to perform pursuant to the terms of the Loan Documents as negotiated, intended, and agreed to by and between Lender and Debtor.

51. Debtor has timely and fully performed all of the conditions, covenants and promises required of it under the Loan Documents, except those from which Debtor's performance may be excused by reason of Lender's prior material breaches and/or anticipatory repudiation of the Loan Documents.

52. Lender materially breached the Loan Documents by, among other things, failing to adequately fund the Advances and improperly declaring a default when none existed. Lender also

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

failed to release Debtor's collateral for the Overadvance, which had Lender abided by the Loan Documents, was properly paid off months ago.

53. As a direct and proximate result of the Lender's breach, Debtor has been damaged in an amount to be proven at trial, and any future performance obligation under the Loan Documents has been discharged.

54. Lender's refusal to perform under the Loan Documents has required Debtor to employ attorneys for redress, entitling it to recover its reasonable attorneys' fees and costs of suit herein as an element of its damages.

## SECOND CLAIM FOR RELIEF
Breach of the Implied Covenant of Good Faith and Fair Dealing

55. Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

56. An implied covenant of good faith and fair dealing exists in every Nevada contract that forbids arbitrary and unfair acts by one party that disadvantages the other.

57. The Loan Documents constitute a valid and enforceable agreement between Debtor and Lender.

58. Debtor had a justifiable expectation that it would receive benefits under the Loan Documents consistent with the spirit of the Loan Documents.

59. As a result of the actions of Lender set forth hereinabove, Lender deliberately violated the implied good faith and fair dealing contained in the Loan Documents and performed in a manner that was in violation of or unfaithful to the spirit of the contract, or otherwise arbitrary and unfair.

60. As a result of the Lender's breach of the implied covenant of good faith and fair dealing, Debtor has been damaged in an amount to be proven at trial, and any future performance obligation has been discharged.

61. As a result of Lender's breach, Debtor has had to employ attorneys for redress, entitling it to recover its reasonable attorneys' fees and costs of suit herein as an element of its damages.

. . .

. . .

### THIRD CLAIM FOR RELIEF
Intentional Interference with Contractual Relations

62. Debtor incorporates by reference and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

63. Debtor held contracts with vendors and customers which, and at all relevant times, constituted valid and existing contracts between Debtor and the third parties.

64. Lender knew of such contracts, and acted intentionally to disrupt Debtor's contractual relations, by failing to properly fund the Advances and purporting to call a default under the Loan Documents.

65. Lender's actions have disrupted Debtor's contractual relations pursuant to the third-party agreements as alleged above.

66. As a result of Lender's intentional interference, Debtor has been damaged in an amount to be proven at trial.

67. As a result of Defendants' tortious acts, Debtor has had to employ attorneys for redress, entitling it to recover its reasonable attorneys' fees and costs of suit herein as an element of its damages.

68. Lender's conduct was malicious, oppressive and/or fraudulent.  Punitive damages are therefore warranted for Lender's actions in order to punish and deter them from future misconduct.

### FOURTH CLAIM FOR RELIEF
Promissory Estoppel

69. Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

70. Lender made a promise Lender reasonably should have expected would induce Debtor to perform in a certain manner, and specifically, through acceptance of the Borrowing Procedures and Interest Date Agreement. For example, Debtor relied on Lender's consistent conduct in providing requested Advances from 2012 to mid-2017 in its belief that Lender would continue such conduct and continue providing Advances upon Debtor's request.

71. Lender's promise produced reliance or forbearance by Debtor in making the requests for Advances and making the interest payments and, as a result, the promises of Lender must be enforced for injustice is to be avoided.

72. Lender's promises were relied upon by Debtor, to Debtor's detriment.

73. As a result of the Lender's actions, Debtor has been damaged in an amount to be proven at trial, and any future performance obligation has been discharged.

74. As a result of Lender's actions, Debtor has had to employ attorneys for redress, entitling it to recover its reasonable attorneys' fees and costs of suit herein as an element of its damages.

## FIFTH CLAIM FOR RELIEF
Declaratory Judgment Regarding Violation of Automatic Stay

75. Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

76. Debtor filed its voluntary petition on January 31, 2018 at 12:01 p.m. and, to date, no order has been entered granting Lender relief from the automatic stay under 11 U.S.C. § 362.

77. Lender received actual notice of the filing of the Chapter 11 Case and the imposition of the automatic stay.

78. Despite the imposition of the automatic stay and being notified thereof, Lender took the following actions post-Petition Date (the "Stay Violation"):

    a.   Filed the Post-Petition Complaint;

    b.   Sent the Second Round of Debtor Accounts Letters; and

    c.   Collected in excess of $30,000 of Debtor's funds and failed to turnover the same to Debtor without demand.

    d.   Initiated withdrawal from Debtor's Wells Fargo account.

79. Lender's violation of 11 U.S.C. § 362(a)(6) was willful because its conduct was intentional, and it had prior actual knowledge of the automatic stay.

80. An actual case or controversy exists regarding the Lender's violation of the automatic stay.

81. Based on the facts and circumstances set forth above, this Court should find that

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

Lender's Stay Violations violated the automatic stay and that Debtor is entitled to damages as a result thereof.

82. As a result of Lender's actions, Debtor has had to employ attorneys for redress, entitling it to recover its reasonable attorneys' fees and costs of suit herein as an element of its damages.

