GARMAN TURNER GORDON LLP
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail:  tgray@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail: tpilatowicz@gtg.legal
MARK M. WEISENMILLER, ESQ.
Nevada Bar No. 12128
E-mail:  mweisenmiller@gtg.legal
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone 725-777-3000
*[Proposed] Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-18-10453-LED |
| U.S.A. DAWGS, INC., | Chapter 11 |
| Debtor. | Date:   April 3, 2018<br>Time:  9:30 a.m. |

**DECLARATION OF ERVIN M. TERWILLIGER IN SUPPORT OF APPLICATION FOR ORDER APPROVING THE EMPLOYMENT OF THREE TWENTY-ONE CAPITAL PARTNERS, LLC TO PROVIDE INVESTMENT BANKER SERVICES TO DEBTOR *NUNC PRO TUNC* TO FEBRUARY 22, 2018**

I, Ervin M. Terwilliger, under penalty of perjury under the laws of the United States, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I am Managing Partner at Three Twenty-One Capital Partners, LLC ("3-21").  In my capacity as such, I am familiar with 3-21's daily business, operations, financial affairs and billing practices.  Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of 3-21's business, operations, finances, and billing practices, information learned from my review of relevant documents, and information supplied to me by other members of 3-21's management and employees and Debtor's business and legal advisors.  If called upon to testify as to the content of this Declaration, I could and would do so.

4852-2254-3966, v. 1

2.    I make this Declaration in support of the *Application for Order Approving the Employment of Three Twenty-One Capital Partners, LLC to Provide Investment Banker Services to Debtor Nunc Pro Tunc to February 22, 2018* (the "Application")[1] filed herewith.

3.    In the Application, the Debtor seeks entry of an order approving, pursuant to Sections 327, 328, 1107, and 1108 of the Bankruptcy Code, and Bankruptcy Rule 2014, employment and retention of 3-21 by Debtor to provide investment banker services to Debtor, *nunc pro tunc* to February 22, 2018.   Pursuant to Sections 328(a), 330, and 331 of the Bankruptcy Code, the Debtor, as debtor-in-possession, requests that the Court approve the retention and compensation of 3-21 by Debtor in accordance with the terms and conditions set forth in the *Agreement Between U.S.A. Dawgs, Inc. and Three Twenty-One Capital Partners, LLC* (the "Retention Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1**.

4.    3-21 is private investment bank and advisory firm specializing in bankruptcy proceedings, entirety sales, strategic mergers, equity investments, joint ventures, debt and equity recapitalizations, purchase of chattels and real property, sale of assets, and restructuring engagements.   3-21's members have extensive experience in advising over 500 companies and has substantial experience in restructuring processes, including bankruptcy, assignment for the benefit of creditors, Article 9 foreclosures and bulk sales.   3-21 also has substantial experience in locating acquirers, investors, sources of debt capital, and joint venture partners for distressed or "storied" businesses.   See **Exhibit 2** hereto for 3-21's qualifications.

5.    Subject to further order of the Court, it is proposed that 3-21 be employed to provide investment banker services to the Debtor, including the following services to secure an equity investment and/or a debt recapitalization to confirm a plan of reorganization, and/or sell a portion of, all or substantially all the assets of Debtor via a Section 363 sale (or other extraordinary corporate action) (either, a "Transaction"):

-    Work with Debtor to devise the best course of action to effectuate the desired outcome for the Debtor;

---

[1] All capitalized terms not defined herein are as defined in the Application.

