Ogonna M. Brown, Esq. (NV Bar No. 7589)
Email: obrown@nevadafirm.com
F. Thomas Edwards, Esq. (NV Bar No. 9549)
Email: tedwards@nevadafirm.com
Mary Langsner, Esq. (NV Bar No. 13707)
Email: mlangsner@nevadafirm.com
HOLLEY DRIGGS WALCH
FINE WRAY PUZEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912

Todd M. Lander, Esq. (CA Bar No. 17031)
Email: todd.lander@ffslaw.com
*Admitted Pro Hac Vice*
Arash Beral, Esq. (CA Bar No. 245219)
Email: arash.beral@ffslaw.com
*Admitted Pro Hac Vice*
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone:    310/255-6100
Facsimile:    310/255-6200

*Attorneys for GemCap Lending I, LLC*

E-filed on: April 12, 2018



# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>U.S.A. DAWGS, INC.,<br><br>Debtor. | Case No. 18-10453-LEB<br>Chapter 11<br><br>**SECURED CREDITOR GEMCAP LENDING I, LLC'S SUPPLEMENT IN SUPPORT OF MOTION TO DISMISS OR APPOINT A TRUSTEE FOR BAD FAITH OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ABSTENTION**<br><br>Date of Evidentiary Hearing: **May 10, 2018**<br>Time of Evidentiary Hearing: **9:30 a.m.**<br><br>Judge: Hon. Laurel E. Babero |

Secured Creditor GemCap Lending I, LLC ("GemCap"), by and through its undersigned counsel, hereby files its Supplement in Support of Motion to Dismiss or Appoint a Trustee For Bad Faith or, In the Alternative, Motion For Relief From the Automatic Stay Or For Abstention ("Supplement"). GemCap seeks dismissal of the chapter 11 Case of Debtor U.S.A. Dawgs, Inc. ("Debtor") or appointment of a chapter 11 trustee or examiner, or, in the alternative, that GemCap be afforded relief from the automatic stay to pursue litigation or that this Court abstain until resolution of litigation against Debtor. This Supplement is filed pursuant to the Court's Order issued at the March 29, 2018, hearing on Debtor's Motion to Continue Hearing or, In the Alternative, Motion to Strike [ECF No. 191].[1]

This Supplement is supported by the papers and pleadings on file in this Case[2]; the Declaration of Richard Ellis, co-President of GemCap, filed concurrently herewith ("Ellis Decl."); the Declarations of Richard Ellis on file with the Court at ECF Nos. 30, 48, and 105; the Declaration of Todd Lander, filed concurrently herewith ("Lander Decl."); the Declarations of Todd Lander on file with the Court at ECF Nos. 106 and 168; the Declaration of Joseph L. Leauanae, President of Anthem Forensics on file with the Court at ECF No. 185 ("Leauanae Decl."); the arguments advanced in GemCap's initial Motion to Dismiss or Appoint a Trustee For Bad Faith or, In the Alternative, Motion For Relief From the Automatic Stay Or For Abstention [ECF No. 45] (the "Motion"); the arguments advanced in GemCap's Omnibus Reply In Support of Motion to Dismiss or Appoint a Trustee For Bad Faith or, In the Alternative, Motion For Relief From the Automatic Stay Or For Abstention [ECF No. 184] ("Reply"); GemCap Lending I, LLC's Requests for Judicial Notice [ECF No. 47 ("First Request for Judicial Notice"); ECF No. 170 ("Second Request for Judicial Notice"); and ECF No. 198 ("Third Request for Judicial Notice")]; any oral argument the Court entertains at hearing on the Motion; and any evidence presented at evidentiary hearing on the Motion.

---

[1] All references to "ECF No." are to the numbers assigned to the documents filed in the Case identified in the caption above ("Case"), as they appear on the docket maintained by the Clerk of the Court of the United States Bankruptcy Court for the District of Nevada.

[2] Judicial notice of which GemCap respectfully requests this Court take pursuant to FED. R. EVID. 201(b) and (c)(2), and FED. R. EVID. 1101(a) and (b).

2030237_4.docx
3761832.1 24093-808

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. §§ 157(a) and (b)(1), and LR[3] 1001(b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O) and is a contested matter under FED. R. BANKR. P. 9014. Venue in the District of Nevada is appropriate pursuant to 28 U.S.C. § 1408.

