1  Ogonna M. Brown, Esq. (NV Bar No. 7589)        E-filed on: April 12, 2018
   Email: obrown@nevadafirm.com                    Todd M. Lander, Esq. (CA Bar No. 17031)
2  F. Thomas Edwards, Esq. (NV Bar No. 9549)       Email: todd.lander@ffslaw.com
   Email: tedwards@nevadafirm.com                  Admitted *Pro Hac Vice*
3  Mary Langsner, Esq. (NV Bar No. 13707)          Arash Beral, Esq. (CA Bar No. 245219)
   Email: mlangsner@nevadafirm.com                 Email: arash.beral@ffslaw.com
4  HOLLEY DRIGGS WALCH                             Admitted *Pro Hac Vice*
   FINE WRAY PUZEY & THOMPSON                      FREEMAN, FREEMAN & SMILEY, LLP
5  400 South Fourth Street, Third Floor            1888 Century Park East, Suite 1900
   Las Vegas, Nevada 89101                         Los Angeles, California 90067
6  Telephone:    702/791-0308                      Telephone:  (310) 255-6100
   Facsimile:    702/791-1912                      Facsimile:  (310) 255-6200
7  ***Attorney for GemCap Lending I, LLC***

8                  **UNITED STATES BANKRUPTCY COURT**

9                         **DISTRICT OF NEVADA**

10 In re:                                   | Case No. BK-S-18-10453-LED
                                            | Chapter 11
11 U.S.A. DAWGS, INC.,                      |
                                            | **DECLARATION OF RICHARD ELLIS IN**
12             Debtor.                      | **SUPPORT OF SECURED CREDITOR**
                                            | **GEMCAP LENDING I, LLC'S RENEWED**
13                                          | **MOTION TO DISMISS OR APPOINT A**
                                            | **TRUSTEE FOR BAD FAITH OR, IN THE**
14                                          | **ALTERNATIVE, MOTION FOR RELIEF**
                                            | **FROM THE AUTOMATIC STAY OR**
15                                          | **FOR ABSTENTION**

16                                          | Date of Evidentiary Hearing: **May 10, 2018**
                                            | Time of Evidentiary Hearing: **9:30 a.m.**
17                                          | Place:  Courtroom No. 2, Third Floor
                                            |            Foley Federal Building
18                                          |            300 Las Vegas Blvd. S.
                                            |            Las Vegas, NV 89101
19

20         I, Richard Ellis, declare that:

21         1.     I am over the age of 18 and mentally competent. Except where stated on

22 information and belief, I have personal knowledge of the facts in this matter, and if called upon

23 to testify, could and would do so.

24         2.     I am the co-President of secured creditor GemCap Lending I, LLC ("GemCap").

25         3.     I make this Declaration in Support of GemCap's Renewed Motion to Dismiss or

26 Appoint a Trustee for Bad Faith or, it the Alternative, Motion for Relief from the Automatic Stay

27 or Abstention.

28

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

## I.    GEMCAP'S LENDING BUSINESS

4.    GemCap is a family-run asset-based commercial lender that has established a thriving niche serving small- and mid-sized businesses in need of funding unavailable from larger and traditional lending institutions.  For example, GemCap funded in excess of $70 million in new loans and purchased a multimillion dollar factor in 2017 alone.  Formed in 2008, GemCap has built a reputation for integrity, diligence and fair play among borrowers, and has consequently seen dramatic growth in its loan portfolio in the past several years.

5.    The basic business blueprint is straightforward.  GemCap receives over $2 billion in loan requests annually, many from distressed companies that cannot turn to or rely upon conventional funding.  The company then assesses the asset base of each prospective borrower to determine if sufficient tangible and recoverable assets – typically taking the form of equipment, inventory and accounts receivable – exist to secure the requested loan and make GemCap whole in the event of a default.  If so, and the borrower otherwise qualifies, appropriate funding and security terms are negotiated.

6.    Once a loan is approved, GemCap typically funds on a revolving basis subject to a specified limit and ratio to asset value, a structure under which the borrower must demonstrate that its asset base and liquidity warrant continued lending.  More specifically, borrowers must accompany each request for funding with a borrowing base certificate delineating the available inventory, accounts receivable and other loan security, and establishing that the borrower is entitled to receive funding in the requested amount.  These certificates are essential for GemCap, given that they are the central instrument in the funding process and are relied upon in making lending decisions.  Where GemCap funds a request based on a certificate exaggerating the borrower's attachable asset base and/or otherwise misrepresenting the financial picture such that the borrower is not eligible to receive the funding it has requested, the result is an overadvance – *i.e.*, the borrower has been funded in an amount exceeding its eligibility.  GemCap engages in ongoing due diligence concerning certificates and the borrower's representations in them – by, among other things, routinely auditing the borrower's certificates and financial circumstances – in order to avoid overadvances.  But some inevitably occur, and GemCap's loan documents

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

1    invariably require that they be repaid immediately.  Where they are not, GemCap then pursues its

2    rights against the pledged security or, when necessary, initiates litigation.

3    **II.    GEMCAP'S LOAN TO THE DEBTOR, U.S.A. DAWGS.**

4        7.    On October 24, 2012, GemCap and the debtor U.S.A. Dawgs, Inc. ("USA

5    Dawgs" or the "Debtor"), entered into a Loan and Security Agreement, Promissory Note, and a

6    Loan Agreement Schedule (among other agreements), which were subsequently amended eight

7    times over the next five years.  A true and correct copy of the Loan and Security Agreement with

8    all eight of its amendments is attached to this Declaration as **Exhibit "A"**.  A true and correct

9    copy of the Promissory Note with all seven of its amendments is attached hereto as **Exhibit "B"**.

10   A true and correct copy of the Loan Agreement Schedule is attached hereto as **Exhibit "C"**.

11   (Collectively, these documents shall be referred to as the "Loan Documents").  (While

12   Amendment No. 8 to the Loan and Security Agreement is already included in Exhibit A, a stand-

13   alone copy of Amendment No. 8 is also attached as **Exhibit "D"** for ease of reference, as that

14   amendment will be discussed below.)

15       8.    The construct of the Loan Documents, such as it evolved over time, is relatively

16   simple.  GemCap agreed to provide a revolving credit facility to USA Dawgs which, at its

17   highest point, equaled the maximum principal amount of $7,500,000.00.  GemCap later agreed,

18   at the Debtor's request, to reduce that maximum to $5,500,000, in light of a continuing decrease

19   in the Debtor's assets – i.e., the amount of inventory and accounts receivable against which it

20   was entitled to borrow under GemCap's lending formula.  In essence, the Debtor's collateral

21   base was declining, and its eligibility to receive funding from GemCap was reducing in a

22   proportionate amount – it could not, as a result, borrow to the maximum amount theoretically

23   available ($7.5 million).  But it was incurring fees under the Loan Documents as a result of its

24   not using the full amount of the funding line.  In an effort to accommodate the Debtor, GemCap

25   lowered the maximum principal credit facility amount to $5.5 million, in order to allow the

26   Debtor to avoid paying fees on the unused portion of the facility.  In all, since October 24, 2012,

27   GemCap loaned funds to the Debtor in excess of $50,000,000.00 under the terms of Loan

28   Documents.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

9.      GemCap received, as a condition to the loan, a first priority security interest in all of the Debtor's assets, *i.e*., "Collateral" as defined in Section 5.1 of the Loan and Security Agreement, and it perfected that security interest by filing UCC Financing Statements in Nevada. A true and correct copy of GemCap's UCC Financing Statements are attached to this Declaration collectively as **Exhibit "E"** and are incorporated herein as though set forth in full.

