**Exhibit A**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of June 29, 2018, by and between Dawgs Holdings LLC, a Delaware limited liability company ("Buyer") and U.S.A. DAWGS, INC., a Nevada corporation ("Debtor" or "Seller", and collectively with Buyer, the "Parties").

## RECITALS

**WHEREAS**, on January 31, 2018 (the "Petition Date"), Seller commenced a case (the "Bankruptcy Case") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code") by filing a voluntary petition in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), Case No. 18-10453-LEB; and

**WHEREAS**, since the commencement of the Bankruptcy Case, Seller has continued in possession of its property and has continued to operate and manage its Business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, in connection with the Bankruptcy Case and, upon the terms and subject to the conditions set forth in this Agreement, the Sale Order (defined *infra*), and the Bidding Procedures Order (defined *infra*), Seller wishes to sell, convey, assign and transfer to Buyer, and Buyer wishes to purchase and acquire from Seller, the Assets (defined *infra*), free and clear of all Liens (defined *infra*), claims, interests and encumbrances, all in the manner and subject to the terms and conditions set forth in this Agreement, the Sale Order, the Bidding Procedures Order, and pursuant to Sections 105 and 363 and other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure; and

**WHEREAS,** Seller has conducted a public Auction of the Assets pursuant to Section 363 of the Bankruptcy Code (the "Auction") and the Bidding Procedures Order entered by the Bankruptcy Court; and

**WHEREAS**, Buyer was the Prevailing Bidder (as defined in the Bidding Procedures Order) at the Auction; and

**WHEREAS**, the execution and delivery of this Agreement and Seller's ability to consummate the Sale transaction set forth in this Agreement are governed by the requirements of the Sale Order and the Bidding Procedures Order;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all Parties, the Parties have agreed as follows:

AmericasActive:12311230.7

# ARTICLE I
# DEFINITIONS; PURCHASE AND SALE OF ASSETS

1.1     Definitions. For purposes of this Agreement, capitalized terms used in this Agreement are defined or cross-referenced below and in **Schedule B** and the following terms not otherwise defined herein shall have the following respective meanings:

**Accounts:** All accounts receivable of Seller, including without limitation, the accounts receivable set forth on the Accounts Receivable Schedule, which is set forth on **Schedule A** attached hereto.

**Agreement**: Has the meaning set forth in the opening paragraph of this document.

**Assets**: All of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including intellectual property and goodwill), of Seller, wherever located and whether now existing or hereafter acquired, owned, leased, licensed or used or held for use in or relating to the operation of the Seller's business as of the Closing Date. Without limiting the generality of the foregoing, the Assets include, without limitation, all of the items described on **Schedule B** attached hereto and incorporated herein, which are the subject of the Auction, this Agreement and the sale transaction contemplated by the Bidding Procedures Motion.

**Auction**: A public auction of the Assets on June 29, 2018, at 10:00 a.m. ("Auction Date"), conducted by Debtor at the Bankruptcy Court, Courtroom No. 3, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101, on proper Notice of Auction issued pursuant to this Court's Bidding Procedures Order.

**Bankruptcy Case**: Has the meaning set forth in the Recitals.

**Bankruptcy Code**: Has the meaning set forth in the Recitals.

**Bankruptcy Court**: Has the meaning set forth in the Recitals.

**Bidding Procedures Motion**: On file with the Court at Docket No. 314, the *Motion For Entry of Order Approving Bid Procedures Relating to Sale of Debtor's Assets For Auction Scheduled for June 29, 2018, or Alternatively August 1, 2018; Approving the Form and Manner of Notice of Sale By Auction, and Establishing Procedures For Noticing; and For Entry of an Order Authorizing the Sale of Debtor's Assets Outside of the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests*.

**Bidding Procedures Order**: On file with the Court at Docket No. 383, the *Order Approving Bid Procedures Relating to Sale of Debtor's Assets For Auction Scheduled For June 29, 2018, Or Alternatively August 1, 2018; Approving the Form and Manner of Notice of Sale By Auction, and Establishing Procedures For Noticing; and For Entry of an Order Authorizing the Sale of Debtor's Assets Outside of the Ordinary Course of Business Free*

2

*and Clear of All Liens, Claims, Encumbrances, and Interests*.