### SIXTH CLAIM FOR RELIEF
#### Declaratory Judgment Regarding Lender Licensing in Nevada

83. Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

84. Pursuant to Nev. Rev. Stat. § 675.060, an installment loan license is required for a person who is engaged in the business of lending in Nevada. A person engages in lending in Nevada if they solicit or make loans in Nevada, whether consumer or commercial loans.

85. Debtor is informed and believes that Lender is engaged in lending and soliciting loans in Nevada. Lender has not only solicited and entered into the nine loans which comprise the Loan Agreement with Debtor, but has solicited and entered into loans with other Nevada entities as well.

86. For example, upon information and belief, Lender has attended the Auto Finance Summit trade show held annually in Las Vegas, Nevada and has solicited loans at that trade show. Upon information and belief, Lender attended the Auto Finance Summit trade show in 2010, 2014, 2015, and 2016.

87. Lender also informed Debtor on multiple occasions during its visits to Debtor's offices in Las Vegas, Nevada that it intended to visit other potential or existing loan clients in Las Vegas on the same trip.

88. Lender's website solicits loan business in the United States and Canada. In particular, Lender's website states that "GemCap, an innovative lending firm, provides senior-secured, commercial asset-based loans and invoice factoring to low and middle market business within the United States & Canada, as well as in-transit inventories en route to the United States." Nowhere does Lender's website state that it does not solicit or accept loans from Nevada.

89. Lender has not obtained an installment loan license as required by Nevada Revised Statutes and as such, Lender is prohibited from providing installment loans in Nevada. Upon information and belief, Lender has not complied with many of the multitude of steps that are

required to obtain such a license, which requirements are at least partially geared towards protecting Nevada residents and businesses from Lender's conduct.

90. An actual case and controversy exists regarding the Lender's ability to conduct business in Nevada and the validity of the Loan.

91. Based on the facts and circumstances set forth above, this Court should find that Lender is not properly licensed to provide of solicit loans in Nevada, and that Debtor is entitled to damages as a result thereof.

92. Debtor further seeks a declaration that Lender violated the Nevada licensing requirements, including those set forth in Nev. Rev. Stat. § 675.060.

93. Debtor further seeks a declaration that the any and all loan agreements between Lender and Debtor are null and void for Lender's failure to comply with Nevada law.

### SEVENTH CLAIM FOR RELIEF
Objection to Claim; Declaratory Judgment on Claim

94. Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

95. As of the date undersigned, Lender has not yet filed a formal proof of claim in the Chapter 11 Case.

96. However, Lender has asserted an informal proof of claim in this case which Debtor is entitled to object to under Ninth Circuit law.

97. As a result of the wrongful allegations of default under the Loan Documents, Lender has wrongfully charged Debtor default interest, attorneys' fees, late charges, and other amounts and asserted these amounts in connection with its purported secured claim.

98. Lender has also failed to properly apply prior payments made by Debtor, which has caused Lender to overcharge Debtor regular interest and other amounts

99. Debtor has made payments to Lender based on Lender's incorrectly calculated principal balance, resulting in significant overpayments to Lender.

100.    Debtor objects to Lender's asserted claim amount and affirmatively asserts that if any portion of Lender's claim is allowed, it should be reduced substantially based on the improper amounts charged by Lender.

101.    Lender's asserted claim should also be offset and reduced by any damages awarded to Debtor based on Lender's breaches of the Loan Documents and bad faith conduct, as set forth herein.

102.    An actual case and controversy exists regarding the amount of Lender's purported claims and the extent of Lender's asserted lien amount.

### EIGHTH CLAIM FOR RELIEF
Accounting

103.    Debtor repeats and re-alleges all of the foregoing paragraphs as if fully set forth herein.

104.    Lender has a duty to render an accounting to Debtor in order to determine the proper balance of the amounts due under the Loan Documents.

105.    Lender has failed to provide an accounting of the amounts received from Debtor and the application of the payments to the amounts due under the Loan Documents.

106.    Debtor requests an accounting to determine where and how the amounts received from Debtor have been applied.

WHEREFORE, Debtor requests that the Court enter Judgment against Defendants as follows:

A.    For damages in an amount to be proven at trial;

B.    For punitive damages in an amount to be determined at trial;

C.    Declaring that Lender has violated the automatic stay and, pursuant to 11 U.S.C. § 362(k), for compensation for actual damages, proportional punitive damages, and reasonable fees and costs from Lender in amounts to be decided by the Court

D.    Declaring that Lender is not properly licensed to provide installment loans in Nevada and determining the Loan to be void for failure of Lender to comply with NRS § 675.060, *et seq.*

E.    Sustaining Debtor's objection to Lender's proof of claim;

F.    Determining the proper amount of Lender's claim after a trial on the merits;

Garman Turner Gordon LLP
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

G.      Further reducing Lender' allowed claim(s) by any offsets for damages incurred by Debtor in an amount to be proven at trial;

H.      For an accounting;

I.      For an award of reasonable attorneys' fees;

J.      For pre-judgment and post-judgment interest at the statutory rate of interest;

K.      For an award of costs; and

L.      For such other and further relief that the Court deems just and proper.

DATED this 16th day of February, 2018.

GARMAN TURNER GORDON LLP

By: */s/ Teresa M. Pilatowicz*
TALITHA GRAY KOZLOWSKI, ESQ.
TERESA M PILATOWICZ, ESQ.
650 White Drive, Suite 100
Las Vegas, Nevada 89119
*[Proposed] Attorneys for Debtor*