2

- Conduct due diligence on Debtor's business;
- Devise restructuring scenarios with Debtor;
- Create a marketing plan;
- Create financial modeling to aid in the Transaction;
- Work with third party professionals and creditors;
- Attend and advise for all required Court matters, including without limitation, cash collateral, exclusivity, dismissal or trustee motions, stay relief, sale, and confirmation proceedings;
- Prepare marketing materials, confidential information memorandum, and secure due diligence data room, which will include information regarding the business;
- Endeavor to locate parties who may have an interest in a Transaction with the Debtor;
- Circulate materials to all parties in interest regarding the business;
- Respond, provide information to, communicate and negotiate with and obtain offers from interested parties and make recommendations to Debtor as to whether an offer should be accepted;
- Communicate regularly, including a weekly report, with Debtor about the status of 3-21's efforts with respect to the marketing efforts;
- Recommend to Debtor the proper method of handling any specific problems encountered with respect to the marketing of the business or in raising capital or equity; and
- Perform related services necessary to maximize the proceeds to be realized in the Transaction.

6.      Subject to the Court's approval of the Application, 3-21 is willing to provide investment banker services to Debtor as described herein.

7.      The Debtor may submit applications to retain certain other estate professionals. As such, 3-21 intends to monitor and coordinate carefully its efforts and delineate clearly its respective duties so as to prevent duplication of effort whenever possible.  Rather than resulting in extra expense to the Debtor's estate, it is anticipated that the efficient coordination of efforts of the Debtor's attorneys and other professionals will greatly add to the progress and effective administration of the Chapter 11 Case.

8.      Prior to 3-21 commencing its representation of the Debtor, the Debtor disclosed to 3-21 its equity security holders, its management and former management, and its known creditors in order for 3-21 to determine any prior or present representation of any creditors or parties-in-interest.

9.      To the best of my knowledge and following diligent investigation, neither 3-21,

3

4852-2254-3966, v. 1

nor any of its owners or employees, have any present or prior connection with the Debtor, the Debtor's creditors, or other parties-in-interest, their respective attorneys and accountants, except that:

> (i) a current client of 3-21 is seeking financing from GemCap in an unrelated matter in an unrelated industry in order to effectuate a purchase. 3-21 is engaged to provide services with regard to the purchase and is not directly involved with GemCap in client's efforts to obtain financing from GemCap; and

> (ii) Broad Cassel represented Correct Craft with respect to its purchase of Challenger, Inc. 3-21 represented Challenger in the sale.

As such, 3-21 makes these disclosures in accordance with Bankruptcy Rule 2014 but emphasizes that 3-21 does not have a conflict of interest and is disinterested. To the best of my knowledge, neither 3-21, nor any of its owners or employees, hold or represent any interest adverse to Debtor's estate and 3-21 and its owners and employees are disinterested persons within the meaning of Sections 101(14) and 327 of the Bankruptcy Code, as modified by Section 1107(b). Additionally, 3-21 does not have any connection with the Office of the United States Trustee or any persons employed in the Office of the United States Trustee. 3-21's representation of the Debtor will not be adverse to the Debtor's estate.

10.    3-21 will conduct an ongoing review of its files to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, 3-21 will supplement its disclosure to the Court.

11.    3-21 shall receive a one-time retainer of $20,000 (the "Retainer") from the Debtor to be credited against the Fee described below and in Section 7 of the Retention Agreement.

12.    3-21 will be paid a fee immediately at the closing of any Transaction (the "Fee") based upon Transaction Value (as defined in the Retention Agreement) received by Debtor and computed using the applicable following formula:

A. In the event of a § 363 Sale of Debtor's assets, 3-21's Fee (the "363 Fee") will be the sum of:
> (i) Six percent (6%) of the Transaction Value of the filed and approved stalking horse bid; plus
> (ii) Ten Percent (10%) of any value above the stalking horse bid.

B. In the event of an equity investment or debt recapitalization leading to a plan of

reorganization, 3-21's Fee (the "Plan Fee") will be the sum of:

    (i) 2 1/2 percent (2.5%) of any debt raised; plus

    (ii) Six percent (6%) of any equity raised as part of the plan of reorganization; plus

    (iii) a flat fee of $150,000 for a confirmed plan of reorganization.