## II. INTRODUCTION

The Court is well aware of GemCap's contention that this bankruptcy proceeding is not a legitimate effort to reorganize a debtor conducting itself in good faith. Debtor is instead misusing the protections of this Court in an increasingly transparent effort to afford it shelter while its two primary insiders, Steven Mann and Barrie Mann (collectively, the "Mann Brothers"), plot ways to take personal advantage of an asset which Debtor lists as its most valuable—the (by now) virtually ubiquitous "Crocs Litigation"[4]— all while squandering the cash collateral of its secured creditor, GemCap. In fact, Debtor's own financial reporting establishes not only that the company cannot reorganize, but that no meaningful effort to lay the groundwork for a reorganization is underway. The simple fact is that Debtor's bankruptcy Petition was filed as a tactic for the Mann Brothers to preserve their interest in the Crocs Litigation, and not because Debtor had any reasonable interest in or designs on a revival of its business.

Accordingly, GemCap respectfully requests that the Court dismiss Debtor's Case pursuant to 11 U.S.C. § 1112(b). As explained below, Debtor's conduct—both prepetition and post-Petition—constitutes a veritable blueprint for bad faith and amply supports the requested dismissal, as follows: (i) Debtor filed its voluntary bankruptcy Petition on January 31, 2018, despite GemCap's repeated and generous attempts to assist the company (including offering forbearance agreements on the defaulted loan) and principally, if not solely, because GemCap would not subordinate its security interest in the Crocs Litigation; (ii) Debtor sought and retained

---

[3] Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada ("LR").

[4] The Crocs Litigation includes D. Nev. Case No. 2:17-cv-02054-JCM-NJK, D. Nev. 17-cv-02054-JCM-NJK, and D. Colo. Case No. 1:06-cv-00605-PAB-KMT (lead, consolidated with 16-cv-02004-PAB-KMT) (collectively, the "Crocs Litigation").

an unlicensed "investment bank", Three Twenty-One Capital Partners ("321"), to market the business as a going concern, yet both Debtor and 321 are excluding the Crocs Litigation from this anticipated sale effort despite the Crocs Litigation being scheduled as the largest asset of the estate; (iii) Debtor has no reasonable likelihood of reorganizing within a reasonable time, or at all, based on its own projections and reporting filed with the Court; (iv) Debtor's reporting is, in that regard, wildly inconsistent and reflects not merely Debtor's rapidly declining finances but an apparently intentional effort to conceal the defunct status of the business under a haze of accounting deception; (v) that reporting, when stripped of its subversive intent and—as the Leauanae Decl. makes painfully clear—demonstrates that Debtor is burning through cash collateral while presiding over the continuing decline of its own asset base and Collateral[5]; (vi) Debtor is spending more than it is receiving, notwithstanding that the vast majority of its secured and unsecured debt is not being serviced, and Debtor is losing money ($17,000 in February) despite extraordinarily favorable conditions afforded by the protection of the automatic stay (which cannot be duplicated in the marketplace); (vii) Debtor is an inadequate fiduciary that is mismanaging its dwindling assets and diverting GemCap's cash collateral; and (viii) Debtor's bankruptcy Case is nothing more than a disguised two-party dispute, since Debtor filed its bankruptcy Petition [ECF No. 1] immediately after resolution efforts with GemCap fell through and in an effort to avoid a pre-judgment writ of attachment in an action GemCap filed in California on January 31, 2018.

GemCap respectfully requests its Motion be granted and Debtor's Case be dismissed. Should the Court, for any reason, find cause not to dismiss this Case, then, in the alternative, GemCap respectfully requests it be afforded relief from the automatic stay so that it may proceed with new litigation against Debtor in California, or that this Court abstain from holding further

---

[5] Defined at Section 5.1 of the Loan and Security Agreement, which describes the collateral security for the payment and performance of obligations under the Loan and Security Agreement ("Collateral"). See ECF No. 30-1 at pp. 18-20 of 136. As identified in the Motion, on October 24, 2012, GemCap and Debtor entered into a Loan and Security Agreement, Promissory Note, and a Loan Agreement Schedule (among other agreements), which were subsequently amended eight (8) times over the next five years. True and correct copy of the Loan and Security Agreement with all eight amendments is attached as Ex. A to Ellis Decl., ECF No. 30-1.

proceedings in this matter until a determination of rights is had through litigation in the California courts.

### III.     STATEMENT OF FACTS

By this express reference GemCap incorporates all statements of fact and evidence it has proffered to the Court, including but not limited to the Statements of Fact set forth in the Motion and Reply, and all declarations and affidavits filed concurrently therewith in support.

### IV.     ANALYSIS

Section 1112(b)(1) of the Bankruptcy Code[6] provides, in that regard, that the Court may dismiss or convert to Chapter 7 a bankruptcy case for cause "unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate[.]" Section 1112(b)(2) articulates a limited exception to dismissal or conversion, noting that if the Court identifies "unusual circumstances" and Debtor, or another party in interest, establishes that the elements of 11 U.S.C. §§ 1112(b)(2)(A)-(B) have been met, the bankruptcy Court may not convert or dismiss the bankruptcy case.