10.     In addition to GemCap's security interests, the Loan Documents, and the Loan and Security Agreement in particular, include standard loan criteria for GemCap:

- The Debtor "shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule."  Besides loan costs and fees, Section 1(d) allows funds to be only used for "ordinary course working capital needs of the Borrower." This restriction on use is critical, because it ensures that GemCap loan funds are used for the operational purposes for which the money is intended and as to which the collateral supporting the loan relates.  As explained below, however, USA Dawgs systematically and intentionally breached this restriction by using loan proceeds to fund an expensive and uncertain litigation, and not operations.  Loan and Security Agreement, Ex. "A", ¶ 2.3.

- GemCap maintains, as collateral for the loan, a first priority security interest in and lien upon "all now owned and hereafter acquired property and assets of Debtor and the Proceeds and Products thereof."  That pledge of security delineates the full scope of assets and property comprising the collateral and, for purposes of this action, indisputably includes all of the Debtor's accounts receivable and inventory – and any proceeds thereof – and any commercial tort claims the Debtor holds.  Loan and Security Agreement, Ex. "A", ¶ 5.1.

- The Debtor may not dispose of any collateral except for legitimate business reasons without GemCap's consent, *i.e.*, sale of inventory or disposition in the ordinary course of business.  Loan and Security Agreement, Ex. "A", ¶ 5.4(e).

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

- The Debtor must promptly notify GemCap within two business days of certain occurrences, including the depletion of any Collateral and material adverse information relating to the Debtor's financial condition.  Loan and Security Agreement, Ex. "A", ¶ 9.1.

- "Borrower shall observe, perform and comply with the covenants, terms and conditions of this Agreement and the other Loan Documents."  Loan and Security Agreement, Ex. "A", ¶ 9.4.

- Events of default occur upon the Debtor's failure to pay monies when due, failure of insurance, failure to perform, or change in condition (among other events of default).  Loan and Security Agreement, Ex. "A", ¶¶ 11.1, 11.2, 11.3, 11.9.

- The Debtor, to further ensure GemCap's rights to the pledged collateral, irrevocably appointed GemCap as its attorney-in-fact.  Loan and Security Agreement, Ex. "A", ¶ 13.3.

- GemCap maintains rights to inspect the Debtor's books, records, and premises where any collateral is located at any time following an event of default.  Loan and Security Agreement, Ex. "A", ¶ 13.8.

11.     Because GemCap's security interests is primarily in the Debtor's collateral, the preservation of that collateral is a centerpiece of the loan transaction from our perspective.  And as an asset based lender, ensuring the preservation of collateral is essential for GemCap.  The representations and warranties in the Loan and Security Agreement emphasize the importance of that preservation, and of GemCap's right to review books and records reflecting the status of collateral.  These provisions exist for a reason, and are based on GemCap's experience as an asset based lender.  They protect GemCap's rights under the Loan and Security Agreement – and specifically its interest in the "Collateral" securing the loan – by requiring that all Collateral and records be maintained and preserved.  Thus, if these requirements are not satisfied, the very essence of GemCap's benefit of the bargain concerning the Loan and Security Agreement is sacrificed.

12.    The scope of the collateral the Debtor pledged in this case is standard for GemCap, and broad in scope.  Section 5.1 of the Loan and Security Agreement, as amended, describes the pledged security, and includes:

(a)    Accounts;
(b)    Chattel Paper;
(c)    Commercial Tort Claims;
(d)    Deposit Accounts;
(e)    Documents;
(f)    Electronic Chattel Paper;
(g)    Equipment;
(h)    Fixtures;
(i)    General Intangibles (including, without limitation the website domain names set forth on Section 8.21 to the Borrower's Disclosure Schedule);
(j)    Goods;
(k)    Instruments;
(l)    Inventory;
(m)    Investment Property;
(n)    Letter-of-Credit Rights;
(o)    Payment Intangibles;
(p)    Promissory Notes;
(q)    Software;
(r)    Tangible Chattel Paper;
(s)    Securities (whether certificated or uncertificated);
(t)    warehouse receipts;
(u)    cash monies;
(v)    tax and duty refunds;
(w)    Intellectual Property;
(x)    All present and future books and records relating to any of the above including, without limitation, all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to any of the foregoing maintained with or by any other Person);

. . .

(y)    Any and all products and Proceeds of the foregoing in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any or the foregoing.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

### III.    THE BORROWING PROCEDURES

13.    The Loan and Security Agreement was accompanied by a Loan Agreement Schedule ("Schedule"), also executed on October 24, 2012.  *See* Ex. "C".  The Schedule, at Section 1(c)(v), prescribes the specific manner in which the Debtor could request funding and requires the submission of a borrowing base certificate (the "Borrowing Base Certificate") substantiating the request and demonstrating the Debtor's entitlement to the amount sought:

> "**(v)    Borrowing Procedures.**  Whenever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ("Borrowing Certificate") no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of all Accounts (B) a schedule of Eligible Accounts setting forth the calculation of the Eligible Accounts on which such Advance is to be based and a calculation of the Advance requested in connection therewith, (C) a schedule of all Inventory, and (D) a schedule of Eligible Inventory setting forth the calculation of Eligible Inventory on which such Advance is to be based and the calculation of the Advance requested in connection therewith …"

14.    These Borrowing Base Certificates form the basis of GemCap's loan structure, and it is important to understand how they work.  The Debtor's eligibility for advances under the Loan Documents was not based on whether it had borrowed the maximum allowable amount of the facility – in this case, $2 million initially prior to increasing to $7.5 million before a reduction at the Debtor's request to $5.5 million.  Rather, GemCap advances were based solely on whether the Debtor had existing "eligible" collateral, meaning that the Debtor was permitted under the terms of the loan to borrow against that collateral at the "advance rates" provided in the Loan Documents.  In that regard, accounts receivable were generally considered eligible (under Section 1.35 of the Loan and Security Agreement), if they were issued in the ordinary course of business and were not unpaid for more than ninety days, and inventory was generally eligible (under Section 1.36) if it reflected finished goods and was subject to GemCap's perfected security interest.  The advance rates on the two forms of collateral were 85% as to accounts receivable, and 65-70% on inventory (Section 1.15 of the Loan and Security Agreement).  As an illustration, if the Debtor purchased a pair of shoes at a cost of $5.00, the Debtor could borrower from GemCap up to $3.50 (70% of $5.00).  If the Debtor then sold that

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

same pair of shoes on terms for $10.00, the Debtor could Borrower up to $8.50 (85% of $10.00), less the $3.50 already borrowed, for a net additional borrowing of up to $5.00. When GemCap received the payment of $10.00 from the Debtor's customer, the loan of $8.50 would be repaid, and the Debtor could receive the remaining $1.50.Therefore, if the Debtor submitted a Borrowing Base Certificate identifying "eligible" accounts and inventory – meaning they met the criteria under Sections 1.35 and 1.36, respectively – GemCap would advance funds at the rates provided in Section 1.15, so long as the Debtor had not reached the overall limits of the facility. Conversely, however, if a Borrowing Base Certificate reflected no eligible collateral, the Debtor would be ineligible for advances regardless of whether the entirety of the revolving line had been used.