**Bill of Sale**: Has the meaning set forth in Section 1.2(d) of this Agreement.

**Buyer**: Has the meaning set forth in the opening paragraph of this Agreement.

**Closing**: The consummation of the transactions contemplated herein, on the first Business Day following the satisfaction or waiver by the appropriate Party of all of the condition contained in Sections 4.1, 4.2 and 4.3, or on such other date or at such other place and time as may be mutually agreed to by all Parties (the "Closing Date").

**Closing Conditions**: The satisfaction or waiver of the items described in Sections 4.1, 4.2 and 4.3 of this Agreement.

**Lien**: As applied to any person or entity, means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such person or entity.

**Ordinary Course of Business**: The usual and ordinary course of business of the Seller's business in accordance with past custom and practice (including with respect to quantity, timing, duration and frequency).

**Purchase Price**: Has the meaning set forth in Section 1.2(c) of this Agreement

**Sale Order**: The *Order: (I) Authorizing the Sale of Debtor's Assets Outside the Ordinary Course of Business Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief*, to which is attached this signed Agreement as **Exhibit "B"**, which shall be in form and substance acceptable to Buyer in its sole discretion.

**Seller**: Has the meanings set forth in the opening paragraph of this Agreement.

1.2    Purchase; Purchase Price; Closing.

(a)    Purchase of Assets.  Upon the terms and subject to the conditions contained in this Agreement, including approval of the Bankruptcy Court, Seller, in its capacity as debtor in the Bankruptcy Case conducting a public sale pursuant to Section 363 of the Bankruptcy Code, shall sell, assign, and deliver to Buyer, all of Seller's right, title and interest in and to the Assets in accordance with the terms of this Agreement, and Buyer shall purchase and accept possession and title in and to the Assets, free and clear of all Liens, claims interests and encumbrances in accordance with the terms of this Agreement and the Sale Order.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only

3

agreed cure amounts and the liabilities under the Assumed Contracts that arise following the Closing. OTHER THAN AGREED CURE AMOUNTS AND LIABILITIES UNDER THE ASSUMED CONTRACTS THAT ARISE FOLLOWING CLOSING, BUYER IS NOT ASSUMING AND SHALL NOT BE LIABLE FOR ANY DEBT, OBLIGATION, RESPONSIBILITY OR LIABILITY OF THE SELLER (INCLUDING, BUT NOT LIMITED TO, ANY CREDITS, PREPAYMENTS, OR OBLIGATIONS OWED TO ACCOUNT DEBTORS), WHETHER KNOWN OR UNKNOWN, CONTINGENT OR ABSOLUTE OR OTHERWISE.

(b) Deposit.  In accord with the Bid Procedures Order requirements for Qualified Bidder, a Deposit was made by the Buyer by wire transfer or immediately available funds to Debtor's counsel's trust account or to an appropriate escrow agent approved by Debtor's counsel in advance, at Debtor's election, before the Bid Deadline, of an earnest money deposit (the "Deposit") equal to One Hundred Five Thousand Dollars ($105,000).

(c) Purchase Price.  Buyer shall pay to Seller the aggregate amount of Three Million Two Hundred and Fifty Thousand Dollars ($3,250,000) (the "Purchase Price"), which such Purchase Price shall be equal to the dollar amount of the Prevailing Bid at Auction and shall be payable in accordance with Section 1.2(d) below.

(d) Closing.  The Closing of the Sale transaction contemplated by this Agreement shall take place on the Closing Date.  On the Closing Date, the Buyer shall pay the Seller the Purchase Price less the Deposit by a wire transfer of funds to an account designated by Seller and the Buyer and Seller shall execute and deliver to each other duplicate originals of the Bill of Sale, substantially in the form attached hereto as Exhibit A (the "Bill of Sale").

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

2.1 Organization, Standing and Power.  Seller is a Nevada corporation validly existing and in good standing, and has the requisite corporate power and authority to execute and deliver this Agreement and effect the Sale transaction contemplated hereunder.

2.2 Authority. (a) Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by Seller of this Agreement and the Bill of Sale, the consummation by Seller of the Sale transaction contemplated herein, and the performance of its obligations hereunder, have been and, in the case of documents required to be delivered at the Closing, will be, as of the Closing Date duly authorized and approved by all necessary corporate action of Seller and no other corporate proceeding on the part of Seller is necessary to authorize such execution delivery and performance.