The Fee on the closing of any Transaction shall be the greater of: (a) the aggregate of the result of the calculation(s) above or (b) a minimum fee of $200,000 ("Minimum"). The Fee shall be paid in cash at closing with respect to any portion of the Transaction Value. The Retainer is credited against the Fee.

3-21 shall be entitled to receive its Fee from any Transaction made within six (6) months following the termination of the Retention Agreement by a prospect identified as a Registered Prospect. A Registered Prospect shall be considered a qualified lead contacted by 3-21 during the exclusive engagement period.

13.    The Fee shall be paid in cash immediately at closing.  However, payment of the Fee shall be subject to final approval by the Court pursuant to Sections 330 and 331 of the Bankruptcy Code.

14.    3-21 respectfully submits that such rates are reasonable in light of the high quality and specialized nature of the services being provided.

15.    3-21 will also seek reimbursement of its expenses pursuant to the policies set forth in the Retention Agreement, which provide that out-of-pocket expenses are strictly for marketing costs, business services, database services, printing, mailing, and travel related expenses (but not expert services), and the responsibility of the Debtor.

16.    There is no agreement of any nature, other than with respect to owners and employees of 3-21, as to the sharing of compensation to be paid to 3-21.

17.    3-21 understands that its compensation is subject to Court approval of a final basis as set forth herein.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 26 day of February 2018.

                                */s/ Ervin M. Terwilliger*

                                ERVIN M. TERWILLIGER

4852-2254-3966, v. 1

# EXHIBIT 1

# EXHIBIT 1

AGREEMENT BETWEEN U.S.A. DAWGS, INC.
AND THREE TWENTY-ONE CAPITAL PARTNERS, LLC

THIS AGREEMENT is made this 22nd day of February 2018 by and between **U.S.A. DAWGS, INC.** ("CLIENT" or "USA DAWGS"), and **THREE TWENTY-ONE CAPITAL PARTNERS, LLC** ("3-21").

RECITALS

WHEREAS, CLIENT has filed a bankruptcy petition in the United States Bankruptcy Court for the Nevada (the "Bankruptcy Court"), Chapter 11 Case No. 18-10453 (the "Chapter 11 Case");

WHEREAS, CLIENT seeks to:
   (1) Secure an equity investment and/or a debt recapitalization to confirm a plan of reorganization, and/or
   (2) Sell a portion of, all or substantially all the assets of CLIENT via a §363 Sale (or other extraordinary corporate action); and

WHEREAS, 3-21 is an enterprise specializing in bankruptcy proceedings, entirety sales, strategic mergers, equity investments, joint ventures, debt and equity recapitalizations, purchase of chattels and real property, sale of assets, restructuring engagements; and

WHEREAS, 3-21 is an enterprise whose members have extensive experience in advising over 500 companies; and

WHEREAS, 3-21 has substantial experience in restructuring processes, including Bankruptcy, Assignment for the Benefit of Creditors, Article 9 Foreclosures and Bulk Sales; and

WHEREAS, 3-21 has substantial experience in locating acquirers, investors, sources of debt capital, and joint venture partners for distressed or "storied" businesses; and

WHEREAS, CLIENT and 3-21 desires to enter into this AGREEMENT regarding INVESTMENT BANKING SERVICES to be performed by 3-21 and the compensation to be paid to 3-21 for its services; and

NOW THEREFORE, in consideration of the promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, CLIENT and 3-21 hereby agree, subject to all the terms, covenants, conditions and provisions hereinafter set forth, as follows:

1. **EXCLUSIVE AGENCY.** Upon entry of an order of Bankruptcy Court approving this Agreement, CLIENT hereby retains 3-21 as exclusive agent, to seek one or more counterparties to, purchase the assets of CLIENT, or provide an equity investment in and/or a debt recapitalization of CLIENT as part of a plan of reorganization (either, a "TRANSACTION"). The term of 3-21's exclusive agency shall begin as of the date of this AGREEMENT and shall continue for 6 months. This agreement shall automatically be extended in 30-day increments

unless cancelled in writing prior to termination of the exclusive period. Either party may terminate this notice on not less than thirty (30) days prior notice, subject to the provisions of Paragraph 7 below.