**A.     Cause to Dismiss Exists Based on Debtor's Bad Faith Bankruptcy Filing.**

Courts have overwhelmingly and unambiguously held that a lack of good faith in filing a Chapter 11 Petition is cause for dismissal. *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994). When bad faith is established as cause for relief under Section 1112(b), "[d]ebtor bears the burden of proving that the Petition was filed in good faith." *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1048 (9th Cir. 2013); *Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC)*, 2011 WL 4502102, *9 (B.A.P. 9th Cir. Aug. 26, 2011).

Good faith does not refer to the debtor's subjective intent. Rather, it encompasses distinct equitable limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws and, in that context, decisions finding a lack of good faith generally are predicated on a variety of factors. *See Can-Alta Props., Ltd. v. State Sav. Mortg. Co.*, 87 B.R. 89, 91 (B.A.P. 9th Cir. 1988); *see also In re Marsch*, 36 F.3d at 828. Those facts—which the Court

---
[6] 11 U.S.C. §§ 101 – 1532.

weighs in assessing a lack of good faith—include whether: (1) the debtor has only one asset; (2) the debtor has an ongoing business to reorganize; (3) there are any unsecured creditors; (4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and (5) the case is essentially a two party dispute capable of prompt adjudication in state court. *See St. Paul Self Storage Ltd. P'ship v. Port Authority of St. Paul (In re St. Paul)*, 185 B.R. 580, 582-83 (B.A.P. 9th Cir. 1995).[7]

Against that decisional backdrop, Courts also generally recognize that two-party disputes should be resolved through the normal litigation process and that filing bankruptcy to avoid litigation in nonbankruptcy forums is bad faith. *See In re Silberkraus*, 253 B.R. 890, 906 (Bankr. C.D. Cal. 2000). Accordingly, and in the two-party context, where a debtor's filing is intended to deter or harass a creditor unreasonably, and to facilitate a speedy and feasible reorganization, the Court may and should conclude that the Petition has been filed in bad faith. *See In re St. Paul*, 185 B.R. at 583. *In re St. Paul* is instructive. The Bankruptcy Appellate Panel ("BAP") there affirmed the bankruptcy Court's finding of a bad faith filing when the debtor's purpose in filing its Petition was not to effectuate a reorganization of its business, but to "remove a two-party dispute to bankruptcy Court to delay and frustrate a creditor." *Id.* at 584; *see also In re Marsch*, 36 F.3d at 829; *In re Van Owen Car Wash, Inc.*, 82 B.R. 671, 673 (Bankr. C.D. Cal. 1988); *see also In re Oasis at Wild Horse Ranch, LLC*, 2011 WL 4502102 at *1. In reaching that conclusion, the BAP focused on the two-party dispute as the basis of dismissal for bad faith under Section 1112(b), finding as follows:

> The filing of the bankruptcy petition has delayed, not hastened, completion of the litigation. This tactic belies the stated intention of Debtor's proposed plan to promptly pursue its claims against [the opposing party] for the benefit of its creditors. Debtor was poised to do just this in state court yet sought the unneeded refuge of the bankruptcy court. The circumstances support [the opposing party]'s contention on appeal that the sole purpose of the bankruptcy was to delay the day of reckoning on [the opposing party]'s counterclaim against Debtor and its general partner . . . .

---

[7] Other "bad faith" factors can include "the timing of the filing of the Petition; whether the debtor is 'financially distressed,'; whether the Petition was filed strictly to circumvent pending litigation; and whether the Petition was filed solely to reject an unprofitable contract." *Barclays-Am./Bus. Credit Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.)*, 871 F.2d 1023, 1027 (11th Cir. 1989).

*Id*. at 583-84. The same result should occur here.

**1.    Bad Faith Is Established on This Record.**

Notably, Debtor's conduct, both before and after the Petition's filing, demonstrates that the sole purpose of this proceeding is preservation of the Crocs Litigation for the benefit of insiders, not to facilitate a legitimate and good faith effort to reorganize Debtor. Richard Ellis has testified, for example, that GemCap made repeated efforts to assist Debtor in the weeks prior to the Petition Date of January 31, 2018—offering forbearance agreements and other accommodations that could have afforded Debtor time and space to manage the decline of its business and potentially structure a pathway to ultimate survival. *See, e.g.*, Ellis Decl. at ¶ 32. But Debtor refused all those offers of help, not because the offers impaired its business (they did not) but because GemCap would not subordinate its security interest in the proceeds of the Crocs Litigation. And that strips the thin veneer of legitimacy off Debtor's Petition: in the midst of a collapse of its collateral and business, Debtor disregarded GemCap's lifelines because it insisted on receiving priority over the proceeds of the Crocs Litigation and was willing to scuttle its business in order to ensure that priority. Steven Mann even told Richard Ellis that Steven Mann's only ambition was to keep the company technically operating until the Crocs Litigation was concluded. Ellis Decl. at ¶ 68. Thus, when GemCap reasonably refused to subordinate its security interest in the Crocs Litigation, Debtor filed for bankruptcy rather than risk that litigation being wrested from the Mann Brothers' control.