15.     For these reasons, the Borrowing Base Certificates are the basis on which GemCap makes lending decisions, and its principal tool in assessing the daily or weekly status of its loans.  Given their importance, these Certificates include language specifying that they are binding representations and warranties concerning the facts provided in each certificate, including that the reported accounts receivable are genuine obligations to the Debtor and that the listed inventory and equipment are in the Debtor's possession and control.  GemCap takes those representations and their veracity very seriously, precisely because it relies upon them in working to ensure that loans stay "in formula" – i.e., that there is existing eligible collateral to support all of GemCap's funding, and at the rates advances – and that there are no "over-advances."  An over-advance, very simply, occurs where the borrower is in receipt of funds to which the borrower is not entitled in light of the available eligible collateral.

16.     For example, if a borrower maintains no eligible collateral but nonetheless submits a Borrowing Base Certificate that mistakenly inflates the value of its inventory and accounts receivable to falsely suggest eligibility, and GemCap advances against that collateral in reliance on that representation, that funding would be considered an over-advance – that is, an advance not supported by eligible collateral, and thus one the borrower is not entitled to receive under GemCap's typical loan agreement.  And that funding would be considered an over-

advance regardless of whether the borrower had reached the overall limits of the revolving facility (e.g., $5.5 million in the case of USA Dawgs).   Where an over-advance occurs, Paragraph 1(c)(iv) of the Schedule requires that it be repaid immediately.   To be clear, however, the contemplation of this paragraph – and GemCap – is that over-advances are the product of routine vicissitudes of the normal course of business, not the intentional inflation of a borrower's collateral or serious and material shortfalls in availability.   GemCap commonly sees inadvertent over-advances where, for example, a borrower has a customer that accepts goods and then issues a charge-back against those goods, or files for bankruptcy and the accounts receivable that were previously eligible (and included on borrowing base certificates) become ineligible, and other common occurrences in business that may result in advances that were too generous in amount or not technically permitted under the Loan Documents.   These typically lead to unexpected over-advances, which borrowers repay prior to submitting the next borrowing base certificate. But that is entirely distinct from over-advances that are the product of intentional misstatement of the amount of eligible collateral, which would immediately lead to a cessation in funding, or which are so large in volume (such as $240,000) that GemCap would either suspend funding or enter into an amendment to permit the over-advance for a determinate period and allow continued advances in the interim (such as what transpired in the Debtor's case).

17.    Beyond the Borrowing Base Certificates, the Schedule requires that remittances from Account Debtors and all other proceeds of Accounts and other Collateral "shall be directed to Lender and deposited in an account at a financial institution selected by Lender (the "Collection Account").   Borrower shall cause all Collections with respect to all Accounts to be sent directly to Lender's address …   Any collections or other Collateral proceeds received by Borrower from any source whatsoever shall be held in trust for the benefit of Lender and immediately remitted to Lender in kind."   Schedule, Ex. "C", ¶ 1(c)(vi).   Again, these provisions ensure that proceeds from the sale of inventory – inventory GemCap is advancing against, which in turn produces accounts receivable GemCap likewise advances against – are submitted to

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

GemCap Collection Accounts, and thus are not diverted elsewhere in contravention of the Loan Agreement.

## IV.     THE GUARANTEES

18.     Concurrent with the Loan Documents, Steven Mann and Barrie Mann executed Continuing Guarantees.  True and correct copies of the Continuing Guarantees executed by Steven Mann and Barrie Mann, and all eight of the reaffirmations thereto, respectively, are attached hereto as **Exhibit "F"**.  Those Continuing Guarantees made the Manns personally and individually responsible for all of the Debtor's "Indebtedness" (which includes all debts, duties, obligations and liabilities).

## V.     THE DEBTOR FELL INTO FINANCIAL DISTRESS AND FRAUDULENTLY INDUCED GEMCAP TO MAKE A PROTECTIVE $240,000 OVERADVANCE (*I.E.*, IN EXCESS OF THE AVAILABLE INVENTORY AND ACCOUNTS RECEIVABLE FUNDING FORMULAS).

19.     The loan remained in place for approximately five years, and during that time GemCap repeatedly made efforts to assist the Debtor in response to many requests for accommodations.  These accommodations were many in number.  GemCap agreed in December 2013, for example, to increase the maximum available principle of the loan from $2 million to $2.5 million, which the Debtor requested because to enable it to increase the volume of its inventory purchases during the then upcoming holiday season.  That "seasonal line increase" is reflected in the First Amendment to the Loan and Security Agreement.  A few months later, after increasing the maximum line availability again to $3 million, the Debtor sought a reduction in the prevailing interest rate on the loan, a significant request of a lender in GemCap's position – as an asset based lender advancing against collateral alone, GemCap bears higher risk than larger regulated lenders, and thus must charge higher interest rates for its business model to sustain itself.  Notwithstanding that, GemCap agreed by way of the Third Amendment to the Loan Agreement in March 2014 to reduce the interest on prospective advances – i.e., those advances made after the effective date of the Amendment – from 17% to 13%.  As a consequence, the Debtor received among the lowest interest rates GemCap has ever provided in more than a decade in business.  And we agreed to the reduction largely as a measure of our general goodwill

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

to borrowers.  We believed, at the time, that USA Dawgs had been a good borrower, and we wanted to recognize that fact.

20.    As time passed, however, we began to observe some issues concerning the Debtor's status and collateral base.  By the end of 2014, for example, the Debtor continued reporting problems with inventory it was selling to Walgreens –Walgreens eventually returned all of the inventory for a credit, leaving the Debtor with inventory that has remained unsold after years – and the Debtor had issues with its accounting reporting.  Its Borrowing Base Certificates and other reporting also started reflecting a substantial increase in its existing inventory, with obvious effects for the loan.  To start, the accumulation of inventory means that the Debtor is spending money on goods but not efficiently converting those goods into accounts receivable. Beyond that, any notable increase in inventory signals that the inventory on hand may "age out" – that is, sit for so long that its value diminishes significantly and the available sizes and colors are limited – requiring steep discounting to induce further sales.

21.    That is what GemCap observed from 2014 through 2016 – very little new inventory was purchased; the average age of the inventory increased; and sales plummeted. Small inventory purchases coupled with low sales caused a decline in the Debtor's collateral basis and a concomitant reduction in its borrowing eligibility. That combination of factors is what led the Debtor, in April 2017, to reduce the overall availability under the line from $7.5 million – to which the line had been increased by way of the Fifth Amendment to the Loan Agreement in April 2015 – to $5.5 million.  That reduction in availability resulted, as I mentioned above, in a situation where the Debtor simply lacked the eligibility to borrow to the limits of the line, which prompted the requested reduction – due in part, according to the Debtor, to the fact that fees were being paid on the unused portion of the line.  The aging of the inventory and reduction in quality and quantity of accounts receivable adversely affected GemCap's security position, notwithstanding that the overall loan balance actually reduced as a result.  The reason is simple – GemCap's risk is determined by the amount of the outstanding balance vis-à-vis the value of the Debtor's existing collateral, not by the overall amount of indebtedness.

Thus, for example, GemCap bears more risk where a loan balance of $4 million is supported by collateral of $3 million in value than in circumstances where the loan balance is $9 million and the pledged collateral is $10 million.   It is under-collateralized in the former scenario and adequately protected in the latter.  I think it's important to understand this distinction, because in the several days prior to the Debtor's Bankruptcy filing, Steve and Barrie Mann variously remarked that USA Dawgs' loan balance had declined in recent years, as if to suggest that GemCap's exposure likewise declined with the balance.   The precise opposite was in fact occurring, as I explained to them.  USA Dawgs' eligibility dwindled as its collateral base eroded, and while that brought the loan balance down as a result, it necessarily increased GemCap's risk because the quality of our pledged collateral suffered through aged inventory and sales with ever increasing discounts.