(b) Subject to requisite Bankruptcy Court approval and except as set forth on Schedule 2.2(b), the execution and delivery by Seller of this Agreement, the Bill of Sale, and the

4

consummation of the Sale transaction contemplated hereby will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any of the provisions of: (i) the certificate of incorporation, bylaws or similar governance documents of Seller; (ii) any agreement or permit to which Seller is a party or by which any of its properties or assets are bound; (iii) any order of any Governmental Authority applicable to Seller or any of its properties or assets of; or (iv) any applicable law.

2.3     Conveyance.  Upon Closing, Seller shall convey to Buyer all of Seller's interest in and to the Assets, free and clear of all Liens, claims interests and encumbrances as set forth in the Sale Order pursuant to a Bill of Sale.  Seller has not sold, transferred, subordinated, or otherwise assigned the Assets or entered into any agreement providing therefore except this Agreement.

2.4     Accounts Receivable Balance.  The balance of the Accounts on the books and records of Seller as of June 29, 2018 is $499,310.97.

2.5     No Conflict.  The consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with or result in a breach of the terms, conditions or provisions of any order of any court or other agency of government to which Seller is subject, or the certificate of incorporation or similar governance documents of Seller.

2.6     Title to Assets; Sufficiency.  Seller owns and has good and marketable title to all of the Assets and, at Closing, Buyer will be vested with good and indefeasible title to such Assets free and clear of all Liens, claims, interests and encumbrances.  Seller sells, assigns, transfers and conveys the Purchased Assets to Buyer on an "AS IS" and "WHERE IS" basis, with no representations or warranties as to merchantability, fitness or use.  With the exception of certain intellectual property (including trademarks) and domain name and website which are owned by Double Diamond Distribution, Ltd. and Steven Mann, respectively, the Assets constitute all of the properties used in or held for use in the Business and are sufficient for Buyer to conduct the business from and after the Closing Date without interruption and in the Ordinary Course of Business as it has been conducted by Seller.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

3.1     Organization, Standing and Power.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the requisite power and authority to carry on its business as now being conducted and to effect the Sale transaction contemplated hereunder.

5

3.2 Authorization.

(a) Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by Buyer of this Agreement and the Bill of Sale, the consummation by Buyer of the Sale transaction contemplated herein, and the performance of its obligations hereunder, have been and, in the case of documents required to be delivered at the Closing, will be, as of the Closing Date duly authorized and approved by all necessary corporate action of Buyer.

(b) Subject to requisite Bankruptcy Court approval, the execution and delivery by Buyer of this Agreement, the Bill of Sale, and the consummation of the Sale transaction contemplated hereby will not, conflict with any of the provisions of the certificate of incorporation or similar governance documents of Buyer.

3.3 Consents and Approvals. Except for the consents, approvals or authorizations of, or declarations, filings, or registrations with the Bankruptcy Court, including obtaining Bankruptcy Court approval for the transaction contemplated under this Agreement, no consent of or filing with any other entity or individual must be obtained in connection with the execution and delivery of this Agreement, the Bill of Sale, or the documents necessary to consummate the Sale transaction contemplated by this Agreement.

3.4 Brokers. Except for the compensation to Three Twenty-One Capital Partners, LLC, Seller's investment banker, to be paid by Seller, as such compensation may be approved by the Bankruptcy Court, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Sale transaction contemplated by this Agreement

3.5 Good Faith. The Sale transaction contemplated by this Agreement has been achieved in good faith, at arms-length, and with no fraud or collusion by any of the Parties; therefore the Sale transaction is entitled to a finding of good faith under 11 U.S.C. § 363(m).

## ARTICLE IV

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES; AS IS SALE

4.1 Conditions to Each Party's Obligations. The respective obligations of each of the Parties to effect the Sale transaction contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following conditions (any or all of which may be waived by such Parties in whole or in part to the extent permitted by applicable law):

(a) Order Permitting Transactions. Prior to the Closing Date, the Bankruptcy Court shall have entered an Order approving the sale, authorizing Seller to sell and assign to Buyer the Assets, in form and substance acceptable to Buyer and Seller and no court or other governmental entity having jurisdiction over Seller or Buyer having issued or entered any Order, decree, or injunction (whether temporary, preliminary or permanent) then in effect to stay or otherwise enjoin the Sale transaction contemplated by this Agreement, and such order shall be final and non-appealable; and

(b) <u>Transfer Document</u>.  On the Closing Date, Buyer and Seller shall each execute and deliver to each other, duplicate originals of the Bill of Sale.