2. **INVESTMENT BANKING SERVICES.** 3-21 shall perform the following services:

(a) Work with CLIENT to devise the best course of action to effectuate the desired outcome for the CLIENT.

(b) Conduct due diligence on CLIENT's business.

(c) Devise restructuring scenarios with CLIENT.

(d) Create a marketing plan.

(e) Create financial modeling to aid in the TRANSACTION.

(f) Work with third party professionals and creditors.

(g) Attend and advise for all required Court matters, including without limitation, cash collateral, exclusivity, dismissal or trustee motions, stay relief, sale, and confirmation proceedings.

(h) Prepare marketing materials, confidential information memorandum, and secure due diligence data room, which will include information regarding the business. CLIENT shall have final approval of all materials and their use and prior approval of all prospective purchasers given access to the data room.

(i) Endeavor to locate parties who may have an interest in a TRANSACTION with the CLIENT.

(j) Circulate materials to all parties in interest regarding the business; provided, however, 3-21 shall not release materials or information concerning CLIENT's business or its assets to any party that has not been approved in writing in advance by CLIENT.

(k) Respond, provide information to, communicate and negotiate with and obtain offers from interested parties and make recommendations to CLIENT as to whether an offer should be accepted.

(l) Communicate regularly, including a weekly report, with CLIENT about the status of 3-21's efforts with respect to the marketing efforts.

(m) Recommend to CLIENT the proper method of handling any specific problems encountered with respect to the marketing of the business or in raising capital or equity.

(n) Perform related services necessary to maximize the proceeds to be realized in the TRANSACTION.

(o)  3-21 shall have no authority to bind CLIENT to any agreements or offers and CLIENT shall have sole authority to select a stalking horse bidder, the highest and best offer in a sale process, and/or any refinancing or equity terms presented to CLIENT by 3-21.

(p) 3-21's services shall commence upon execution of the AGREEMENT; provided, however, that the parties understand that the agreement remains subject to Bankruptcy Court approval. CLIENT shall promptly file a motion seeking approval of this Agreement and seek an order shortening time for the motion to be heard.

3. **OFFERING PROCEDURE.** CLIENT shall offer information regarding CLIENT's business and its assets under a procedure that shall include the following:

(a)  All communications and inquiries regarding a potential TRANSACTION shall be directed to 3-21.

(b)  To be considered, all offers must be accompanied by appropriate financial material showing ability to close a transaction and include a deposit where deemed necessary.

(c)  CLIENT shall have the right to:

(i) Determine in its sole discretion which offer, if any, is to be accepted; and

(ii) Reject, at any time, any offer which, in the CLIENT's sole discretion, is deemed to be inadequate or insufficient or not in conformity with the terms and conditions of this AGREEMENT

(d)  CLIENT, upon notice to those parties which have submitted offers, may impose other terms and conditions as it may determine to be in the best interest of the CLIENT.

4. **RETAINER.** 3-21 shall receive a one-time retainer of twenty thousand dollars ($20,000). The RETAINER shall be credited against the FEE in Section 7 below.

5. **EXPENSES.** Out-of-pocket expenses are the responsibility of the CLIENT. Expenses are strictly for marketing costs, business services, database services, printing, mailing, and travel-related expenses. 3-21 shall make every best effort to limit expenses and shall obtain CLIENT's prior approval before incurring out-of-pocket expenses in excess of $15,000. Expenses shall not include costs for expert services.