The post-petition record underscores that perfidious purpose. The Debtor moved, for example, to employ 321, the unlicensed and unqualified "investment bank", to market Debtor as a "going concern" to prospective purchasers. But it's clear that neither 321 nor Debtor intend to market the Crocs Litigation as part of that effort, excising from the marketing and proposed sale process the single largest asset of Debtor's estate, according to Debtor.[8] 321's valuation

---

[8] GemCap does not and cannot assign any value to the Crocs Litigation given its inherently speculative nature and the highly contested nature of the competing claims. That said, Debtor has scheduled the Crocs Litigation as its most valuable asset by a substantial margin, representing singularly more than half Debtor's overall asset value. *See generally* ECF No. 77. GemCap cannot share that conclusion, for reasons already explained, and the Crocs Litigation plainly represents a present liability because of the costs attendant to prosecuting it. But if Debtor intends to market the company as a going concern, all assets must be included in any effort to put the company to market, and certainly the asset Debtor contends is the most valuable of the lot must be included in the sale effort.

overview expressly excludes the Crocs Litigation, in fact, and Debtor acknowledged in open Court in March that the Crocs Litigation has not been included in marketing efforts. All of which is to reiterate what is clear from the record—Debtor, and more specifically its two primary insiders the Mann Brothers, are using the bankruptcy process to protect their personal interest in the Crocs Litigation, not to reorganize Debtor's business. And the artifice they and Debtor have constructed is now transparent. Debtor's principals intend to exhaust GemCap's cash collateral to keep Debtor technically afloat—if all but defunct—to buy time while 321, the unlicensed investment bank, purportedly solicits investment or purchasers, all while jealously guarding the Mann Brothers' interest in and control over the Crocs Litigation. This is, simply put, a litigation strategy, not an authentic bankruptcy proceeding.

### 2.    The Principles of the *St. Paul P'ship* Decision Support GemCap's Position.

These facts speak directly to the principles set out in the *St. Paul* decision and the implications of that decision. The debtor there filed its petition in the midst of a contentious litigation with its former commercial landlord and plainly intended the Petition principally as an instrument to leverage an advantage in the litigation. The Bankruptcy Court granted the landlord's motion to dismiss, finding that the Petition was filed not in an effort to effectuate a legitimate reorganization but rather as a litigation tactic. The BAP affirmed, finding that the record supported the lower Courts determination that the Petition was filed in bad faith. The obvious similarities to this Case, where Debtor's Petition is a naked attempt to preserve the Crocs Litigation for insiders, alone warrants the same result: dismissal. But in affirming dismissal, the BAP in *St. Paul* articulated several non-exclusive factors that can inform the determination of bad faith, including those identified below and which support a finding of bad faith in this Case.

#### a.    Debtor's Accounting Discrepancies.

To start, Debtor has no effective ongoing business capable of reorganization and no cash to make ongoing adequate protection payments. These factors (numbers 2 and 4 outlined in *St. Paul*) stand out in confirming that Debtor is effectively defunct and cannot reorganize. Specifically, Debtor's post-petition reporting is not simply inconsistent—and occasionally

indecipherable—but shifts between cash and accrual accounting methods in a thinly-veiled effort to conceal the true state of financial affairs of the business. As the Leauanae Decl. illustrates, Debtor's reports reflect a company that is out of cash and out of time. Mr. Leauanae explains specifically that Debtor is using accounting gimmickry to obscure the fact that Debtor is essentially defunct and in a wind-up process. *See* Leauanae Decl. at ¶¶ 7-8. He concludes without ambiguity that Debtor is insolvent and any continued operations will result in nothing other than a further decline in GemCap's collateral. *See* Leauanae Decl. at ¶ 8.