22.    The situation started coming to a head in the summer of 2017, as the Debtor's financial troubles apparently began to mount.  The Debtor continually exhausted its eligibility under the revolving facility.   That reality specifically became clear to me when GemCap discovered through its ongoing diligence that the Debtor had past due payroll tax obligations. Steve Mann confirmed in conversations we had that month that USA Dawgs lacked the means to meet the payroll tax obligations.   In fact, Debtor owes $472,950 in priority claims, including $446,662 owed to the IRS for payroll taxes.  *See* Debtor's Amended Schedules, [ECF No. 77], pp. 15 and 27 of 49.  Debtor also owes past due royalty payments in the sum of approximately $90,000, which must be paid in order for Debtor to preserve its ability to continue to sell licensed inventory.  All of these expenses are not accounted for in the Debtor's Budget [ECF No. 6-2]. When coupled with the fact that its Borrowing Base Certificates at the time showed that the company had limited or no borrowing availability under GemCap's lending formula, it was clear USA Dawgs was staring at a prospective shut down.   GemCap would have been more than within its rights to refuse any further advances, and leave the company to its own devices.

23.    We did not do that, however.  Steve Mann requested that GemCap advance USA Dawgs an additional $240,000 to cover its tax obligations, and continue funding against the

HOLLEY•DRIGGS•WALCH
FINE•WRAY•PUZEY•THOMPSON

HDW

existing collateral in accordance with GemCap's advance rates.  Mr. Mann was asking GemCap to fund a knowing over-advance, as a means of allowing USA Dawgs to remain in business. This proposed arrangement is what GemCap refers to as a "permitted over-advance," in which we occasionally agree to provide additional short-term assistance to borrowers.  The mechanics of this form of over-advance is akin to having a loan balance and a separate credit card account with the same bank.  The over-advance is documented in the form of an amendment to the loan agreement, which effectively severs it – at least for the period of the permitted over-advance – and permits the borrower to continue receiving advances without having to pay the over-advance amount immediately.  That is necessary because, as mentioned above, the GemCap Loan Documents require that over-advances be repaid immediately.  In this manner, GemCap funds the requested over-advance, and provides a separate and finite repayment date for that over-advance amount specifically, as in creating a temporary credit card account from the borrower. The obligation of the borrower, in turn, is to continue paying routine advances under the loan agreement during the permitted over-advance period, with the over-advance amount itself additionally being paid by the specified date in the amendment.  The borrower must, in other words, meet its ongoing repayment obligations and repay the over-advanced funds by the deadline identified in the loan amendment.  The borrower's ongoing payments under the loan do not, under these circumstances, get applied to the permitted over-advance – the loan agreement is amended specifically to define when the over-advance amount must be repaid.

24.    In this case, GemCap was prepared to consider the Debtor's requested over-advance, though we needed to understand how USA Dawgs projected its ability to continue receiving advances in the ordinary course under the Loan Documents and repay the over-advance amount within a specified time.  That analysis was necessary for GemCap because, again, this proposed over-advance – were GemCap to extend it – would separate the over-advanced funds from the existing revolving facility, thereby allowing the Debtor to continue requesting funding if there was eligible collateral to borrow against, but would impose an independent and finite date for repayment of the $240,000.  USA Dawgs would, in other words,

1    need to repay advances under the terms of the Loan Documents and, at the conclusion of the

2    over-advance period, pay an additional $240,000 to retire the over-advance. Given where the

3    Debtor was at the time, with a diminishing collateral base and evaporating eligibility, GemCap

4    insisted the Debtor provide us with financial projections giving us some comfort that it could

5    meet its obligations in the event we obliged its request.

6          25.    USA Dawgs did provide us with projections in August 2017, indicating its

7    anticipated sales for the upcoming holiday season, and based on which it expected to repay

8    GemCap's over-advance and meet its ongoing requirements under the Loan Documents. A true

9    and correct copy of those projections are attached to this Declaration as **Exhibit "G"**, and they

10   forecast sales of $5,211,000 from October 2017 through January 2018. I also had several

11   conversations with Steve Mann, who assured me the projections were realistic and that sales and

12   margins would be more than adequate to service GemCap's debt over the remainder of 2017 and

13   repay the $240,000 over-advance by December 31, 2017. On the basis of the projections

14   provided, and Mr. Mann's representations, GemCap agreed to provide the over-advance. This

15   accommodation permitted USA Dawgs to remain in business despite its financial status, and Mr.

16   Mann in particular expressed his appreciation to GemCap in an email dated August 16, 2017,

17   taking pains to note that "[w]e really appreciate your help on this." A true and correct copy of

18   that email is attached to this Declaration as **Exhibit "H"**.

19         26.    Notwithstanding GemCap's willingness to assist the Debtor, we insisted that any

20   such accommodation be committed to writing, and we therefore memorialized it in Amendment

21   No. 8 to the Loan and Security Agreement dated August 17, 2017. That Amendment provided

22   that the additional $240,000 in funding placed USA Dawgs in an over-advance position, but that

23   GemCap was advancing it on the express representation that it be repaid by December 31, 2017.

24   And the precision of that obligation, and the timing of it, is plain on the face of the executed loan

25   amendment. *See* Amendment No. 8 (¶ D), Ex. D. More particularly, these terms comported with

26   the typical over-advance agreements I described above. That is, the $240,000 in additional

27   funding was excised from the day-to-day administration of the loan – and would be identified

28

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

separately on the Debtor's subsequent Borrowing Base Certificates – and was subject to an independent repayment date, December 31, 2017.  In short, the Debtor was permitted to request funding despite the over-advance (assuming otherwise eligible collateral), with the condition that the over-advanced amount be repaid in its entirety by December 31, 2017.  But funds GemCap received during the over-advance period would be applied to the then existing revolving loan balance, not the $240,000 over-advance.[1]  That was the very purpose of Amending the Loan Documents and specifying a date by which the $240,000 would be repaid – to make clear that the Debtor's rights and obligations would subsist in the ordinary course up to December 31, 2017, at which point the over-advance had to be repaid.  If not, the Debtor would then fall into default.

## VI.    **THE NOTICE OF DEFAULT**.

27.    USA Dawgs did not comply with its obligations, however.  The sales projections it provided GemCap proved overstated by approximately 50%.  To illustrate that point, I prepared the chart attached to this Declaration as **Exhibit "I",** using sales data the Debtor provided to us on Borrowing Base Certificates, financial statements, and in the form of bank records, and which GemCap received and inputted into its computer system in the ordinary course of business.  GemCap maintains a systematic program to monitor its loans and the information its borrowers provide to it.  That information is then uploaded into the system upon receipt, and then maintained in that system as a matter of course.  GemCap maintains this loan monitoring system in the same basic manner for each of its borrowers.  That said, Exhibit I represents a compilation and comparison of the sales projections USA Dawgs provided GemCap in August 2017 (Exhibit G) and the actual sales it realized based on the hard data it provided GemCap.  That comparison shows that while USA Dawgs projected sales of $5,211,000 between October 2017 and January 2018, its actual sales were a mere $2,579,713.41, or more than 50% less than the projections.