4.2 <u>Conditions to Obligation of Seller</u>.  The obligation of Seller to effect the Sale transaction contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable law):

(a) <u>Purchase Price Payment</u>.  Seller's receipt of the Purchase Price in immediately available funds to U.S.A. Dawgs, Inc.'s Debtor in Possession Account, held at Wells Fargo Bank, account number ending in 8118 pursuant to wire instructions set forth on Schedule 4.2(a).

(b) <u>Performance of Obligations; Representations and Warranties</u>.  Buyer shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date and each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

4.3 <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to effect the Sale transaction contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conjunctive conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable law):

(a) <u>Performance of Obligations; Representations and Warranties</u>.  Seller shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, and each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date;

(b) <u>Compliance with Orders</u>.  Seller shall have provided the requisite notice required by the Bidding Procedures Order and having conducted the Auction pursuant to same, and all objections filed or received in response thereto having been otherwise resolved prior to the Closing Date;

(c) <u>Approval Order</u>.  The Order approving this Agreement (the Sale Order), when presented to and as entered by the Bankruptcy Court, shall be in form and substance satisfactory to Buyer and Seller.

4.4 <u>As is Where is Sale</u>.  **BUYER IS PURCHASING THE ASSETS AS IS, WHERE IS, WITHOUT REPRESENTATION, WARRANTY, OR RECOURSE. WITHOUT LIMITING THE FOREGOING, ALL IMPLIED OR EXPRESS WARRANTIES ARISING UNDER THE UNIFORM COMMERCIAL CODE OR UNDER ANY OTHER APPLICABLE LAW INCLUDING THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED BY**

7

**SELLER IN THEIR ENTIRETY.  BUYER HAS NOT RECEIVED, NOR HAS IT RELIED UPON, ANY REPRESENTATIONS OR WARRANTIES FROM THE SELLER OR ANY THIRD PARTIES CONCERNING THE ASSETS.  BUYER HAS CONDUCTED ITS OWN DUE DILIGENCE CONCERNING THE VALUE AND CONDITION OF THE ASSETS, AND ENTERS INTO THIS AGREEMENT UNDERSTANDING AND APPRECIATING THAT THIS IS AN AS IS, WHERE IS SALE.**

## ARTICLE V

## ADDITIONAL AGREEMENTS

5.1    Consents.  Seller will use its reasonable best efforts, and Buyer will cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required by this Agreement, including the consents and approvals set forth on Schedule 2.2(b).

5.2    Access to Information; Confidentiality.

(a)    Prior to the Closing Date, Buyer will be entitled, through its officers, employees, consultants and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of Seller's business and such examination of the books and records of such business and the Assets as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination will be conducted upon reasonable advance notice during regular business hours and under other reasonable circumstances and will be subject to restrictions under applicable law. Following the Closing, Seller shall provide Buyer with reasonable access to all records and other documents in the custody, possession and control of Seller and permit Buyer to inspect and, at Buyer's expense, copy such documents.

(b)    From and after the date of this Agreement, Seller shall, and shall cause its affiliates and representatives to keep confidential and not use any non-public information in such person or entity's possession (other than information which was or becomes available to Seller on a non-confidential basis from a source other than Buyer) relating to Buyer, its affiliates, the Assets or Seller's business prior to the Closing.

5.3    Conduct of the Business Pending the Closing.  During the period from the date of this Agreement to and through the Closing Date, Seller will (a) conduct its business only in the Ordinary Course of Business and (b) use its commercially reasonable efforts to (i) preserve the present business operations, organization and goodwill of Seller's Business and (ii) preserve the present relationships with customers and suppliers of Seller's business.

8

## ARTICLE VI

## GENERAL PROVISIONS

6.1     Survival of Representations and Warranties.  The representations and warranties set forth in this Agreement or in any Schedule or Exhibit thereto shall survive the Closing for a period of ninety (90) days following the Closing Date.

6.2     Expenses.  Each Party shall pay its own expenses incident to this Agreement and the Sale transaction hereby contemplated.