6. **TRANSASCTION VALUE.**

A. In the event of a §363 Sale of CLIENT's assets (or other extraordinary corporate asset sale), the term TRANSACTION VALUE as used in this AGREEMENT shall include the gross sum of the following payments or assumptions by the purchaser ("TRANSACTION VALUE"):

(i)   The total gross value of all consideration (including credit bids, cash, securities or other property) paid or received or to be paid or received, directly or indirectly, in connection with a TRANSACTION in respect of the assets of the Company or the outstanding securities of the Company on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested), plus the principal amount of any debt (including, but not limited to assumed leases and accounts payable) of the Company outstanding as of the closing date of a TRANSACTION or directly or indirectly of the Business that is assumed, refinanced or extinguished in connection with a TRANSACTION, and amounts payable in connection with earnouts, agreements not to compete, consulting agreements, employment agreements or similar arrangements, restricted securities, options, or other future non-cash consideration.

(ii)  If the TRANSACTION takes the form of a recapitalization, equity investment, or similar transaction, TRANSACTION VALUE will also include seventy-five percent (75%) of the value of all shares retained by the shareholders of the acquired company or the value of equity interests rolled over or invested into a new corporate entity.

(iii) The fees and expenses of 3-21, credit bids, and all other closing costs shall not be deducted when computing TRANSACTION VALUE or the fee to be paid to 3-21.

B.  In the event that an equity investment or debt recapitalization is used to exit bankruptcy through a plan of reorganization, TRANSACTION VALUE as used in this AGREEMENT shall include the gross sum of the following ("TRANSACTION VALUE"):

(i)   The aggregate gross proceeds raised from the sale by CLIENT or its shareholder(s) of Client's Securities, and
(ii)  The gross value of any debt commitment amount of any line of credit, term loan or other debt instrument.

7.  **3-21 FEE.** 3-21 will be paid a fee at the closing of any TRANSACTION (the "FEE") based upon TRANSACTION VALUE received by CLIENT and computed using the applicable following formula:

A.  In the event of a §363 Sale of CLIENT's assets, 3-21's FEE (the "363 FEE") will be the sum of:
(i)   SIX PERCENT (6%) of the TRANSACTION VALUE of the filed and approved stalking horse bid; plus
(ii)  TEN PERCENT (10%) of any value above the stalking horse bid.

B.  In the event of an equity investment or debt recapitalization leading to a plan of

reorganization, 3-21's FEE (the "PLAN FEE") will be the sum of:

    (i)   TWO AND ONE-HALF PERCENT (2.5%) of any debt raised; plus

    (ii)  SIX PERCENT (6%) of any equity raised as part of the plan of reorganization; plus

    (iii) a flat fee of $150,000 for a confirmed plan of reorganization.

The FEE on the closing of any TRANSACTION shall be the greater of: (a) the aggregate of the result of the calculation(s) above or (b) a minimum fee of $200,000 ("MINIMUM FEE"). The FEE shall be paid in cash at closing with respect to any portion of the TRANSACTION VALUE. The RETAINER is credited against the FEE.

3-21 shall be entitled to receive its FEE from any TRANSACTION made within six (6) months following the termination of this AGREEMENT by a prospect identified as a REGISTERED PROSPECT. A REGISTERED PROSPECT shall be considered a qualified lead contacted by 3-21 during the exclusive engagement period.

8. **NOTICES.** All notices, statements, demands, requests, consents, communications and certificates from any party hereto to the other, shall be made in writing and sent by United States registered mail or certified mail, return receipt requested, postage prepaid, addressed as follows:

(a) If intended for the CLIENT:

    Steve Mann
    USA Dawgs, Inc.
    steve@usadawgs.com

    With copy to Counsel:

    Talitha Gray Kozlowski
    650 White Drive, Suite 100
    Las Vegas, NV 89119
    tgray@gtg.legal

(b) If intended for the 3-21:

    Ervin M. Terwilliger
    Three Twenty-One Capital Partners, LLC.
    2205 Warwick Way Suite 310
    Marriottsville, MD 21104

or other such addresses or entities either party hereto may from time to time direct by service of notice on the other party as provided above.