That financial condition is equally clear from Debtor's reporting to this Court. Indeed, deconstructing the massive dichotomies between the Weekly Reports[9] and the February Monthly Operating Report ("February MOR") [ECF No. 180] is a challenge in itself. Several numerical variations distinguish themselves. Debtor's cash collateral budget ("Budget") [ECF No. 6-2] projected, for example, revenue between February 1, 2018, and March 3, 2018, of $370,000, and anticipated expenditures over the same period of $315,000. The Weekly Cash Collateral Reports for the same period [ECF Nos. 105, 125, and 138] demonstrated, in contrast, actual receipts of merely $271,900 ($100,000 less than projected), with expenditures of $300,600. The Debtor, in other words, spent $30,000 more than it received between February 1, 2018, and March 2, 2018.[10] And Steven Mann admitted that fact in open Court on March 12, 2018. But the February MOR inexplicably lists disbursements of $198,716—more than $100,000 less than actual expenditures reported to the Court over the same period.[11] The only feasible explanation, as Mr. Leauanae testifies, is that Debtor is using the accrual accounting method strategically and conveniently, to exclude expenses actually incurred in February but which it may contend were accrued previously. *See* Leauanae Decl. at ¶ 8.

---

[9] *See* ECF Nos. 83, 125, 138, 149, 164 (collectively, the "Weekly Reports").

[10] How, given these numbers, Debtor could have more money in the bank at the end of the month is mystifying, to say the least. The Budget reported $34,000 of available cash on February 1, 2018; when coupled with the nearly $30,000 cash deficit over the ensuing thirty days (as Debtor itself reported) it is difficult to fathom how Debtor's cash position could have improved over that time. And yet that is what Debtor purports to show.

[11] GemCap notes that the final of Debtor's Weekly Reports for February included March 1 and 2, and thus the $300,600 in expenditures mentioned above incudes two days in March. That said, the discrepancy between the Weekly Reports and MOR-reported disbursements remain stark.

This form of gamesmanship has no place in this bankruptcy proceeding, where true and accurate reporting are essential to the integrity of the process. Beyond that, Debtor's legerdemain cannot conceal essential facts: Debtor's receipts for February were $100,000 less than it projected to the Court on February 1, 2018—continuing a pattern of overstating financial performance in order to induce accommodations—while its actual reported expenditures were merely $15,000 less than projected, and Debtor is burning rapidly through GemCap's cash collateral while not replenishing inventory or otherwise resuscitating the business in any sense.

### b.  Debtor's Dwindling Inventory.

The state of the inventory is particularly notable because Debtor is purchasing little to no new inventory, which is an essential component of any reorganization because no consumer business can survive unless it acquires goods to sell.[12] As a result, the company's inventory continues simultaneously to age and decline in value. The February MOR identifies inventory value of only $5,871,649, for example, or $173,000 less than the $6,044,751.81 Debtor reported on its last borrowing base certificate to GemCap on January 21, 2018 [Ellis Decl. at Ex. "R"].[13] The Leauanae Decl. is again instructive, because it similarly observes the immutability of the inventory and the resulting consequences for the business. *See* Leauanae Decl. at ¶¶ 8-9. And these facts collectively and likewise extend an ominous trend reiterating what has been clear to GemCap from the outset of this proceeding—Debtor's asset and collateral base is in full collapse, and the business has long since crossed the Rubicon from a salvageable enterprise to one sustaining itself only in the barest technical sense and for the sole purpose of allowing its insiders to prosecute and benefit from the Crocs Litigation.

Despite this reporting, Steven Mann has twice testified under oath in March that Debtor has actually acquired inventory. He purported to explain the delay in those acquisitions as a result of the Chinese New Year, though there is no evidence that Debtor was unable to buy inventory over the same period in previous years. That said, Debtor's reporting to the Court

---

[12] Debtor's Weekly Reports identified no inventory purchases in February.

[13] Debtor's Weekly Reports for March 3 to March 9, 2018 [ECF No. 149] identified a further decline in inventory value, to $5,834,550.91, and no new inventory purchases for that week.

conflicts directly with Steven Mann's twice-repeated testimony under oath. The Weekly Reports do not reveal inventory purchases between February 1, 2018, and March 9, 2018. Accordingly, Steven Mann was either testifying falsely, or this is yet another example of Debtor's opaque approach to accounting.[14] Whatever the explanation, the fact remains that inventory continues to decline, and it also continues to age.