---

[1]    The Loan Documents provided that customers of USA Dawgs make payments to a GemCap "lockbox" account.  That account was created under and pursuant to the Loan Documents, and existed to receive funds designated for the Debtor.  GemCap would routinely "sweep" the account, which is to say it would draw funds it advanced against the goods that the customer was paying for, and then remit the remainder to USA Dawgs.  The payments GemCap received under the Loan Documents, including during the over-advance period, were primarily received in this manner.

3758973.1 24093-808                                    - 15 -

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

28.     Those meager sales figures alone laid waste to USA Dawgs' projections and its ability to repay the over-advance as required.   Beyond that, Borrowing Base Certificates furnished to GemCap after August 2017 demonstrate an additional and compounding problem – that is, the continued aging of inventory.  GemCap knows and understands, based on its years as an asset based lender, that aging inventory almost invariably means that the value of that inventory drops, with a resulting decline in the Debtor's sales margins and the availability to receive funding under the Loan Documents.  Nor did GemCap allow these concerns to mount without informing the Debtor of the implications.  On November 22, 2017, for example, David Ellis – GemCap's co-president – sent an email to Steve Mann discussing asking to discuss USA Dawgs' sales plans, and noting that while "you're in the middle of high season . . . .sales are already behind projections."  This email was in the wake of a discussion between David Ellis and Mr. Mann concerning GemCap's concerning over the very low margins the Debtor was receiving on sales made through Amazon and the problems that presented for GemCap.  GemCap was, in other words, doing everything it could do to alert USA Dawgs to the fact that its sales and margins were well below projections, posing an obvious risk that the over-advance might not be paid by the December 31, 2017 deadline.  A true and correct copy of the November 22, 2017 email from David Ellis to Steve Mann is attached as **Exhibit "J".**

29.     Another issue arose in December 2017, concerning ongoing litigation between USA Dawgs and Crocs, Inc. in the United States District Court in Colorado.  GemCap knew of the existence of the litigation – Steve Mann had discussed it with me on occasion – but certainly had taken no role in the process.  In early December, however, Steve Mann informed me that the spiraling costs of the dispute, which he had previously indicated related to claims of false advertising on the part of Crocs, Inc. relating to certain patent assertions it had made, was forcing USA Dawgs to seek independent funding from third party litigation financing organizations.  On December 6, 2017, I met with Mr. Mann at USA Dawgs' facility in Las Vegas, to discuss, among other things, his efforts to secure financing for the litigation.  He explained specifically that the costs of the dispute were excessive, but that he believed USA Dawgs would eventually

HOLLEY•DRIGGS•WALCH
FINE•WRAY•PUZEY•THOMPSON

realize considerable recovery.  He went so far as to tell me that the company was, for all intents and purposes, no longer a shoe manufacturer but had become a professional litigant.  My interpretation of his remarks was that he and the company were principally banking on the results of the litigation, and not the sales of goods, to repay the mounting list of creditors.  In any event, I told him GemCap wished USA Dawgs the very best in the litigation , but that GemCap's role and interest was limited to its existing role of an asset-based lender.  Mr. Mann emailed me later that same day, thanking me for coming in and reiterating that "I really appreciate working with you guys and the efforts you make to help us out."  A true and correct copy of this email is attached as **Exhibit "K"** to this Declaration.

30.    Not surprisingly, December 31, 2017 came and went without repayment of the over-advance, and the Debtor thus defaulted on its over-advance and interest payment obligations.  As a result of the default, compounded with the discovery of the fraud that been perpetrated upon GemCap (discussed in further detail below), on January 23, 2018, GemCap issued a Notice of Default, accelerating the total indebtedness and making demand upon USA Dawgs to make payment in the amount of $3,895,104.83, plus interest accruing from and after January 23, 2018, plus costs and expenses (including attorneys' fees).  A true and correct copy of the Notice of Default is attached as **Exhibit "L."**

31.    Concurrent with the Notice, GemCap made demand upon each of the Guarantors, Steven Mann and Barrie Mann.  A true and correct copy of these demands is also included in Exhibit "L".  Both the Notices of Default and the demands to the Guarantors required payment to be made by no later than 5:00 p.m. E.S.T. on January 26, 2018.

32.    Notwithstanding the default, GemCap continued its efforts to assist USA Dawgs in an attempt to avoid litigation.  I specifically had several phone conversations and in-person meetings with Steve Mann in January 2018, and GemCap proposed the terms of a Forbearance Agreement – i.e., an agreement under which GemCap forbears any liquidation of collateral or litigation to enable the Debtor additional time to stabilize financially and work itself back into conformity with the Loan Documents.  USA Dawgs rejected each such proposal.  At one point,

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

in the last week of January, Mr. Mann sent me additional sales and financial projections, this time for January through April 2018.

33.     I was naturally suspicious of these new projections, given that the projections GemCap had received in August had proven so materially overstated when compared to actual sales. My concern only heightened when I reviewed the new forecast, a true and correct copy of which is attached to this Declaration as **Exhibit "M".** To start, the sales projections for January 2018 – $530,000 – I knew to be exaggerated, because GemCap had been tracking sales against the August projections and it was already clear the January number was almost certainly going to be less than $530,000. In fact, as we now know, the total January sales were a mere $378,777.42, well under $530,000 and close to a million dollars less than what USA Dawgs projected in August – those projections forecast $1,254,000 in January 2018 sales. Beyond that, the Debtor was forecasting a dramatic increase in sales between January and June 2018 which simply did not comport with anything GemCap had observed, and that did not appear realistic in any sense. The Debtor was projecting sales in June 2018, for example, of $850,000, or roughly $500,000 more than actual sales in January 2018 ($378,777.42.) That alone raised GemCap's eyebrows. But when considering that number almost the $883,537.15 in actual sales made in December 2017 – December being the busiest retail month of the year by a considerable margin – GemCap could not take these projections seriously. GemCap could not continue lending based on this information.

34.     Given all that, neither USA Dawgs nor the Guarantors have issued payment to GemCap. Steve Mann instead emailed me on January 23, 2018 and informed me that he had engaged counsel and that all communications should be directed to those lawyers. He also informed me that GemCap would not be permitted access to the USA Dawgs premises the next day, as we had requested. A true and correct copy of this email is attached to this Declaration as **Exhibit "N"**.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VII.    GEMCAP DISCOVERS THAT THE DEBTOR HAS FURNISHED GEMCAP WITH FRAUDULENT INFORMATION, ILLEGALLY DIVERTED GEMCAP'S COLLATERAL, AND ENGAGED IN OTHER GROSS MISCONDUCT.**

**A.    GemCap Discovers that the Debtor was Illegally Diverting GemCap's Collateral.**

35.    GemCap discovered that USA Dawgs engaged in a pattern of fraud and diversion of collateral, in stark violation of the Loan Documents.  To begin with, under the Loan Agreement, the Debtor was required to direct all sales income to GemCap's Collection Account in order to protect GemCap's cash collateral.  However, GemCap discovered evidence that the Debtor (and those complicit with the Debtor) were and are actively and deliberately diverting funds away from GemCap's Collection Account and instead funneling funds to themselves through a third party online payment system, PayPal.  We discovered that diversion through GemCap's review of bank statements received from USA Dawgs.  Those records specifically show that USA Dawgs habitually received payments into its bank account and did not forward these payments to GemCap.  This intentional diversion – which certainly transpired without GemCap's knowledge or consent – is not merely in breach of the Loan Documents, but constitutes fraud.  Despite our demand for an accounting of and information relating to those PayPal transfers, USA Dawgs has refused to provide GemCap the required documentation.