6.3     Notices.  Any notice, communication, request, reply or advice hereunder (a "Notice") shall be in writing and shall be delivered by a reputable overnight commercial courier service with next business day delivery, by hand delivery.  Notice shall be deemed given on the earlier of the first business day following the date sent by such overnight commercial courier service or upon receipt. For purposes of Notice, the addresses of the Parties shall be as follows:

Seller:     U.S.A. Dawgs, Inc.
            Attn: Steven Mann
            4120 West Windmill Lane Suite 106
            Las Vegas. NV 89139

            **and**

            _____
            _____
            _____
            _____

Buyer:      Dawgs Holdings LLC
            c/o Optimal Investment Group, Inc.
            15303 Ventura Blvd. #900
            Sherman Oaks, CA 91403
            Attention: Joey Separzadeh

            a**nd**

            Winston & Strawn LLP
            333 S. Grand Avenue
            Los Angeles, CA 90071
            Attention: Saul Rostamian

6.4     Section and Other Headings.  Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9

AmericasActive:12311230.7

6.5 <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement. If any provision of this Agreement should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

6.6 <u>Entire Agreement</u>.  This Agreement (including the Schedules and the Exhibit hereto) constitutes the sole and entire agreement of the Parties with respect to the Sale transaction for purchase of the Assets and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to same.  In the event of any inconsistency between the statements in this Agreement and otherwise, the language of this Agreement controls.

6.7 <u>Schedules and Exhibits</u>.  Each Schedule and Exhibit hereto shall be deemed to be a part of this Agreement to the same extent as if set forth verbatim in the body of this Agreement.

6.8 <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns; nothing herein, express or implied, is intended to or shall confer upon any other entity or individual any legal or equitable benefit, claim, cause of action, remedy, or right of any kind.

6.9 <u>Governing Law; Jurisdiction</u>.

(a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Nevada.

(b) THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA FOR ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

6.10 <u>Counterparts; Electronic Signature</u>.  This Agreement may be executed in counterparts, and each such counterpart shall be deemed an original and all such counterparts shall constitute one and the same instrument.. This Agreement may be executed by facsimile or other electronic signature any such signature shall be of the same force and effect as an original signature.

6.11 <u>Further Assurances</u>.  Following the Closing, the Parties shall execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Buyer or the Seller in order to fully consummate the Sale transaction contemplated hereby, subject to Bankruptcy Court approval as needed.

6.12 <u>Successors and Assigns; Amendments</u>.  Buyer shall have the right to assign to any affiliate or affiliates (each an "Assignee" any of its rights or obligations (including the right to acquire any of the Assets) and may require any such Assignee to pay all or a portion of the Purchase Price.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

**[SIGNATURES ON NEXT PAGE]**

AmericasActive:12311230.7

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set forth above.

**BUYER:**
**DAWGS HOLDINGS LLC**

By: _____

Name: _____

Title: _____


**SELLER:**
**U.S.A. DAWGS, INC.**

By: _____

Name: _____

Title: _____

## SCHEDULE A
## [ACCOUNTS RECEIVABLE SCHEDULE]

AmericasActive:12311230.7

## SCHEDULE B

## [ASSETS DESCRIPTION]

(a) Accounts;

(b) Chattel Paper;

(c) Claims;

(d) Deposit Accounts;

(e) Documents;

(f) Electronic Chattel Paper;

(g) Equipment;

(h) Fixtures;

(i) General Intangibles;

(j) Goods;

(k) Instruments;

(l) Inventory;

(m) Investment Property;

(n) Letter-of-Credit Rights;

(o) Payment Intangibles;

(p) Promissory Notes;

(q) Software;

(r) Tangible Chattel Paper;

(s) Securities (whether certificated or uncertificated);

(t) all Cash monies received by the Debtor after July 4, 2018; *provided*, however, for sake of clarity, notwithstanding anything to the contrary in this Exhibit B or in the Agreement, Assets shall not include the $30,554.17 in the Debtor's account as of July 4, 2018.

(u) warehouse receipts;

      (v)      tax and duty refunds;

      (w)      Intellectual Property;

      (x)      all present and future books and records relating to any of the foregoing including, without limitation, all present and future books of account of every kind or nature purchase and sale agreements, invoices, ledger cards, bills of lading, and other shipping evidence, statements, correspondence, memoranda, credit files, and other data relating to the Assets or any account debtor; together with the tapes, disks, diskettes, and other data and software storage media and devices, file cabinets, or containers in or on which the foregoing are stored (including any rights of Seller with respect to any of the foregoing maintained with or by any other person or entity);

      (y)      the following agreements to which the Seller is party: (i) Receivables Insurance Policy with Atradius Trade Crit Insurance, Inc.  Cure amount - $0, (ii) Commercial Insurance Policy with Capri Insurance Services, Ltd.  Cure amount - $0, (iii) Software subscription with Nextpoint, Inc.  Cure amount - $3,763.50 and (iv) Insurance contract with Anthem Blue Cross and Blue Shield.  Cure amount - $0.00 (collectively, the "**Assumed Contracts**");

      (z)      all non-cash assets owned by Seller and not included in (a) through (y) foregoing; and

      (aa)      Any and all products and proceeds of the foregoing.