9. **DISCLAIMER AND WAIVER OF LIABILITY.** CLIENT will verify all qualifications of any party it enters a TRANSACTION. 3-21 will not make any verifications or warranties,

including, but not limited to, counterparties' health, experience, competency, residency or financial status. 3-21 shall not be liable or responsible for any claims and damages of any kind to CLIENT relating to the above referenced transactions, including, but not limited to, all claims and damages of every kind attributable to the performance or non-performance of CLIENT and/or a counterparty in any TRANSACTION.

10. **NON-ASSIGNABILITY.** Neither party hereto shall assign this AGREEMENT or any of its rights or interest hereunder without first obtaining the other party's written consent.

11. **TIME OF THE ESSENCE.** Time, whenever mentioned herein shall be of the essence of this AGREEMENT.

12. **ENTIRE AGREEMENT.** This is the entire AGREEMENT between the parties hereto regarding the transaction contemplated hereby and there are no other terms, covenants, conditions, provisions, warranties, representations or statements, oral or otherwise, of any kind whatsoever. Any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this AGREEMENT in whole or in part unless such agreement is in writing and signed by the party against whom the enforcement of the change, modifications, discharge or abandonment is sought.

13. **HEADINGS.** The headings, if any, incorporated in this AGREEMENT are for the convenience and reference only and are not part of this AGREEMENT and shall not in any way control, define, limit or add to the terms and conditions hereof.

14. **GOVERNING LAW.** This AGREEMENT shall be construed, interpreted and governed by the laws of the State of Nevada and the Parties consent to the jurisdiction of the United States Bankruptcy Court for the District of Nevada and the United States District Court for the District of Nevada..

15. **COUNTERPARTS.** This AGREEMENT may be executed in any number of counterparts, each of which shall be original, but such counterparts together shall constitute one and the same instrument.

16. **LEGAL CONSTRUCTION.** In case any one or more of the provisions contained in this AGREEMENT shall for any reason be held to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality or enforceability shall not affect any other provision of this AGREEMENT and this AGREEMENT shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

IN WITNESS WHEREOF, the parties hereto have duly executed this AGREEMENT under seal, as of the day and year first above written.

*Subject to BANKRUPTCY COURT Approval*

U.S.A. DAWGS, INC.

By: _____

STEVEN MANN
CEO

THREE TWENTY-ONE CAPITAL
PARTNERS, LLC

By: _____

Ervin M. Terwilliger
Managing Partner

# EXHIBIT 2

# EXHIBIT 2



Presentation of Capabilities



# Three Twenty-One Capital Partners

Three Twenty-One Capital Partners is a Private Investment Bank and Advisory Firm founded to provide "Wall Street Level" expertise to lower-middle market businesses in the most challenging business situations.

Three Twenty-One Capital Partners' team has executed or advised engagements with over $15 billion in transaction value.

Three Twenty-One Capital Partners' Senior Management team is comprised of CFA's, CPA's, Business Owners and Directors with experience in every facet of the business continuum, from inception to exit.



2

# Investment Banking Solutions

Solutions Focused.  Results Driven.



3

# Investment Banking Solutions





4

# Advisory Services

Every Three Twenty-One Capital Partners engagement begins with Advisory Services.

- Valuation services

- Investor targeting (Domestic and International)

- Story-crafting

- Professional recommendations

- Employee/Client Messaging

- Chief Restructuring Officer services

- Interim/Turnaround Management





5

# Restructuring Processes

Three Twenty-One Capital Partners has served the restructuring needs of hundreds of companies.  We are relied upon restructuring professionals and recognized experts in Federal Bankruptcy Court.