### c. There Is No Effective Ongoing Business Capable of Reorganization.

These facts establish that, far from the rosy projections Debtor would have this Court accept, Debtor as a company is effectively out of money and has no conceivable reorganization plan. The Leauanae Decl., having unwound Debtor's byzantine accounting methods, is emphatic on that point: Debtor is effectively defunct and is being maintained on legal life support while it sells the remainder of its assets. *See* Leauanae Decl. at ¶ 9. There is consequently no pathway forward, particularly when considering that the company not only must address GemCap's secured debt but an array of unsecured debt that is essential to any prospective operations. By way of example only, the Schedules identify hundreds of thousands of dollars in obligations to Federal Express and UPS, both of which are obviously necessary for any consumer business to function effectively. *See generally* ECF No. 77. The same is true of ongoing royalty payments that are listed on borrowing base certificates submitted to GemCap (and designated for payment in the cash collateral Budget) but which apparently have not been paid in any capacity since February 1, 2018. *See generally* Ellis Decl. These vendors must be paid, and they must be willing to do business with Debtor as an essential companion to any reorganization plan. But Debtor has not suggested, in either its representations to the Court or its reporting (the Weekly Reports), that it has the slightest inclination how to address this paralytic problem. To the contrary, Debtor reported a $17,000 loss for February, notwithstanding the sophistry in its

---

[14] Debtor retreats into accrual accounting when it wants to offload expenses (hence, the February MOR reflects $100,000 less in expenditures than that shown on the Weekly Reports). This may be an instance where Debtor is embracing a shift back to cash accounting in order to create the false impression that disbursements are lower. Assuming arguendo that some inventory purchases have been made, it may be that Debtor has not yet paid for those purchases. Thus, while liability has been accrued, neither the February MOR nor the Weekly Reports show those acquisitions because Debtor has not disbursed the cash reflecting those purchases. This suggests, in other words, that Debtor is alternating between cash and accrual accounting, depending on convenience, and is obscuring the actual status of the company in the process.

reporting and the fact that it is not presently paying any of its secured or unsecured creditors. Simply put, Debtor has no plan of reorganization. If it did, the remnants and indicia of a salvageable company would be apparent in the reporting, both the Weekly Reports and the February MOR. They are not. Debtor cannot survive, and it has no intention of surviving.

### d. This Case Is a Two-Party Dispute.

Additionally, and notwithstanding the presence of unsecured creditors, this is essentially a two-party dispute. The myriad financial issues discussed above alone warrant dismissal of this Case because they confirm that Debtor is no longer an operating business in any meaningful sense, and it cannot be reorganized. Beyond that, however, this Case is, stripped to its core, a two-party dispute between Debtor and GemCap, a factor which further supports dismissal.

GemCap acknowledges, of course, that Debtor has unsecured creditors. Indeed, those creditor claims are substantial and, based on the financial data proffered by Debtor, incapable of being resolved in this Case. Debtor's assets are admittedly insufficient to satisfy the secured debt, much less realize payment to unsecured creditors. Specifically, Debtor admitted in oral argument on March 12, 2018, during the evidentiary hearing on cash collateral, that if its assets are sold GemCap will not be made whole. There is not, in other words, sufficient value to satisfy the obligations to GemCap and, if GemCap were left with a deficiency, then Debtor cannot genuinely represent to this Court that there is any mechanism by which unsecured creditors could expect anything. Debtor contends the mere presence of unsecured creditors cuts against dismissal. But that does not change the basic reality that GemCap and Debtor are engaged in a two-party dispute, one in which Debtor filed this Case in order to wrest any litigation advantage from GemCap.

Beyond that, Debtor's obsession with the Crocs Litigation, and, more particularly, the Mann Brothers' determination to personally reap what they believe to be the benefits of it, further establishes the two-party nature of this Case. As set forth *supra*, the issue that ultimately frustrated GemCap's efforts to accommodate Debtor was Debtor's insistence that GemCap subordinate its security interest in the proceeds of the Crocs Litigation. That reasonable refusal was the primary stumbling block, rooted in the Mann Brothers' insistence on controlling the

1  Crocs Litigation—this intransigence led to the filing of Debtor's Petition on January 31, 2018.
2  *See* Ellis Decl. at ¶¶ 66-68. All other conditions were negotiable, but not that one. *Id.* Since
3  January 31, 2018, it has been more of the same, with Debtor purporting to market the company
4  as a "going concern" but excluding the Crocs Litigation from the scope of those efforts.

5  To make matters even worse, Debtor's insiders conspired and participated together to
6  fraudulently encumber Steven Mann's own Nevada real property in an effort to render Mr. Mann
7  judgment-proof. The above history serves to confirm what this Case actually entails, namely that
8  Debtor's insiders want to vitiate GemCap's security priority in the Crocs Litigation and defraud
9  GemCap. And the Mann Brothers are willing to waste what is left of the cash collateral to force
10  that result. GemCap, knowing it is undersecured and not wanting to relinquish any priority
11  (notwithstanding that it cannot assess the value of the Crocs Litigation itself), refuses. All other
12  matters are ancillary. That presents, in short, a two-party dispute, where the pretense of Debtor's
13  filing gives way to reality that this Case was filed in bad faith and as a litigation tactic, not as a
14  legitimate attempt to salvage Debtor's company.