36.    GemCap further discovered over the internet in a Las Vegas Sun article (accessible at https://vegasinc.lasvegassun.com/business/notes/2018/jan/15/the-notes-philanthropy-jan-14-20-2018/) published on January 15, 2018 that "USA Dawgs donated 7,500 pairs of shoes to Project 150."  Those shoes were, of course, GemCap collateral and their disposition – whether by donation or otherwise – constitutes a clear impairment of pledged loan security.  A true and correct copy of this newspaper article is attached to this Declaration as **Exhibit "O".**

37.    Concerned about the Debtor's diversion of funds and collateral, on or about January 24 and 25, 2018, GemCap executed its rights under the Loan Documents as well as

California Commercial Code § 9-607, and sent notices to certain of the USA Dawg's account debtors to direct all sums payable by those account debtors to USA Dawgs directly to GemCap.

38.    In clear and irrefutable showing of fraud and wrongdoing, on January 25, 2018, one account debtor contacted GemCap's counsel and notified GemCap's counsel that the Debtor had directed it just the day before to *stop paying GemCap and direct all payments to the Debtor itself*.  This stunning revelation places an exclamation mark on the story of deceit and fraud of which the Debtor (and those complicit with it) are guilty, and thus emphasizes the serious misconduct and fraud at the heart of this dispute.

**B.    GemCap Discovers that the Debtor Set Up a Secret Bank Account to Siphon Away GemCap's Cash Collateral.**

39.    Things have grown worse since then.  GemCap discovered, for example, that on or about January 23, 2018, USA Dawgs opened a new bank account at Nevada State Bank, without a GemCap Collection Account, and is receiving funds to that account that are not being directed to GemCap.  A true and correct copy of the excerpt from the ledger showing this account, and funds being received into it, is attached as **Exhibit "P"**.  Specifically, the opening of this account is a clear violation of the Loan Documents, and constitutes, from GemCap's perspective, an intentional diversion of collateral – cash is collateral under our Loan Documents – away from GemCap.  Lastly, but not least, our continuing review of the account records demonstrated that USA Dawgs continued to receive funds from the sale of inventory, but directed those funds to itself and not to the GemCap Collection Accounts as required under the Loan Documents.  *See* Exhibit P.

40.    This further diversion is particularly egregious, because the parties, in an effort to resolve the dispute, entered into a temporary "standstill agreement" on Friday, January 26, 2018, by which neither GemCap nor USA Dawgs or its related companies would file litigation, and USA Dawgs would neither divert funds or collateral – including proceeds from sales – in contravention of the Loan Documents.  That standstill, which was set to expire on January 30, 2018 at 12:00 noon, was extended by written agreement to January 31, 2018, on the same terms.  These records demonstrate that USA Dawgs has breached even that limited standstill agreement.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

C.    **The Debtor Fraudulently Concealed the Severe Financial Drain Caused by the Decades' Long Crocs Litigation.**

41.    GemCap further discovered that the Debtor concealed from GemCap the severe financial drain posed by the decades' long Crocs litigation, with no end in sight.  USA Dawgs and its Canadian affiliate, Double Diamond Distribution, have over the last several years been embroiled in a series of litigation matters involving Crocs, Inc. ("Crocs"), the maker of the famous "Crocs" shoe.  I am informed and believe, based on my review of financial information GemCap has been able to review, that USA Dawgs, Double Diamond Distribution, and other related entities (collectively, the "Related Entities") have separately and/or collectively invested millions of dollars and an enormous amount of time and energy in litigation against Crocs and its affiliates.  But in devoting such inordinate human and financial resources to litigation, the Debtor allowed its business operations to suffer and its profits, revenues, and margins have deteriorated.

42.    And issues abound concerning the funding of litigation and whether GemCap's funds were redirected from operations – the Loan Agreement restricts the permissible use of funds to ordinary course working capital needs – and instead plunged into litigation expenses on behalf of USA Dawgs or Double Diamond Distribution, or both, in direct contravention to the Loan Documents.  In fact, the excessive funding of the litigation, when coupled with the starvation of operations over the very period GemCap funded *$50 million* that USA Dawgs was contractually required to devote solely to operations, make clear that loan funds were diverted to the Debtor's litigation excursion and not its day-to-day business.  And that intentional diversion breached the use of funds restrictions found at ¶ 1(d) of the Loan Agreement Schedule.

43.    All of which is to make clear that USA Dawgs has, through fraud, neglect and incompetence, overseen a stark deterioration of its financial position, and an attendant erosion of the collateral base of the loan.  Although USA Dawgs' funding availability was declining in 2017, Steve Mann continued to represent to me – in various conversations in the past year – that the company was doing well and that the Crocs litigation was on the verge of resulting in an extremely lucrative settlement for him and his business.  GemCap did not know, because Steve

HOLLEY•DRIGGS•WALCH
FINE•WRAY•PUZEY•THOMPSON

Mann and USA Dawgs did not inform us, that the business was in fact deteriorating financially at a rapid pace. The Loan Documents compelled USA Dawgs to apprise GemCap of this material adverse condition concerning the company's economic or asset posture, as part of the borrower's ongoing reporting requirements. But it concealed all this information, for months at a minimum, refusing to disclose the rapidly declining condition of the company and its assets. GemCap instead discovered the perilous state of affairs only in the last several days, as it has extracted limited data from USA Dawgs and slowly pieced together the emerging portrait of a business that has actively misrepresented its viability and collateral, all while requesting and receiving advances under the revolving loan facility and placing GemCap at substantially increased risk of non-payment.

44.    For instance, GemCap has become informed that USA Dawgs was recently sued in a collections action, that the Debtor, too, failed to inform GemCap of in material breach of the Loan Documents. Most notably, USA Dawgs has refused to share its financial information with GemCap in the past weeks, including specifically refusing to permit GemCap personnel access to its operational facility in Las Vegas for purposes of examining collateral and books and records, in direct and further violation of the Loan Documents.

45.    In fact, despite several demands, USA Dawgs has continued this refusal to allow GemCap access to the premises, making the process all the more complicated and denying GemCap information it needs to assess the scope of the damages USA Dawgs has caused and inflicted by its myriad misconduct. And these repetitious and material breaches, now compounding themselves, are placing GemCap in an increasingly untenable position as it attempts to protect its interests and, most particularly, the integrity of the collateral USA Dawgs pledged to secure the $50 million in loan funds it has secured in the past five years.

D.    **The Debtor Provided False Information in the Borrowing Base Certificates to Defraud More Funds from GemCap.**

46.    As explained above, the Borrowing Base Certificates constitute binding representations and warranties by the Debtor regarding the value and quality of the Debtor's accounts receivables and inventory. GemCap loans funds to the Debtor based upon a specified

HOLLEY•DRIGGS•WALCH
FINE•WRAY•PUZEY•THOMPSON

percentage of the qualified collateral reported in the Borrowing Base Certificates.  It is of critical importance that the information provided by the Debtor is truthful and accurate.  If an inaccurate Borrowing Base Certificate is submitted, GemCap runs the risk of advancing funds that a borrower is not entitled to receive, creating an over-advance.