Capitalized terms used in this Schedule B and not otherwise defined herein or in the Agreement shall have the following meanings:

"**Account Debtor**" or "**account debtor**" has the meaning ascribed to such term in the UCC.

"**Accounts**" or "**accounts**" means "accounts" as defined in the UCC, and, in addition, any and all obligations of any kind at any time due and/or owing to Seller, whether now existing or hereafter arising, and all rights of Seller to receive payment or any other consideration including, without limitation, invoices, contract rights, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments and all other debts, obligations and liabilities in whatever form owing to Seller from any Person, Governmental Authority or any other entity, all security therefor, and all of Seller's rights to receive payments for goods sold (whether delivered, undelivered, in transit or returned) or services rendered, which may be represented thereby, or with respect thereto, including, but not limited to, all rights as an unpaid vendor (including stoppage in transit, replevin or reclamation), and all additional amounts due from any Account Debtor, whether or not invoiced, together with all Proceeds and products of any and all of the foregoing.

"**Avoidance Actions**" shall mean claims and causes of action under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548 and 550, or any other similar state or federal law, and the proceeds thereof.

"**Chattel Paper**" has the meaning ascribed to such term in the UCC.

"**Claims**" means all of Seller's claims arising from facts and circumstances which occurred prior to the Closing, including without limitation (i) Commercial Tort Claims (as defined in the UCC) and the claims added to the definition of Commercial Tort Claim in the Loan and Security Agreement pursuant to that certain Amendment Number 8 to the Loan and Security Agreement and to the Loan Agreement Schedule, between Seller and GemCap Lending I, LLC ("GemCap"), dated effective as of August 17, 2017,  (ii) all Avoidance Actions of the Debtor and (iii) the Adversary Action against GemCap and any claims, if any, against GemCap.  A true and correct copy of the Loan and Security Agreement with all eight amendments thereto is attached as Exhibit "A" to the Declaration of Richard Ellis on file with the Bankruptcy Court at Docket No. 30-1.

"**Deposit Accounts**" has the meaning ascribed to such term in the UCC.

"**Document**" or "document" has the meaning ascribed to such term in the UCC.

"**Electronic Chattel Paper**" has the meaning ascribed to such term in the UCC.

"**Equipment**" means "equipment", as such term is defined in the UCC, now owned or hereafter acquired by Seller, wherever located, and shall include, without limitation, all equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and Seller's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories thereof or thereto, and all substitutions and replacements therefor.

"**Fixtures**" has the meaning ascribed to such term in the UCC.

"**General Intangibles**" has the meaning ascribed to such term in the UCC.

"**Goods**" has the meaning ascribed to such term in the UCC.

"**Governmental Authority**" or "**Governmental Authorities**" means any federal, state, county or municipal governmental agency, department, instrumentality, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Instruments**" has the meaning ascribed to such term in the UCC.

"**Intellectual Property**" means all of the intellectual property owned or licensed by Seller including without limitation: (a) inventions, processes, techniques, discoveries, developments and related improvements, whether or not patentable; (b) United States patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, of any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) unregistered, United States registered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol and any foreign or international equivalent of any of the foregoing and all

goodwill associated therewith; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Seller; (f) copyrights; (g) work for hire; (h) customer and mailing lists; and (i) any and all rights of the Seller to the names "USA DAWGS," "DAWGS," "DAWGS GOLF," "DOGGERS," "SNAPPY SOCKS" or any derivation thereof (collectively, the "Names"), and Seller's entire customer list and database and all assets used or useful in the conduct of its business over the internet or in any electronic medium, including any websites, URLS or domain names owned by Seller.  For the avoidance of doubt, Buyer acknowledges that certain intellectual property (including trademarks and the Names) and the domain name and website are owned by Double Diamond Distribution, Ltd. and Steven Mann, respectively, and such intellectual property, domain name, and website are not being transferred pursuant to this Agreement.