Experts at:

- Bankruptcy
  - o 363 Sales
  - o Plans of Reorganization
- Negotiation of Complex/Contentious Engagements
- Valuation
- Liquidations/Partial Liquidations
- Stakeholder priority





6

# Restructuring Processes

Our team has the experience to maximize the outcome on your underperforming assets.  Three Twenty-One Capital Partners has extensive experience selling businesses with the following characteristics:

- Unsustainable or higher than expected Cash-Burn

- Misaligned management and equity dynamics

- Creditor pressures

- Pending Litigation

- Business trauma

- Missed projections

- Inconsistent top and bottom lines

- Management turnover

- Underperforming industry and investment thesis



7

# "Storied" Situations

Every company has a "Story". We target the right audience to effect the best possible outcome.

- Down years or quarters

- "Orphaned" businesses or business units

- Growth potential or trend improvements

- Business model changes

- Cash constraints

- Management or Board of Director turnover



"Storied" Situations



8

# Closely-Held Business Transactions

Closely-Held businesses are run differently than larger corporations. Understanding the difference is key to a successful presentation to the market.  We frequently encounter and actively manage:

- Varying Owner Interests

- Un-Audited Financials

- Non-Recurring or One-Time Expenses

- Family Involvement



Closely-Held Business Transactions



9

# Recapitalizations

Three Twenty-One Capital Partners has the experience and deep contacts, including Strategic, Private Equity, Family-Shops, Venture, Turn-Around Investors and Lenders, to secure the best available options:

- Equity Investor/Partner

- Entirety Sale

- Debt Recapitalization

- Targeting of Parallel Paths

    o   Financial Investors

    o   Strategic Investors

    o   "Hybrid" Investors

    o   Internal Shareholders





10

# Three Twenty-One Capital Partners Delivers Results

- Over the past three years, Three Twenty-One Capital Partners delivered actionable offers for 94% of its engagements





*Source: Pepperdine University 2015 to 2017 Private Capital Markets Report and Three Twenty-One Capital Partners.*



11

# Performance and Relevant Experience

Solutions Focused.  Results Driven



12

# Representative Distressed and Bankruptcy Engagements



## Apparel and Consumer Products Expertise

- Three Twenty-One Capital's partners have extensive experience in apparel related transactions for both manufacturers and retailers. Companies advised include:

















14

# Deal Team

Solutions Focused.  Results Driven



# Three Twenty-One Capital Partners' M&A Advisor Recognition

- The M&A Advisor is a leading insights and intelligence provider for mergers and acquisitions professionals

- Each year, the M&A Advisor recognizes emerging leaders within the M&A deal professional community

- Ervin Terwilliger and Erik Endler were recognized as emerging leaders in 2017

*"The Annual M&A Advisor Emerging Leaders Awards was born as the 40 Under 40 Awards in the United States in 2010 to recognize and celebrate the achievements of young M&A, Financing and Turnaround professionals who had reached a significant level of success and made a notable contribution to their industry and community. With the expansion of the Emerging Leaders program to the United Kingdom, and Europe in 2016, the 2017 US award winners join a truly global network of outstanding young professionals," said David Fergusson, President and Co-CEO of The M&A Advisor.*



16

# Ervin M. Terwilliger

*Founder, Managing Partner*



Ervin is the Founder and Managing Partner of Three Twenty-One Capital Partners.

Ervin manages the firm's portfolio of engagements, interacting directly with clients, investors and Three Twenty-One Capital Partners' deal teams.

Ervin has been featured in industry publications providing financial insight on various U.S. Industry Sectors and the M&A Landscape. Ervin has completed over 120 transactions and consulting engagements in the last 10 years, with a concentration on family and founder-run businesses.

Ervin sits on the board of directors for The Maryland Proton Therapy Center and has held director positions for international manufacturing concerns, as well as interim C-level positions.

Ervin is a relied upon valuation, process and sale expert in U.S. Bankruptcy Courts.

Ervin graduated from the University of Delaware with a Bachelor's of Science in Business Administration in Management and Marketing and is an active member of the ABI and TMA.