15  Based upon the foregoing, this Court should dismiss Debtor's Petition as a bad faith
16  filing involving what boils down to a two-party dispute in which Debtor tried to gain litigation
17  advantage by filing this instant Case.

18  **B.    Cause to Dismiss Exists Based on Debtor's Unauthorized Use of Cash Collateral.**

19  Section 1112(b)(1) vests the Court with broad discretion in determining cause. *See*
20  *Sanders v. U.S. Trustee (In re Sanders)*, 2013 WL 1490971, *6 (B.A.P. 9th Cir. Apr. 11, 2013).
21  Section 1112(b)(4)(D) of the Bankruptcy Code provides that the unauthorized use of cash
22  collateral substantially harmful to one or more creditors warrants dismissal or conversion of a
23  chapter 11 debtor's bankruptcy case. The evidence here plainly demonstrates widespread
24  mismanagement of cash collateral demanding the dismissal of this Case for cause.

25  **1.    Debtor Intentionally Diverted Cash Away From GemCap.**

26  To start, Debtor intentionally diverted cash away from GemCap in contravention of the
27  Loan Documents and failed to account for those diverted funds. That misconduct is sufficient to
28  warrant dismissal alone, but to GemCap's knowledge and understanding none of this has been

cured or halted, and indeed continues to date. Under the Loan Agreement, Debtor was required to direct all sales income to GemCap's Collection Account in order to protect GemCap's Cash Collateral. Ellis Decl. at ¶ 17 and Ex. "C". But GemCap discovered evidence that Debtor was actively and deliberately diverting funds away from GemCap's Collection Account via the PayPal Transfers. *See* Ellis Decl. at ¶ 35. This intentional diversion transpired certainly without GemCap's knowledge or consent and is a breach of the Loan Documents. GemCap has also recently learned Debtor was violating the Loan Documents by diverting GemCap's collateral without GemCap's consent by habitually not forwarding payments to GemCap that were received into Debtor's bank account. *Id.* at Exs. "P" and "Q" thereto. GemCap's demands for an accounting of and information related to these wrongful transfers have fallen on deaf ears. *Id*.

### 2. Debtor's Own Records Evince Post-Petition Cash Collateral Mismanagement

GemCap initially filed its Motion on February 8, 2018, but the Weekly Reports (*i.e.*, the notices of cash collateral filed with this Court) and the February MOR filed since then have demonstrated ongoing cash collateral mismanagement prejudicial to GemCap. The record specifically shows that: (1) Debtor has systematically wasted approximately $250,000 in inventory since February 1, 2018, without replacing any of that inventory, further imperiling GemCap's collateral and sealing Debtor's fate; (2) Debtor has reported different expenditures at different times ($300,000 in disbursements for February in its Weekly Reports, but only $198,000 in the February MOR), but nonetheless managed to lose $17,000 in February despite having the protection of the automatic stay and being free from litigation or collection efforts and not having to pay any secured or unsecured debt; and (3) Debtor is not conjuring any plan of reorganization that could lead to the revival of its business but is instead burning through its cash collateral and remaining assets in the hope that the Crocs Litigation will provide a "Hail Mary"-style payday for the Mann Brothers. With Debtor losing money despite the numerous institutional protections now sheltering it, such a trend can only be the result of mismanagement of cash collateral. The Court should therefore dismiss this Case.

**C.     There Are No Unusual Circumstances on This Record.**

The Bankruptcy Code requires Debtor to demonstrate unusual circumstances exist in order to rescue it from the statutory mandate of conversion or dismissal under 11 U.S.C. § 1112. *Warren v. Young (In re Warren)*, 2015 WL 3407244, *4 (B.A.P. 9th Cir. May 28, 2015). Courts have determined that "unusual" describes conditions that are not common in most chapter 11 cases and which establish that dismissal or conversion is not in the best interests of creditors and the estate. *See, e.g.*, *In re Miell*, 419 B.R. 357, 367 (Bankr. N.D. Iowa 2009); *In re LG Motors, Inc.*, 422 B.R. 110, 117 (Bankr. N.D. Ill. 2009).

Unusual circumstances are present on this record, and debtor has failed to demonstrate for the Court what "unusual circumstances" exist that would rescue it from the statutory mandate of conversion or dismissal. In short, not only can Debtor establish no "unusual circumstances", but Debtor is manipulating the bankruptcy process. On this record the Motion should be granted.