47.    In this case, there were irregularities in the Debtor's reporting of the Borrowing Base Certificates.  By way of example, during the single month of December 2017, the Debtor made 7 upward adjustments in the figures reported in its Borrowing Base Certificates, with each upward adjustment increasing the borrowing base against which the Debtor could borrow from GemCap.  When asked why the values were repeatedly being adjusted upward, the Debtor would offer innocuous explanations, such as that the warehouse manager and staff "post inventory adjustments all the time after counts or finding mislabelled or unaccounted for product" or that the variances were due to the volume of orders.  A true and correct copy of some of the email correspondence with the Debtor in regard to the Borrowing Base Certificate increases is attached hereto as **Exhibit "Q"**.

48.    Our review of the records demonstrate to GemCap that USA Dawgs and its complicit collaborators have submitted fraudulent and false Borrowing Base Certificates, and otherwise have falsely and fraudulently facilitated advances to which USA Dawgs is not entitled under the Loan Documents in an amount exceeding $400,000.

## VIII.    THE DEBTOR'S MISREPRESENTATIONS SUBMITTED IN SUPPORT OF ITS CASH COLLATERAL MOTION

49.    I have reviewed the Omnibus Declaration of Steven Mann that the Debtor has submitted in support of its Motion of GemCap's Cash Collateral.  [Docket No. 10].  Mr. Mann's declaration is replete with misstatements and mischaracterizations, the more pertinent of which are addressed below:

### A.    It is the Debtor, Not GemCap, which Breached the Loan Agreement.

50.    As demonstrated above, the Debtor has breached the Loan Agreement in countless respects.  Mr. Mann, on the other hand, falsely alleges that GemCap has purportedly

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

breached the Loan Agreement by collecting $2 million since August 2017 and then improperly refused to apply those funds to the $240,000 overadvance. *See* Mann Decl., ¶ 38.

51.    Mr. Mann has deliberately misstated the facts to confuse the Court. As of January 23, 2018, the Debtor owed $3,895,104.83, which is comprised of *two separate components*:

(1)    The Debtor owed approximately $3.65 million under the secured revolver (*i.e.*, secured by the Debtor's inventory). As the inventory (*i.e.*, the borrowing base) is sold, GemCap collects the sales proceeds and pays down this secured debt.

(2)    The Debtor owes an additional $240,000 in overadvance. The Debtor was obligated to pay this debt off by December 31, 2017, but failed to do so. *See* Amendment No. 8 (¶ D), Ex. D. This gave rise to an event of default.

52.    Mr. Mann argues that GemCap should have taken the sales proceeds that are earmarked for the $3.65 million secured debt, use those funds to pay down the $240,000 overadvance, and completely ignore the existence of the $3.65 million secured debt. That was not what was agreed to, nor, as explained above, does it comport with the terms of Amendment No. 8 to the Loan Documents or the nature of an over-advance. The proceeds from the sale of the collateral obviously has to be applied to the debt that is secured by that collateral – the secured debt cannot simply be disregarded. The over-advance, again as explained above, was separated from the underlying loan facility and had to be independently repaid by December 31, 2017. In essence, USA Dawgs was required to repay the revolving loan in the ordinary course and separately and independently repay the permitted over-advance.

53.    To illustrate by example, assume a revolving lender advanced $100 to a borrower, and the borrower then requested and received a $240 over-advance under the same terms provided to USA Dawgs. That over-advance would need to be repaid in four months. If, during that four-month period, the borrower received and repaid $400 in loan advances, it still owes the $240 over-advance, because it was not entitled under the loan agreement terms to receive that

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

additional $240 – thus, the need for the amendment. Under Mr. Mann's logic, that critical fact should be ignored, and since more than $240,000 was collected by GemCap between August and December 2017, we should simply pretend that the over-advance disappeared. That makes no sense. But even if the collected funds were applied in the manner he suggests – i.e., collections were taken against the specific over-advanced amount – that would simply create a new over-advance, because the money directed to the $240,000 over-advance would not be used to pay down other advances that GemCap was providing. In my example above, it would amount to taking the first $240 of the $400 collected and applying it to the over-advance, meaning that only $160 of the collections is left to repay the pre-existing $100 in indebtedness and the $400 in additional advances. In other words, there would be an over-advance of $240. That is the result if Mr. Mann's logic is applied.

54.    That said, USA Dawgs acknowledged that the over-advance had not been repaid. Specifically, attached hereto as **Exhibit "R"** is a true and correct copy of the most recent Borrowing Base Certificate which was executed by Mr. Mann on January 21, 2018. As confirmed in this Borrowing Base Certificate, the remaining _overadvance_ amount of $232,297.31 remained unpaid.

55.    Furthermore, GemCap has always advanced funds to USA Dawgs in accordance with the Loan Documents, and without exception extended advances consistent with the stated value of the pledged collateral. To demonstrate that fact, attached as **Exhibit "S"** to this Declaration is a true and correct copy a loan balance collateral comparison, taken from information GemCap holds in its electronic loan monitoring database and maintained in the ordinary course of business. That analysis shows, without ambiguity, that GemCap's advances were in fidelity to the Loan Documents and in conformity with the lending formulas to which the parties agreed. GemCap did not, in any instance, deny USA Dawgs funding to which it was entitled.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

**B.      The Debtor's Budget Presented to the Court is Contrary to the Debtor's Cash Flow Furnished to GemCap for the Same Time Period.**

56.      In support of its Motion, the Debtor attached a 3-month "Budget" that purports to show that the Debtor will be operating on a cash-flow positive basis for February 2018 through to April 2018.  *See* Debtor's Motion, Ex. 2.  However, this was entirely inconsistent with the cash flow projections that the Debtor furnished to GemCap.

57.      The Debtor's budget showed a per-day operating budget that is 40% less than the 2017 per-day operating budget and projects monthly accounts receivable collections to exceed 2017 fourth quarter average monthly collections by over $100,000 per month.   (The fourth quarter should be the highest quarter of the year.)  In late January 2018, as mentioned and in an effort to induce GemCap to increase its overadvance to the Debtor (which GemCap declined to do), the Debtor furnished GemCap with cash flow projections – with "bare bone expenses" for January 2018 through to April 2018, a true and correct copy of which is attached hereto as Exhibit "M".  As I explained above, these cash flows shows that the Debtor would be cash flow negative in the very first month of January 2018 by over $250,000.  The budget also neglected several other critical items that GemCap believed would need to be addressed in the next 90 days for operations to continue, namely:

- Budget assumed that GemCap would continue to allow the $240,000 overadvance;

- Budget assumed that Debtor would not need to pay past due interest to GemCap;

- Budget assumed that Debtor would not need to return diverted proceeds to GemCap (collectively, the preceding bullet points moved the overadvance over $500,000);

- Budget did not address the past due $211,000 to Federal Express.  Debtor already switched from UPS due to unpaid past due to UPS of approximately $173,000.  So, shipping options are very limited for Debtor;

- Debtor had past due rent of $177,000 as of December 2017;

- Debtor had past due payroll taxes of approximately $580,000;

HOLLEY•DRIGGS•WALCH
FINE•WRAY•PUZEY•THOMPSON

HDW

- Debtor had past due royalty payments of approximately $90,000. Unpaid royalties can prevent the sale of license inventory. These items should be removed from the borrowing base but had not.

58.    The Debtor's Budget makes no sense given that, as discussed in further detail below, the Debtor's Budget allocates <u>no money</u> to pay GemCap for the expended collateral or for the on-going Crocs litigation. No explanation is provided in the Motion as to how the Debtor would be funding the Crocs litigation.