"**Inventory**" means "inventory," as such term is defined in the UCC, now owned or hereafter acquired by Seller, wherever located, and, in any event, shall include, without limitation, all raw materials, work-in-process, finished and semi-finished Inventory including, without limitation, all materials, parts, components and supplies relating to the manufacture or assembly thereof, packaging and shipping supplies relating thereto, and all other inventory, merchandise, goods and other personal property now or hereafter owned by Seller, which are held for sale, exchange or lease or are furnished or are to be furnished under a contract of service or an exchange arrangement or which constitute raw materials, work-in-process or materials used or consumed or to be used or consumed in Seller's business, or the processing, packaging, delivery or shipping of the same, and all finished goods and the products of the foregoing, whatever form and wherever located; and all names or marks affixed to or to be affixed thereto for purposes of selling same by the seller, manufacturer, lessor or licensor thereof and all right, title and interest of Seller therein and thereto.

"**Investment Property**" has the meaning ascribed to such term in the UCC.

"**Letter-of-Credit Rights**" means "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not the beneficiary thereof has demanded or is entitled to demand payment or performance.

"**Payment Intangibles**" has the meaning ascribed to such term in the UCC.

"**Promissory Note**" has the meaning ascribed to such term in the UCC.

"**Securities**" has the meaning ascribed to such term in the UCC.

"**Software**" has the meaning ascribed to such term in the UCC.

"**Tangible Chattel Paper**" has the meaning ascribed to such term in the UCC.

"**UCC**" means the Uniform Commercial Code as presently enacted in Nevada (or any successor legislation thereto), and as the same may be amended from time to time, and the state counterparts thereof as may be enacted in such states or jurisdictions where any of the Assets are located or held.

## EXHIBIT A

## BILL OF SALE

**KNOW ALL PERSON BY THESE PRESENTS,**

THAT on January 31, 2018, U.S.A. Dawgs, Inc., a Nevada Corporation ("Seller"), commenced a case under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 – 1532) by filing a voluntary petition in the United States Bankruptcy Court for the District of Nevada (Bankruptcy Case No. 18-10453-LEB); and

THAT on June 29, 2018, Seller held a public auction (the "Auction") of the Assets (as that term is defined in the Asset Purchase Agreement between Seller and Buyer signed June 29, 2018 (the "Agreement"); and

THAT for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller, by these presents does hereby sell, grant, and convey unto Dawgs Holdings LLC, a Delaware limited liability company, and its successors and assigns,  ("Buyer") as successful bidder at the Auction, for and in consideration of the sum of Three Million Two Hundred and Fifty Thousand Dollars ($3,250,000) in lawful currency of the United States, the receipt and sufficiency of which is hereby acknowledged, all of Seller's right, title and interest in and to all of the Assets, **AS IS, WHERE IS, WITHOUT REPRESENTATION, WARRANTY (EXCEPT TO THE EXTENT EXPRESSLY SET FORTH HEREIN OR IN THE AGREEMENT), OR WITHOUT RECOURSE.  WITHOUT LIMITING THE FOREGOING, ALL IMPLIED OR EXPRESS WARRANTIES ARISING UNDER THE UNIFORM COMMERCIAL CODE OR UNDER ANY OTHER APPLICABLE LAW INCLUDING THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED BY SELLER IN THEIR ENTIRETY.  BUYER HAS NOT RECEIVED, NOR HAS IT RELIED UPON, ANY REPRESENTATIONS OR WARRANTIES FROM THE SELLER OR ANY THIRD PARTIES CONCERNING THE ASSETS. BUYER HAS CONDUCTED ITS OWN DUE DILIGENCE CONCERNING THE VALUE AND CONDITION OF THE ASSETS, AND ENTERS INTO THIS AGREEMENT UNDERSTANDING AND APPRECIATING THAT THIS IS AN AS IS, WHERE IS SALE.**

**TO HAVE AND TO HOLD** the same unto Buyer, and its heirs, executors, administrators, successors and assigns thereof forever.

Buyer hereby accepts the Assets in accordance with this Bill of Sale and the Agreement.

**IN WITNESS WHEREOF,** this Bill of Sale has been duly executed effective as of this 29th day of June 2018.

**SELLER:**
**U.S.A. DAWGS, INC.**

By: _____

Name: _____

Title: _____

AmericasActive:12311230.7

**BUYER:**
**DAWGS HOLDINGS LLC**

By:_____

Name:_____

Title:_____

AmericasActive:12311230.7