# Erik Endler, CFA

*Managing Partner*



Erik manages Three Twenty-One Capital Partners' deal teams, overseeing all aspects of the firms engagements including, but not limited to due diligence, financial analysis, memorandum creation and deal structuring. Erik joined the firm in 2012.

Prior to 2012, Erik was an Executive Director in Oppenheimer's Consumer and Business Services Investment Banking group, a former Director at CIBC World Markets and Analyst with Deutsche Banc Alex Brown.

Erik's transactional experience spans the consumer products, retail, technology, e-commerce, direct marketing, manufacturing, rental services, professional services, and restaurant sub-sectors. Erik has represented distressed businesses, growth companies and family owned businesses.

Past clients have included companies such as Bare Escentuals, The Brickman Group, Carbonite, Connolly Consulting, Constant Contact, Contigo, Design Within Reach, Jarden and Vitacost to name a few.

Erik graduated with highest honors from the University of Notre Dame with a BBA in Finance and Computer Applications. Erik is a Chartered Financial Analyst (CFA) and is an active member of the ABI and TMA.



# Tim Zahrobsky, CPA

*Partner*



Tim manages the firm's Technology and Growth Equity portfolio and is an active participant on every Three Twenty-One Capital Partners engagement. Tim joins Three Twenty-One Capital Partner after serving as Vice President at ABS Capital Partners, a leading growth equity firm with over $2 billion in invested capital. While at ABS, Tim's primary focus was growth equity investment opportunities in technology-enabled business services, financial services, education services and healthcare companies. Tim has worked closely with growth companies around all aspects of enhancing their businesses through growth, strategy refinement, governance, operational and compensation structure optimization, expansion, and ultimately exit.

Prior to joining ABS Capital, Tim was an Associate in the Consumer and Business Services Investment Banking Division of Oppenheimer & Co.  Earlier in his career, Tim was an Analyst in the Consumer and Business Services Investment Banking Division of CIBC World Markets. Prior to joining CIBC World Markets in 2005, Tim worked as an Associate in the Assurance and Risk Advisory Group at KPMG.

Tim's corporate finance experience includes M&A transactions, capital raising transactions, and public securities offerings, having executed many transactions in the business services, consumer products, and retail industries.

Tim has completed over 30 deals representing over $8 billion in transaction value. Tim is a Certified Public Accountant.  Tim graduated with honors from the Loyola University with a BBA in Accounting.



# Devin Hudgins
*Associate Partner*



Devin supports Three Twenty-One Capital Partners' financial analysis, marketing and due diligence efforts.  Devin works hand in hand with clients to facilitate the flow and dissemination of deal-specific information from memorandum creation to due diligence.

Prior to Three Twenty-One Capital Partners, Devin was an analyst in Citigroup's Equity Derivative Structuring and Interest Rates Trading divisions. Devin priced and issued more than $200 million of corporate debt embedded with equity options on behalf of Citi. Devin further managed a $100 million book of government bonds, as well as provided liquidity in interest rate swaps, bonds and interest rate futures.

Devin is a 2014 graduate of the Robert H. Smith School of Business at the University of Maryland and holds a Bachelor's of Science in Finance & Accounting. While studying, he was an analyst for the Smith School's student-run endowment fund and produced fundamental equity research and corporate valuations as well as actionable industry- and company-level recommendations for the fund.



20

# Colleen Kobus

*Director of Marketing*



Colleen is responsible for the launch and logistics associated with every marketing campaign.

Colleen combines her experience in sales and marketing with her degree in Social/Behavioral Sciences to create well targeted and far reaching marketing programs tailored to each client's specific needs.

Colleen employs a fanatical attention to detail to ensure that the employed marketing message is delivered to everyone that would, could, or should contemplate each investment opportunity.

Colleen graduated with honors from the University of Maryland and holds a Bachelor of Science in Social Science and Human Resources.