### D. Debtor Cannot Establish a Reasonable Likelihood of Plan Confirmation.

Debtor has no reasonable likelihood of plan confirmation on this record. Although the Mann Declaration [ECF No. 10] speculates that Debtor will realize an elusive windfall from the Crocs Litigation, that speculation is apocryphal and insufficient to carry Debtor's burden of establishing a "reasonable likelihood of plan confirmation". Emphasizing that infirmity, Debtor's own cash collateral Budget failed to demonstrate an ability to fund the Crocs Litigation. GemCap is likewise concerned that the same fanciful rosy Budget expressly contradicts the projections Debtor presented to GemCap less than ten (10) days before the Petition Date showing Debtor's finances in the red. [*Compare* Budget ECF No. 6-2, with Ex. G to Ellis Decl. and with Ex. M to Ellis Decl.] In short, Debtor has not, and cannot, discharge its burden of demonstrating a reasonable likelihood of plan confirmation.

### V. IN THE ALTERNATIVE, THE COURT SHOULD APPOINT A TRUSTEE

### A. Appointment of a Trustee Would Serve the Interests of the Estate.

GemCap requests appointment of a trustee if the Court does not dismiss this Case. Section 1112(b)(1) expressly contemplates appointment of a chapter 11 trustee or examiner if the Court finds appointment of an estate professional would be in the best interests of Debtor's creditors and of the estate. The bankruptcy Court has discretion to appoint a trustee. *See In re*

- 14 -

3761832.1 24093-808
2030237_4.docx

*North*, 212 F. App'x 626, 626 (9th Cir. 2006). Relevant factors in making a determination as to whether appoint a trustee include: (1) materiality of the misconduct—cash management issues are critical to any reorganization; (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers—evenhandedness is not apparent on this record; (3) the existence of prepetition avoidable preferences or fraudulent transfers—yes, these are present here based on the Schedules [ECF No. 77]; (4) unwillingness or inability of management to pursue estate causes of action—although the Case is young, Debtor has not demonstrated a willingness or ability to pursue estate causes of action; (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor—a serious concern for this Debtor; and (6) self-dealing by management or waste or squandering of corporate assets—also a significant concern in this Case.

**B.     Appointment of an Examiner Would Also Serve the Interests of the Estate.**

An examiner put in place to investigate the irregularities in Debtor's reporting, the aberrations in pre- and post-petition conduct of Debtor's principals in dealings with creditors, and the issues regarding Debtor's inventory management would certainly serve the interests of the estate. GemCap respectfully requests the Court consider same, if the Case is not dismissed.

**VI.     IN THE ALTERNATIVE, RELIEF FROM STAY SHOULD BE GRANTED**

GemCap incorporates all arguments made *supra* and requests this Court grant it relief from the automatic stay for cause to pursue Debtor in litigation in California. Lander Decl. at ¶¶ 3-7. "The existence of bad faith in commencing a Case constitutes cause for granting relief from the stay pursuant to § 362(d)." *See Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996). As explained above, Debtor is unable to show a reasonable likelihood of reorganization or that GemCap's collateral or a stay of litigation are necessary for an effective reorganization of Debtor. Those facts support the stay being lifted, permitting litigation in California.

**VII.     CONCLUSION**

For the foregoing reasons, GemCap respectfully requests its Motion be granted.

Dated this 12th day of April 2018.

        **HOLLEY DRIGGS WALCH**
        **FINE WRAY PUZEY & THOMPSON**

        */s/ signature*

        Ogonna M. Brown, Esq. (NV Bar No. 7589)
        F. Thomas Edwards, Esq. (NV Bar No. 9549)
        Mary Langsner, Esq. (NV Bar No. 13707)
        400 South Fourth Street, Third Floor
        Las Vegas, Nevada 89101

        Todd M. Lander, Esq. (CA Bar No. 17031)
        *Admitted Pro Hac Vice*
        Arash Beral, Esq. (CA Bar No. 245219)
        *Admitted Pro Hac Vice*
        1888 Century Park East, Suite 1900
        Los Angeles, California 90067

        *Attorneys for GemCap Lending I, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Holley Driggs Walch Fine Wray Puzey & Thompson and that on the 12th day of April 2018, I caused to be served a true and correct copy of SECURED CREDITOR GEMCAP LENDING I, LLC'S SUPPLEMENT IN SUPPORT OF MOTION TO DISMISS OR APPOINT A TRUSTEE FOR BAD FAITH OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ABSTENTION in the following manner:

☒ (ELECTRONIC SERVICE) Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

_____
An employee of Holley Driggs Walch Fine Wray Puzey & Thompson

2030237_4.docx
3761832.1 24093-808