59.    Further, the Debtor has a history of providing entirely unrealistic projections. Again, as already explained, the August 2017 projections that induced the over-advance missed the sales projections by 50%:

|  | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 |
|---|---|---|---|---|---|---|
| Forecast | $687,000.00 | $1,303,000.00 | $1,967,000.00 | $1,254,000.00 | $955,000.00 | $780,000.00 |
| Actual | $530,552.23 | $786,846.61 | $883,537.15 | $378,777.42 | $ | $- |
| Shortfall | $156,447.77 | $516,153.39 | $1,083,462.85 | $875,222.58 | | |
| Shortfall % | 23% | 40% | 55% | 70% | | |

**C.    The Debtor's Collateral is Grossly Overstated.**

60.    Based entirely on Mr. Mann's declaration, the Debtor alleges that "its inventory is valued at $6,000,000 at cost and in excess of $25,000,000 when properly sold, and its accounts receivable total $450,000, which amounts Debtor anticipates are collectible." *See* Motion, ¶ 56, citing Omnibus Decl., ¶¶ 46-47. These purported figures are grossly inflated and are belied by the actual financial data that the Debtor has recently reported to GemCap.

61.    Since 2008, I have served as the co-president of GemCap, an asset-based lender. I have years' of experience in asset valuation, including valuing machinery, equipment, rolling stock, accounts receivable, inventory and intellectual property. I also have years' of experience with auctions and in assessing the liquidation value of assets.

62.    Attached hereto as **Exhibit "T"** is a true and correct copy of the most recent inventory provided by the Debtor, which reports that the "U.S. landed cost" of the Debtor's

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

inventory as well as miscellaneous items to be $6,044,751.81. However, the $6 million "landed cost" has not been "marked to market" (*i.e.*, adjusted to the market value). In this instance, the Debtor's remaining inventory is aged inventory that would have a depressed value. GemCap's analysis shows that based on the aggregated financial information reported by the Debtor, over the course of the past 25 months, the Debtor has sold approximately $5.8 million of inventory and yet only purchased approximately $2.9 million of inventory. Given that the Debtor has sold more inventory than it has purchased, the remaining $6 million of unsold inventory is aged inventory that would have lower resale value.

63.    In addition, based on the information that GemCap has been provided, the Debtor has been selling inventory for less than cost, when all sales costs are taken into account. By way of example, GemCap has analyzed the sales data furnished by the Debtor in regard to the sales made through Amazon for the period from March 10, 2017 to January 12, 2018. Based on GemCap's analysis, the Debtor sold approximately $3 million worth of inventory through Amazon during that time frame, and sustained in excess of $600,000 in <u>losses</u>:

| Analysis of Amazon Seller Central Sales<br>March 10, 2017 to January 12, 2018 | |
| --- | --- |
| Gross Sales from Amazon | $3,046,660.41 |
| Deduct Avg. Cost of Goods Sold | ($1,553,163.00) |
| Deduct Amazon Seller Central Fee | ($2,109,524.41) |
| **Debtor's Loss** | **($616,027.00)** |

64.    Based on my years' of experience in asset valuation as well as my knowledge of the Debtor's inventory, I believe that the liquidation value of Debtor's inventory is approximately 30%-40% of the reported value, or between **$1.8 million** and **$2.4 million**.

65.    To further illustrate that apocryphal nature of the Debtor's budget, attached are three charts GemCap has assembled based on the financial data USA Dawgs has provided, and

HOLLEY·DRIGGS·WALCH<br>FINE·WRAY·PUZEY·THOMPSON

which GemCap maintained in the ordinary course of business.  These charts, reflecting margin trends, true and correct copies of which are attached to this Declaration as **Exhibits "U", "V", and "W"**, demonstrate that USA Dawgs' margins have been in serious decline for some time.  The first (Exhibit U) shows a year over year decline in sales and margins, and makes clear that the Debtor had <u>negative operating income for the last three years</u>.  The second (Exhibit V) is a snapshot of 2017, specifically reflects total sales, collections and GemCap advances on those sales.  The Debtor, as the analysis shows, only collected $890,270 more than GemCap advanced in 2017.  In other words, the company had to operate their company for an entire year on only $890,000.  This explains why USA Dawgs is suffering a cash crisis and, by extension, its budget is a fantasy.  Finally, the third chart (Exhibit W) is a detailed breakdown of the costs of the Debtors' sales, including the costs of goods sold and other variable.  What it establishes is that USA Dawg's operating income was _negative_ 22.5% in 2017.  Given these numbers, the suggestion that USA Dawgs can somehow, in the face of all the facts to the contrary, meet the budget presented to the Court, is effectively impossible.  For that reason, if it is permitted to use GemCap's cash collateral, GemCap will not only be severely prejudiced, its collateral will likely be squandered in its entirety.

        **D.**       <u>**The Crocs Litigation is a Large Liability, Not an Asset.**</u>

       66.     The Debtor further contends that the "Debtor is seeking hundreds of millions of dollars of damages in the Crocs Litigation, could to go to trial as soon as within a year." _See_ Motion, ¶ 56, citing Omnibus Decl., ¶¶ 46-47.  Far from the Debtor's optimistic pronouncements, the Crocs litigation has been a financial albatross that has dragged down the Debtor's finances for years.

       67.     On January 15, 2018, I attended a meeting with Steve Mann, Barrie Mann, and David Ellis.  During that meeting, Mr. Steve Mann advised me that the Crocs litigation was ramping up with depositions and motion practice, and that the Debtor was in critical need of funding to keep the litigation alive.  The Debtor asked GemCap for further overadvances and to subordinate its position so that the Debtor may attempt to arrange for litigation financing.

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

GemCap will not agree to subordinate its position and will not permit its collateral to be wagered on a piece of litigation that has been pending for over a decade.

68.    Specifically, Steven Mann has stated to me that Debtor will require as much as $10 million to continue to fund the Crocs Litigation.  Further, Steven Mann has advised me that the Crocs Litigation was ramping up with depositions and motion practice and that Debtor was in critical need of funding to keep the litigation alive.  The extent of Mr. Mann's focus on the litigation over the last two years was shocking to me.  In fact, he recently told me specifically that his only desire was to keep USA Dawgs technically functioning long enough for the Crocs Litigation to reach a conclusion.  In that context, USA Dawgs asked GemCap for further overadvances and to subordinate GemCap's position so that Debtor may attempt to arrange for litigation financing.  GemCap will not agree to subordinate its position and will not permit its collateral to be wagered on a piece of litigation that has been pending for over a decade. Significantly, the Debtor's Budget [ECF No. 6-2] allocates _no money_ to pay for the on-going legal costs that would be necessary to keep the litigation afloat.  No explanation was provided as to how the Debtor would be funding the Crocs litigation.

I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct and that this declaration was executed on the 12th day of April, 2018 at San Francisco, California.

_____
Richard Ellis

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Holley Driggs Walch Fine Wray Puzey & Thompson, and that on the _12th_ day of April , 2018, I caused to be served a true and correct copy of **DECLARATION OF RICHARD ELLIS IN SUPPORT OF SECURED CREDITOR GEMCAP LENDING I, LLC'S RENEWED MOTION TO DISMISS OR APPOINT A TRUSTEE FOR BAD FAITH OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ABSTENTION** in the following manner:

☒    (ELECTRONIC SERVICE)  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐    (UNITED STATES MAIL)  By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐    (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐    (FACSIMILE)  That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

An employee of Holley Driggs Walch Fine Wray Puzey & Thompson